**No. 2023-2218, -2220, -2221**

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

IN RE: ENTRESTO (SACUBITRIL/VALSARTAN)

---

NOVARTIS PHARMACEUTICALS CORPORATION, *PLAINTIFF-APPELLANT*

v.

TORRENT PHARMA INC., TORRENT PHARMACEUTICALS LTD., *DEFENDANTS*

---

NOVARTIS PHARMACEUTICALS CORPORATION, *PLAINTIFF-APPELLANT*

v.

ALEMBIC PHARMACEUTICALS LIMITED, ALEMBIC PHARMACEUTICALS INC., *DEFENDANTS*

---

NOVARTIS PHARMACEUTICALS CORPORATION, *PLAINTIFF-APPELLANT*

v.

MSN PHARMACEUTICALS, INC., MSN LABORATORIES PRIVATE LTD., MSN LIFE SCIENCES PRIVATE LTD., *DEFENDANTS-APPELLEES*

HETERO USA, INC., HETERO LABS LIMITED, HETERO LABS LIMITED UNIT-III, *DEFENDANTS*

---

Appeals from the United States District Court for the District of Delaware, Nos. 1:19-cv-01979-RGA, 1:19-cv-02021-RGA, 1:19-cv-02053-RGA, and 1:20-md-02930-RGA, Judge Richard G. Andrews

---

## MSN'S OPPOSITION TO EMERGENCY COMBINED MOTION FOR RECONSIDERATION AND PETITION FOR *EN BANC* REHEARING AND MOTION TO EXPEDITE

---

Dated: January 17, 2025

Ronald M. Daignault*
Richard Juang*
DAIGNAULT IYER LLP
8229 Boone Boulevard, Ste 450
Vienna, VA 22182
(917) 838-9795
*Not admitted in Virginia

William A. Rakoczy
Kevin E. Warner
Rakoczy Molino Mazzochi Siwik LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60654
(312) 527-2157

*Counsel for Defendants-Appellees MSN Pharmaceuticals Inc.,*
*MSN Laboratories Private Limited, and MSN Life Sciences Private Ltd.*

## CERTIFICATE OF INTEREST FOR DEFENDANTS-APPELLEES

Pursuant to Federal Circuit Rules 27(a)(7) and 47.4, counsel for Defendants-Appellees certifies the following:

**1.** **Represented Entities.** Fed. Cir. R. 47.4(a)(1).  Provide the full names of all entities represented by undersigned counsel in this case.

> MSN Pharmaceuticals Inc., MSN Laboratories Private Limited, and MSN Life Sciences Private Ltd.

**2.** **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2).  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

> N/A

**3.** **Parent Corporations and Stockholders**.  Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

> N/A

**4.** **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

> Stamatios Stamoulis, Stamoulis & Weinblatt

**5.** **Related Cases.** Whether there are any related or prior cases, other than the originating case number(s), that meet the criteria under Federal Circuit Rule 47.5. Fed. Cir. R. 47.4(a)(5).

> Yes, see separately filed notice

**6.** Required disclosure of information under Fed. R. App. P. 26.1(b) and 26.1(c).  Fed. Cir. R. 47.4(a)(6).

> N/A

Dated:  January 17, 2025

Respectfully submitted,

/s/ William A. Rakoczy
Ronald M. Daignault*
Richard Juang*
DAIGNAULT IYER LLP
8229 Boone Boulevard, Ste 450
Vienna, VA 22182
(917) 838-9795
*Not admitted in Virginia

William A. Rakoczy
Kevin E. Warner
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60654
(312) 527-2157

*Counsel for Defendants-Appellees MSN
Pharmaceuticals Inc., MSN Laboratories
Private Limited, and MSN Life Sciences
Private Ltd.*

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   ARGUMENT.......................................................................................7

    A.    No Facts Have Changed Relevant to Novartis's Alleged
        Entitlement to Pediatric Exclusivity......................................................7

    B.    Denying Injunctive Relief Is Consistent with *In re Omeprazole*..........9

    C.    Novartis Has Not Met the Standards for Obtaining Any Further
        Injunctive Relief. ................................................................................12

        1.    No Likelihood of Success on the Merits...................................13

        2.    No Irreparable Harm. ...............................................................18

        3.    Denying Novartis's Motion Is in the Public Interest. ...............21

III.  CONCLUSION..................................................................................22

## TABLE OF AUTHORITIES

### Cases

*Agostini v. Felton,*
    521 U.S. 203 (1997) ........................................................................17

*AstraZeneca AB v. Apotex Corp.,*
    782 F.3d 1324 (Fed. Cir. 2015) ........................................... 10, 11, 19

*Blazer v. Best Bee Bros. LLC,*
    No. 2022-1033, 2022 WL 16954848 (Fed. Cir. Nov. 16, 2022) ........................17

*Endo Par Innovation Co. v. Becerra,*
    No. 24-cv-999 (TJK), 2024 WL 2988904 (D.D.C. June 10, 2024) ....................19

*Globetrotter Software, Inc. v. Elan Computer Grp., Inc.,*
    236 F.3d 1363 (Fed. Cir. 2001) ........................................................17

*Harsco Corp. v. Zlotnicki,*
    779 F.2d 906 (3d Cir. 1985) ............................................................7

*Horne v. Flores,*
    557 U.S. 433 (2009) ......................................................................16

*In re Entresto (Sacubitril/Valsartan) Pat. Litig.,*
    No. 19-cv-2053-RGA, 2024 WL 3757086 (D. Del. Aug. 12, 2024) ..............6, 21

*In re Entresto (Sacubitril/Valsartan) Pat. Litig.,*
    No. 20-md-2930-LPS, 2021 WL 2856683 (D. Del. July 8, 2021) ....................16

*In re Omeprazole Patent Litigation,*
    536 F.3d 1361 (Fed. Cir. 2008) ......................................................2, 10

*Key Pharms. v. Hercon Laby's Corp.,*
    161 F.3d 709 (Fed. Cir. 1998) ..........................................................14

*Laitram Corp. v. NEC Corp.,*
    163 F.3d 1342 (Fed. Cir. 1998) ........................................................17

*Markman v. Westview Instruments, Inc.,*
    517 U.S. 370 (1996) ......................................................................17

*Mylan Lab'ys, Inc. v. Leavitt,*
   495 F. Supp. 2d 43 (D.D.C. 2007) ....................................................15

*Novartis Pharms. Corp. v. Becerra,*
   No. 24-cv-02234 (DLF), 2024 WL 3823270 (D.D.C. Aug. 13, 2024) ..............20

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
   449 F. App'x 923 (Fed. Cir. 2011) ....................................................13

*Pharmacia & Upjohn Co. v. Ranbaxy Pharms. Inc.,*
   274 F. Supp. 2d 597 (D.N.J. 2003) ...............................................6, 22

*Pharmacia & Upjohn Co. v. Ranbaxy Pharms. Inc.,*
   85 F. App'x 205 (Fed. Cir. 2003) .....................................................6

*Rufo v. Inmates of Suffolk Cnty. Jail,*
   502 U.S. 367 (1992) .....................................................................16

*SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n,*
   718 F.2d 365 (Fed. Cir. 1983) ..........................................................4

*Teva Branded Pharmaceutical Products R&D, Inc. v. Amneal*
   *Pharmaceuticals of New York, LLC,*
   No. 2024-1936, 124 F.4th 898 (Fed. Cir. 2024) ........................ 5, 9, 14

*Teva Pharms. USA, Inc. v. Sandoz, Inc.,*
   572 U.S. 1301 (2014) ...................................................................12

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .......................................................................12

## Statutes

21 U.S.C. § 355a(b)(1)(B) ........................................................... 8, 14, 18

35 U.S.C. § 271(e)(4)(A) ................................................................ passim

## Rules

Fed. Cir. IOP #13 .............................................................................7

FED. R. CIV. P. 15(b)(2) ...................................................................15

FED. CIR. R. 27 .....................................................................................1

FED. R. CIV. P. 60(b) ................................................................ 16, 18

Fed. R. App. P. 8 ................................................................... passim

Novartis does not meet the heavy burden required for granting its Rule 27 motion for reconsideration and/or rehearing of its dismissed Rule 8 motion to enjoin MSN from launching its FDA-approved generic product. ECF115. Novartis's motion should be denied and the January 16, 2025 temporary injunction immediately lifted. ECF 119.

## I.    INTRODUCTION

Novartis gets ahead of itself with its present motion. Whether Novartis is even entitled to pediatric exclusivity under §271(e)(4)(A) is an open and unresolved issue. MSN has the right to challenge Novartis's request for pediatric exclusivity in the district court once the mandate issues, which it has not done. Indeed, contrary to Novartis's thinking, pediatric exclusivity does *not* become operative automatically at this stage of the case where MSN already has final approval, no mandate has issued while MSN's pursues rights still available to it in this Court, and, importantly, no district court has issued an order under 35 U.S.C. § 271(e)(4)(A) that the effective date of MSN's final approval should be modified.

Thus, Novartis is not really asking for an injunction pending appeal under Rule 8. Novartis already benefitted from the Court's August 14, 2024 injunction (ECF65), which this Court rightly lifted upon issuance of its January 10, 2025 decision on the merits of the appeal. ECF109. Instead, Novartis is asking for what is essentially a new injunction based on its alleged entitlement to a post-patent-

expiration regulatory exclusivity. This Court, however, already considered Novartis's arguments and claims of harm when it denied Novartis's motion for clarification or modification of the August 14, 2024 stay. ECF105 at 1-2; ECF109. Novartis then tried again in the early morning of Saturday, January 11, when it asked this Court to immediately issue the mandate. ECF110. Novartis argued that refusing to issue an immediate mandate "could allow MSN to launch during Novartis's earned pediatric exclusivity period, as MSN has made clear it intends to do." *Id*. at 2. But the Court nonetheless properly denied that relief after hearing from MSN. ECF 114. *No facts* have since changed with respect to Novartis's alleged pediatric exclusivity or MSN's launch intentions. Thus, there is no basis in fact to reconsider or grant rehearing related to Novartis's previously-denied Rule 8 motion seeking injunctive relief through July 15, 2025.

Under the notion that the Court supposedly misapprehended *In re Omeprazole Patent Litigation*, 536 F.3d 1361 (Fed. Cir. 2008), Novartis is asking for the core relief under §271(e)(4)(A) from this Court when it is the district court at some point in the future that will in the first instance find whether Novartis is even entitled to that relief and a re-setting of MSN's final approval. This Court's denial of Novartis's motion for clarification or modification of the Court's Rule 8 injunction was *not* contrary to *Omeprazole*. Instead, Novartis's entire argument is premised on a mistaken assumption that under the statute it is automatically entitled to six months

of pediatric exclusivity from this Court at this stage in the proceedings before the Court has issued its mandate. ECF115 at 2. Novartis says it won the appeal, the '659 patent is valid, MSN stipulated to infringement and because relief under § 271(e)(4)(A) is supposedly mandatory, this Court should enjoin MSN in the normal course. ECF 115 at 1-2.

But that is not correct and is not the proper procedure in determining whether Novartis is entitled to pediatric exclusivity in the first instance. Aside from its bare pronouncement that it prevailed on appeal, Novartis does *not* address *at all* its supposed likelihood of receiving a six-month pediatric exclusivity.

Nor is there any basis under *Omeprazole* for automatically re-imposing injunctive relief. In fact, Novartis already relied on *Omeprazole* in its failed motion to clarify (ECF105 at 3-5) and in its failed motion to expedite issuance of the mandate (ECF110 at 2). This Court, however, did not misapprehend or misapply *Omeprazole*, as Novartis contends. *Omeprazole* does not help Novartis because it confirms that an alleged entitlement to a pediatric exclusivity period does not automatically arise and immediately entitle a patentee to block generic competition. As explained further below, the generic product in *Omeprazole* was on the market for *over two months after* expiration of the valid patent and well into the pediatric exclusivity period, while the patentee pressed its rights in court. *Infra*, § II.B.

MSN should be treated no differently. MSN has rights to pursue now in this Court. MSN's hard-earned FDA approval should not be nullified until this Court issues a mandate and until the district court finds whether it is proper to enter relief under § 271(e)(4)(A). As the D.C. District Court held earlier this week when denying another of Novartis's failed attempts to block MSN: "Absent the issuance of the Federal Circuit's mandate, the Delaware court's order finding the '659 patent invalid remains in effect." Add12 at 12:7-9[1]; *see also SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 370 (Fed. Cir. 1983) ("[T]he law is well settled that the pendency of an appeal has no affect on the finality or binding effect of a trial court's holding . . . [including as] to holdings of patent invalidity.") (citations omitted).

The Court should also deny Novartis's relief because, again, Novartis does not meet the standards for obtaining injunctive relief:

***No Likelihood of Success***. Novartis is not likely to succeed on the merits of its appeal because under any outcome going forward, the result is no pediatric exclusivity. MSN may prevail on a petition for rehearing and the patent would remain invalid. Further, this Court has held the '659 patent does not claim sacubitril/valsartan complexes as a matter of law. ECF106 at 14 n.5. Based on that clear holding, MSN's ANDA product does not infringe the '659 patent and the

---

[1] "Add_" citations are to the addendum here. "D.Ct.Dkt._" citations are to the docket in *In re: Entresto (Sacubitril/Valsartan) Patent Litigation*, No. 1:20-md-02930-RGA (D. Del.).

judgment against MSN must be vacated. And because the '659 patent does not claim complexes as a matter of law, it does not claim the complexes in Novartis's Entresto® product, and thus the '659 patent should be delisted from the Orange Book in view of the Court's recent decision in *Teva Branded Pharmaceutical Products R&D, Inc. v. Amneal Pharmaceuticals of New York, LLC*, No. 2024-1936, 124 F.4th 898, 912 (Fed. Cir. 2024).

*No Irreparable Harm*. Novartis has not (and cannot) show that it will be irreparably harmed absent injunctive relief. Now that the '659 patent has expired, Novartis's assertions of irreparable harm are even further lacking. The only purported harm—*i.e.*, economic losses that may be sustained if MSN is allowed to launch during Novartis's possible pediatric exclusivity period—are not cognizable damages by Novartis's own admission. The D.C. District Court held similarly earlier this week, concluding: "Novartis also asserts it will suffer irreparable harm from economic losses as well as the loss of a statutory entitlement [following an MSN launch]. The Court disagrees. . . . Novartis will not suffer anything more than ordinary economic losses." Add10-12 at 10:8-10, 12:18-19.

*The Public Interest*. Novartis's requested injunction runs counter to the public interest. The public benefits directly by the availability of lower cost generics. Further, any public interest argument based on the importance of the patent system is moot now that the '659 patent has expired. Again, the D.C. District Court agreed

with respect to MSN's proposed generic product: "Where a generic manufacturer met all relevant safety and approval standards, there is a clear public interest in receiving generic competition to brand-name drugs as soon as possible." Add12 at 12:21-24; *see also Pharmacia & Upjohn Co. v. Ranbaxy Pharms. Inc.*, 274 F. Supp. 2d 597, 614 (D.N.J. 2003) ("[T]he public has an interest in receiving the benefit of ANDA-approved generic drugs as soon as those products can lawfully come to market."), *aff'd in relevant part*, 85 F. App'x 205 (Fed. Cir. 2003).

***The Balance of Hardships****.* The '659 patent has expired, and along with it, Novartis's rights under this patent to exclude MSN from marketing a generic version of Entresto®. The district court recognized MSN's right to commercialize its product. *In re Entresto (Sacubitril/Valsartan) Pat. Litig.*, No. 19-cv-2053-RGA, 2024 WL 3757086, at *5 (D. Del. Aug. 12, 2024). If MSN is not permitted to capitalize on the significant investments it made to prepare for launch, particularly now that the '659 patent has expired, and Novartis cannot show that it is even entitled to pediatric exclusivity from this Court at this stage in the proceedings, the hardship to MSN would be severe. In short, the balance of hardships factor clearly weighs in MSN's favor.

Novartis has filed a flurry of eleventh-hour motions over the last week to maintain market exclusivity after the '659 patent expires. It has proceeded in Delaware, the D.C. District Court, the D.C. Circuit, and this Court. Every effort has

failed thus far. Enough is enough—the time for competition is now. This motion, too, must fail.

## II.    ARGUMENT

A motion for reconsideration is only proper "to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985).

Novartis does not even mention this standard in seeking relief. Nor does Novartis mention or try to meet any bases for rehearing *en banc*. *See* Fed. Cir. IOP #13. This is unsurprising, as its motion simply re-hashes old arguments the Court already (and correctly) considered. There is no new evidence to consider, and the Court did not err as a matter of law in denying Novartis's Rule 8 motion.

### A.    NO FACTS HAVE CHANGED RELEVANT TO NOVARTIS'S ALLEGED ENTITLEMENT TO PEDIATRIC EXCLUSIVITY.

As noted above, on January 9 and January 11, Novartis filed motions in this Court arguing that its alleged entitlement to pediatric exclusivity demands immediate relief that would result in blocking MSN's launch. The Court in both instances properly rejected Novartis's motions and refused its request to enter additional injunctive relief. *See supra*, § I. Despite the urgency of its tone, Novartis makes no new argument and cites no new facts in the current motion that warrant a different result. The Court's rulings denying additional injunctive relief are thus well founded in fact and law.

Pediatric exclusivity cannot attach to the end of the '659 patent term at least until "in the patent infringement litigation resulting from the [Paragraph IV] certification the court determines that the patent is valid and would be infringed." 21 U.S.C. § 355a(b)(1)(B)(ii). Although the panel issued its opinion last week reversing the district court's determination of invalidity (ECF106), that decision is far from final. The Court has not issued the mandate and, indeed, refused Novartis's request to issue it immediately in light of the pending patent expiration and Novartis's claimed entitlement to pediatric exclusivity. ECF109; ECF114. And the D.C. District Court agreed earlier this week: "Absent the issuance of the Federal Circuit's mandate, the Delaware court's order finding the '659 patent invalid remains in effect." Add12 at 12:7-9. Accordingly, pediatric exclusivity is not a *fait accompli* here and does not automatically attach to the '659 patent and reset MSN's approval just because Novartis claims that to be the case. MSN has rights still to pursue in this Court, and Novartis's request for further injunctive relief ignores that fact.

Novartis says it would have been entitled to an injunction based on pediatric exclusivity if the timing of the panel's opinion was earlier and the district court had "correctly entered judgment and a §271(e)(4)(A) order in July 2023." ECF115 at 13. Novartis is wrong and makes multiple assumptions to support its arguments, including that the Court will ultimately issue a mandate with the panel's decision undisturbed, that the infringement judgment entered by the district court will not be

8

vacated or modified, and that the district court would have issued an order to undo the final approval of MSN's ANDA.

In fact, if this Court had issued its decision earlier, MSN would not have stipulated to infringement because the Court found that the '659 patent "could not have been construed as claiming [sacubitril valsartan] complexes as a matter of law." ECF106 at 14 n.5. And MSN would then have requested leave to file a counterclaim ordering Novartis to delist the '659 patent from the Orange Book. Because the '659 patent does not "claim" complexes *as a matter of law*, Novartis cannot meet the statutory requirements to list the '659 patent in the Orange Book and it is not entitled to pediatric exclusivity. *See Teva*, 124 F.4th at 912.

The bottom line is that pediatric exclusivity does not apply at this time because MSN has final approval, no mandate has issued while MSN's pursues rights still available to it in this Court, and, importantly, no district court has issued an order under 35 U.S.C. § 271(e)(4)(A) that the effective date of MSN's final approval should be modified.

## B.    DENYING INJUNCTIVE RELIEF IS CONSISTENT WITH *IN RE OMEPRAZOLE*.

Novartis asserts that this Court's *Omeprazole* decision supports granting its motion. ECF 115 at 3, 10-14. Not so. Novartis did not even cite *Omeprazole* in its Rule 8 papers (ECF64; ECF71), which undercuts any argument that *Omeprazole* should serve as a basis for the Court to reconsider its order as to that motion.

Moreover, the procedure followed in *Omeprazole* reflects the rights MSN still has prior to a determination that pediatric exclusivity applies. The facts underlying *Omeprazole* are as follows:[2]

- ***In 2003-2004***, during the life of relevant patents, ANDA-filers lawfully launched their generic products. *See Omeprazole*, 536 F.3d at 1366 (Impax launched in September 2004); *AstraZeneca*, 782 F.3d at 1329 (Apotex launched in November 2003).

- ***On April 20, 2007***, the patents expired. *See Omeprazole*, 536 F.3d at 1367.

- ***On May 31, 2007***, during "second wave" litigation, the district court issued an opinion that the patents were valid and infringed. *Id.* at 1366; *AstraZeneca*, 782 F.3d at 1329.

- ***On June 18, 2007***, due to pediatric exclusivity vis-à-vis the relevant patents, the district court ordered, pursuant to § 271(e)(4)(A), that the effective approval date of the ANDAs be October 20, 2007—*i.e.*, six months after patent expiration. *See Omeprazole*, 536 F.3d at 1366; *AstraZeneca*, 782 F.3d at 1341; Judgment, *AstraZeneca AB v. Apotex Corp.*, No. 01-cv-9351-DLC (S.D.N.Y. June 18, 2007) (Dkt. No. 115).

---

[2] Both *Omeprazole* and *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324 (Fed. Cir. 2015), relate to the generic launch of omeprazole.

- ***On June 28, 2007***, FDA revoked approval of Apotex's ANDA, which required it to cease sales until expiration of the pediatric exclusivity period. *See AstraZeneca*, 782 F.3d at 1341.

Thus, the finally approved and launched products remained on the market with FDA approval from April 20 to June 28—all of which was during the "pediatric exclusivity" period.

Only if infringement and validity are decided in the patentee's favor and the *district court* orders § 271(e)(4)(A) relief can the FDA convert a generic's final approval to tentative approval (thus foreclosing further sales) for the remainder of the pediatric exclusivity period. Much remains before Novartis may be entitled to such relief, if at all. MSN currently anticipates petitioning the Court for *en banc* and panel review of its opinion. If the Court agrees with MSN, Novartis's request would be moot. If the Court disagrees with MSN, however, the mandate must issue for the district court to consider ordering § 271(e)(4)(A) relief. That relief is not a foregone conclusion, as discussed further below and as Novartis mistakenly assumes. *Infra*, § II.C.1. No case Novartis cites stands for the proposition that it is entitled to immediate court action that would preliminarily block MSN's lawful product launch while MSN pursues its rights in this Court. As such, the Court correctly lifted its previous injunction. ECF109.

As the FDA recently stated in connection with MSN's possible launch, the Hatch-Waxman Act strikes a balance between protecting the rights of brand drug manufacturers and promoting the speedy entry of generic competition. Sometimes, as FDA pointed out, this will mean that a generic goes to market while the brand manufacturer is still in the process of asserting its rights. That is not improper—it is part and parcel of the congressional design. Add32.

## C.    NOVARTIS HAS NOT MET THE STANDARDS FOR OBTAINING ANY FURTHER INJUNCTIVE RELIEF.

This Court's previous decisions denying Novartis's efforts to deprive MSN of its rights are also consistent with the principles governing equitable relief. The inquiry for an injunction pending appeal under Rule 8 employs the traditional four factors for injunctive relief, here: (1) Novartis's likelihood of success on the merits; (2) whether Novartis will be irreparably harmed absent relief; (3) whether an injunction would harm other parties, *i.e.*, the balance of equities; and (4) the effect on the public interest. *See, e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). If Novartis fails to carry its burden on *either* of the first two elements, no injunction may issue. *See, e.g.*, *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 572 U.S. 1301, 1301 (2014). The Court applied these factors correctly in denying Novartis's Rule 8 motion. Novartis's present motion for reconsideration provides no reason to change that outcome.

### 1.    No Likelihood of Success on the Merits.

**First**, as MSN explained in its opposition to Novartis's motion for immediate issuance of the mandate, MSN's initial assessment is that it will have a fully meritorious argument for rehearing. ECF112 at 4-5. Fundamentally, the Court's decision on MSN's written description defense relies on a perceived distinction between what the '659 patent *claims* and what the claims *cover*. *See* ECF106 at 12-14. That distinction cannot be correct, however, because it leads to the illogical result that Novartis did not describe or claim complexes, yet complexes nevertheless infringe the claims. *Id*. The Court in fact recognized this incongruity when it wrote: "Because valsartan-sacubitril complexes were undisputedly unknown at the time of the invention . . . the '659 patent *could not have been construed* as claiming those complexes *as a matter of law*." *Id*. at 14 n.5 (emphasis added). But it has been Novartis's position all along that the plain and ordinary construction of the '659 patent claims reads on sacubitril-valsartan complexes. In fact, during claim construction below, Novartis noted that it told the Patent Office in its submission for a patent term extension that the '659 patent claims cover Entresto®. D.Ct.Dkt.253 at 6. On appeal, Novartis is estopped from taking a contrary position on its own broad claim construction. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 449 F. App'x 923, 934 (Fed. Cir. 2011) ("The impropriety of asserting a [claim construction] which the trial court adopts and then complaining about it on appeal

should be obvious on its face, and litigants hardly need warning not to engage in such conduct."); *Key Pharms. v. Hercon Laby's Corp.*, 161 F.3d 709, 715 (Fed. Cir. 1998) ("[W]e could appropriately refuse to entertain [the patentee's] appeal on the issue of claim construction.").

Respectfully, this Court should have held Novartis to the broad claim construction Novartis *itself* put forward in this case. MSN submits that the district court's finding of invalidity should have been affirmed in view of Novartis's own construction of the claims, because the '659 patent does not describe sacubitril-valsartan complexes (nor could it, as Novartis did not discover complexes until four years after the priority date, as this Court correctly found). If the claims are invalid, Novartis would not be entitled to any relief under § 271(e)(4)(A) (or otherwise).

**Second**, pediatric exclusivity can *only* attach to a validly-listed Orange Book patent, and the '659 patent is not validly listed. *See* 21 U.S.C. § 355a(b)(1)(B); Add71 ("Pediatric exclusivity will attach to all unexpired exclusivities and patents listed in the [Orange Book]")).

Recently, this Court provided a detailed explanation of the Hatch-Waxman statutory scheme and the requirements for patents listed in the Orange Book. In *Teva*, the Court held that "[t]he more natural reading [of the Orange Book Listing statute] is that, in order to be listed, a patent must both claim the drug *and be infringed by the NDA product*." 124 F.4th at 912 (emphasis added). But to the extent Novartis

14

has "construed [the claims of the '659 patent] to *claim* valsartan-sacubitril complexes . . . , that construction would have been error." ECF106 at 14 n.5. Because "valsartan-sacubitril complexes were undisputedly unknown at the time of the invention," this Court held that "the '659 patent *could not have been construed* as *claiming* those complexes as a *matter of law*." *Id*. (emphasis added). Accordingly, because the valsartan and sacubitril salts in Novartis's Entresto® product are present in a single chemical structure called a "compound" or "complex," as Novartis admits and told the Patent Office (D.Ct.Dkt.253 at 6), the '659 patent cannot be listed in the Orange Book. "Indeed, Novartis obtained separate later patents to such complexes." ECF106 at 15. Although Novartis has other patents in its portfolio, there can be no pediatric exclusivity associated with the '659 patent. *See, e.g.*, *Mylan Lab'ys, Inc. v. Leavitt*, 495 F. Supp. 2d 43, 46 (D.D.C. 2007) ("During the course of these procedural maneuvers, Pfizer's pediatric exclusivity privilege . . . prevented new generic manufacturers from entering the market. This changed . . . when the FDA delisted Pfizer's patent").

If the Court denies MSN's anticipated rehearing petition and issues its mandate, then MSN will move for leave to file a delisting counterclaim under Federal Rule of Civil Procedure 15(b)(2). Novartis, therefore, is not likely to succeed on its request for injunctive relief by virtue of its purported pediatric exclusivity because the '659 patent has no place being in the FDA Orange Book.

**Third**, as this Court noted, MSN argued for claim a construction that would have excluded from infringement the API used in MSN's ANDA product, a sacubitril-valsartan complex. ECF106 at 12. The district court ultimately adopted Novartis's proposed claim construction, determining that the '659 patent's plain and ordinary meaning covered valsartan and sacubitril as a physical combination and as a complex. *See In re Entresto (Sacubitril/Valsartan) Pat. Litig.*, No. 20-md-2930-LPS, 2021 WL 2856683, at *3 (D. Del. July 8, 2021). Relying on this construction, MSN then stipulated to infringement. ECF106 at 12.

But as the Court has now explained, to the extent the '659 patent claims were "construed to *claim* valsartan-sacubitril complexes (*i.e.*, to the extent MSN alleges that its stipulation of infringement was made on that basis), that construction would have been error." *Id*. at 14 n.5. Because "valsartan-sacubitril complexes were undisputedly unknown at the time of the invention," this Court held that "the '659 patent *could not have been construed* as claiming those complexes as a *matter of law*." *Id*. (emphasis added).

Rule 60 allows a party to ask a court to modify or vacate a judgment if a significant change either in facts or in law "renders continued enforcement 'detrimental to the public interest[.]'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)). The Supreme Court has ruled that "it is appropriate to grant a Rule 60(b)(5) motion when

16

the party seeking relief from an injunction or consent decree can show 'a significant change either in factual conditions or in law.'" *Agostini v. Felton*, 521 U.S. 203, 215 (1997) (quoting *Rufo*, 502 U.S. at 384). The scope of a patent defines a party's legal rights and is therefore the standard by which a party's legal rights are judged. *See Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346-47 (Fed. Cir. 1998) (the scope of patent claims "define[s] the scope of the patentee's rights"); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996).

This Court's unequivocal holding fundamentally changes the legal basis on which MSN stipulated to infringement. *See Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 236 F.3d 1363, 1367 (Fed. Cir. 2001) ("Claim construction, of course, is a matter of law."). The law that MSN relied on in its stipulation to infringement of the '659 patent has significantly changed, thus warranting relief of this Court's judgment. *See, e.g.*, *Blazer v. Best Bee Bros. LLC*, No. 2022-1033, 2022 WL 16954848, at *1 (Fed. Cir. Nov. 16, 2022) (Federal Circuit rejecting a district court's claim construction and inputting its own requires vacatur of the district court's judgment regarding infringement).

In fact, in its proposed final judgment, MSN included vacatur language that would have dealt with the *exact* circumstance present here. D.Ct.Dkt.1116 at 4. Novartis objected to this language, stating that the district court did "not have jurisdiction to order the outcome of a hypothetical claim construction reversal or

17

remand by the Federal Circuit." *Id*. Although the district court did not include vacatur language in its July 21, 2023 final infringement judgment against MSN (D.Ct.Dkt.1120), that is no longer a "hypothetical" outcome.

The law is clear that pediatric exclusivity cannot attach to a product unless and until "in the patent infringement litigation resulting from the [Paragraph IV] certification the court determines that the patent is valid and would be infringed." 21 U.S.C. § 355a(b)(1)(B)(ii). Novartis cannot obtain an order requiring MSN's approval date be reset when MSN does not infringe the '659 patent under this Court's clear holding that complexes are outside the scope of the '659 patent. Novartis's bare assumption that a final judgment in view of the Court's January 10 decision will be entered against MSN is wrong. And that incorrect assumption is not enough for Novartis to obtain the injunctive relief it seeks now from the Court. MSN will renew its motion to vacate the judgment against it under Federal Rule of Civil Procedure 60(b)(5) and (6) and, therefore, Novartis will not be entitled to pediatric exclusivity as it assumes.

### 2.    No Irreparable Harm.

Novartis also cannot establish irreparable harm if MSN is permitted to exercise its rights in the matter without an injunction in place. The D.C. District Court, in fact, on January 15 ruled against another one of Novartis's efforts to block

MSN's launch, finding expressly that MSN's launch of its generic Entresto®
product will *not* irreparably harm Novartis. Add10-12.

Novartis illogically argues that its harms can be greater now that the '659
patent has expired. ECF115 at 15. Post-patent expiration—*i.e.*, now—the money or
market share that Novartis says it will lose are not "harms" recoverable at all under
any law. ECF64 at 25 (Novartis noting the Federal Circuit "has rejected entitlement
to Patent Act damages for an invention's unauthorized use during the pediatric-
exclusivity period")); *see also AstraZeneca*, 782 F.3d at 1344 ("[Defendant's] sales
during the pediatric exclusivity period cannot support [patentee's] claim for
reasonable royalties under section 284, because those sales did not infringe
[patentee's] patents.").

But even if lost money and market share were cognizable losses, Novartis is
incorrect to suggest that the inability to claim money damages means it will *de facto*
experience irreparable harm. An alleged "harm" is not necessarily irreparable even
if unrecoverable. *See Endo Par Innovation Co. v. Becerra*, No. 24-cv-999 (TJK),
2024 WL 2988904, at *7 (D.D.C. June 10, 2024) (noting "the fact that economic
losses may be unrecoverable does not, in and of itself, compel a finding of
irreparable harm") (internal quotation and citations omitted). "Monetary loss, even
irretrievable monetary loss, may constitute irreparable harm only if it is so severe as
to cause extreme hardship to the business or threaten its very existence." *Novartis*

*Pharms. Corp. v. Becerra*, No. 24-cv-02234 (DLF), 2024 WL 3823270, at *4 (D.D.C. Aug. 13, 2024) (citation omitted). "[E]ven unrecoverable economic losses do not constitute irreparable harm . . . if they do not spell financial disaster for the moving party." *Id.* (citation omitted). Under this standard, Novartis cannot show that the losses it says it may suffer are irreparable such that they support the relief Novartis seeks. That is exactly what the D.C. District Court concluded earlier this week:

> [T]he introduction of MSN's generic is unlikely to threaten the viability of Novartis's business or cause such extreme hardship as to justify injunctive relief. . . . Entresto sales in the United States accounted for only $3 billion out of Novartis's roughly $45 billion of total global sales revenue in 2023. And even if the Court were to credit Novartis's worst-case scenario, the loss of 90 percent of Entresto's sales revenue would amount to only a 5.7 percent loss in Novartis's total global revenue over a three-month period, based on numbers from Novartis's public filings. That level of economic loss does not constitute irreparable harm, because Novartis will undoubtedly survive as a going business concern absent injunctive relief.

Add10-11 at 10:20-11:8.

Novartis's arguments about irreparable price erosion also fail, just as the D.C. District Court held this week:

> Novartis's anticipated harms from longer term price erosion are also unduly speculative. If MSN's generic were introduced and later removed, Entresto would resume its dominant market position as the only medication of its kind available to chronic heart failure patients.

And Novartis offers no evidence or projections suggesting that it
actually plans to lower Entresto's prices.

Add11 at 11:10-16.

Novartis also ignores that the best it can hope for based on the pediatric
exclusivity at issue in its motion is six more months of exclusivity. It cannot credibly
contend that economic losses it will suffer are irreparable when they are destined to
occur only through July 2025 at the latest.

### 3.    Denying Novartis's Motion Is in the Public Interest.

Novartis does not even address the public interest factor in requesting the
Court to reconsider its ruling on the Rule 8 motion. *See* ECF115. There is no
reasonable question that permitting MSN to launch its approved product would be
in the public interest.

**First**, the '659 patent is now expired. The public has received all intended
exclusionary benefits (including "encouraging innovation") that Novartis alleges are
conveyed by the '659 patent. *See* ECF64 at 25-26.

**Second**, as the district court also correctly recognized, the public has an
interest in access to affordable drugs, which Novartis's requested injunction would
inhibit. *In re Entresto*, 2024 WL 3757086, at *5 ("I also agree with MSN that the
possible decrease in public awareness is likely outweighed by the increased
accessibility and affordability of sacubitril/valsartan drugs that would result from
generic competition."). In short, the public will greatly benefit from the availability

of a lower cost generic version of Entresto®. *See, e.g.*, *Pharmacia*, 274 F. Supp. 2d at 614 ("[T]he public has an interest in receiving the benefit of ANDA-approved generic drugs as soon as those products can lawfully come to market."). There is no legitimate contrary public interest on which an injunction could rest.

## III.    CONCLUSION

For the foregoing reasons, the Court should deny Novartis's motion for reconsideration (ECF115), and immediately lift the temporary injunction currently in place (ECF119).

Dated:  January 17, 2025

Respectfully submitted,

/s/ William A. Rakoczy
Ronald M. Daignault*
Richard Juang*
DAIGNAULT IYER LLP
8229 Boone Boulevard, Ste 450
Vienna, VA 22182
(917) 838-9795
*Not admitted in Virginia

William A. Rakoczy
Kevin E. Warner
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60654
(312) 527-2157

*Counsel for Defendants-Appellees MSN
Pharmaceuticals Inc., MSN Laboratories
Private Limited, and MSN Life Sciences
Private Ltd.*

# <u>CERTIFICATE OF COMPLIANCE</u>

The foregoing filing complies with the relevant type-volume limitations of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1.     The filing has been prepared using a proportionally-spaced typeface and includes 5,156 words.

2.     The brief has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated:  January 17, 2025

/s/ William A. Rakoczy
Ronald M. Daignault*
Richard Juang*
DAIGNAULT IYER LLP
8229 Boone Boulevard, Ste 450
Vienna, VA 22182
(917) 838-9795
*Not admitted in Virginia

William A. Rakoczy
Kevin E. Warner
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60654
(312) 527-2157

*Counsel for Defendants-Appellees MSN Pharmaceuticals Inc., MSN Laboratories Private Limited, and MSN Life Sciences Private Ltd.*

# Addendum

# IN RE: ENTRESTO (SACUBITRIL/VALSARTAN)

## Nos. 23-2218, -2220, -2221 (Fed. Cir.)

### ADDENDUM TABLE OF CONTENTS

| <u>Date</u> | <u>Document</u> | <u>Page</u> |
|---|---|---|
| 01/15/2025 | Transcript of Oral Ruling, *Novartis Pharms., Corp. v. Becerra*, No. 25-cv-90-DLF (D.D.C. Jan. 15, 2025) | Add1 |
| 01/15/2025 | Federal Defendants' Opposition to Novartis's Motion for Temporary Restraining Order or Preliminary Injunction, *Novartis Pharms., Corp. v. Becerra*, No. 25-cv-90-DLF (D.D.C. Jan. 15, 2025) (Dkt. No. 16) | Add15 |
| May 2023 | May 2023 FDA Draft Guidance Document ("Pediatric Drug Development: Regulatory Considerations — Complying With the Pediatric Research Equity Act and Qualifying for Pediatric Exclusivity Under the Best Pharmaceuticals for Children Act") | Add39 |

```
 1              BEFORE THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3   NOVARTIS PHARMACEUTICALS,           .
     CORPORATION,                        .
 4                                       .
              Plaintiff,                 .  Case Number 24-cv-90
 5                                       .
          vs.                            .
 6                                       .
     XAVIER BECERRA, et al.,             .
 7                                       .
              Defendants,                .
 8                                       .
          and                            .  January 15, 2025
 9                                       .  6:01 p.m.
     MSN PHARMACEUTICALS INC., et al., .
10                                       .
              Intervenor-Defendants.  .
11   - - - - - - - - - - - - - - - - -

12

13                   TRANSCRIPT OF ORAL RULING
                BEFORE THE HONORABLE DABNEY L. FRIEDRICH
14                   UNITED STATES DISTRICT JUDGE

15   APPEARANCES:

16   For the Plaintiff:             SUSAN COOK, ESQ.
                                    MARLAN GOLDEN, ESQ.
17                                  JACOB YOUNG, ESQ.
                                    Hogan Lovells US LLP
18                                  555 Thirteenth Street NW
                                    Washington, D.C. 20004
19
     For the Defendants:            GABRIEL SCHONFELD, ESQ.
20                                  U.S. Department of Justice
                                    450 5th Street NW
21                                  Washington, D.C. 20530

22

23                      -- continued --

24

25
```

2

```
 1    APPEARANCES (CONTINUED):

 2    For the Intervenor-Defendants:    CHAD LADMON, ESQ.
                                         SUZANNE BASSETT, ESQ.
 3                                       Polsinelli PC
                                         1401 I Street NW
 4                                       Suite 800
                                         Washington, D.C. 20005
 5

 6    Official Court Reporter:          SARA A. WICK, RPR, CRR
                                         333 Constitution Avenue NW
 7                                       Room 4704-B
                                         Washington, D.C. 20001
 8                                       202-354-3284

 9

      Proceedings recorded by stenotype shorthand.
10    Transcript produced by computer-aided transcription.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2          (All participants present telephonically.)

3          COURTROOM DEPUTY:  Your Honor, we are on the record in

4    Civil Action 24-90, Novartis Pharmaceutical Corporation versus

5    Becerra, et al.

6          If I can have the parties identify themselves for the

7    record, starting with counsel for the plaintiff.

8          MS. COOK:  Good evening, Your Honor.  This is Susan

9    Cook, Marlan Golden, and Jake Young for Novartis.

10          THE COURT:  Good evening.

11          MR. SCHONFELD:  Good evening, Your Honor.  This is

12   Gabriel Schonfeld with the Justice Department for the federal

13   defendants.

14          MR. LANDMON:  And good evening, Your Honor.  This is

15   Chad Landmon.  I am here with Suzanne Bassett and Kendall

16   Gurule, on behalf of the MSN intervenor-defendants.

17          THE COURT:  All right.  Good evening, everyone.

18          I am prepared to rule on Novartis's motion for temporary

19   restraining order.  I've reviewed the filings, including

20   Novartis's reply, and I'm prepared to rule.

21          Novartis Pharmaceuticals brings this action against the

22   Secretary of Health and Human Services for injunctive relief.

23   Novartis alleges that the FDA unlawfully refused to downgrade

24   its prior approval of MSN's generic version of the heart failure

25   drug Entresto.  Before the Court, again, is plaintiff's motion

1  for a TRO.

2      In 2015, FDA approved Novartis's heart failure drug

3  Entresto.  Since that time, Novartis has marketed Entresto

4  without generic competition and has generated over 10.5 billion

5  in revenue in the United States.  Entresto is covered by

6  multiple patents, including the one at issue here, patent

7  8,101,659, or the '659 patent, which expires at 11:59 p.m.

8  today.

9      In addition, because Novartis has conducted research

10  demonstrating Entresto's safety and effectiveness in children,

11  it is entitled to a pediatric exclusivity period, which operates

12  to extend the term of exclusivity of a valid patent by six

13  months.  21 U.S.C. Section 355a(c)(1)(B).

14      In 2019, MSN submitted an application for generic Entresto,

15  including a paragraph for certification in challenging the

16  validity of the '659 patent.

17      Novartis responded by suing for patent infringement in the

18  District of Delaware.  See Consolidated Case, In Re Entresto

19  Patent Litigation, 20-md-2930.  MSN stipulated to infringement

20  during litigation, and in July 2023, the Delaware District Court

21  issued a ruling finding the '659 patent invalid.  Novartis

22  appealed.  On July 24, 2024, FDA granted final approval for

23  MSN's generic.

24      On January 10th of this year, the Federal Circuit issued an

25  opinion holding that the Delaware court erred in finding the

1    '659 patent invalid.  But the Federal Circuit's mandate has not

2    yet issued.

3        Novartis asked FDA to immediately stay its final approval

4    of MSN's generic or to convert the approval to temporary.  FDA

5    declined to do so and explained that there is currently no court

6    order requiring FDA to convert MSN's approval to a tentative

7    approval or otherwise directing the agency regarding MSN's ANDA.

8        On January 13, Novartis filed the instant action and motion

9    for TRO under the APA to compel the FDA to stay or convert its

10   approval.

11       At the same time, Novartis filed an emergency motion in the

12   Delaware court requesting substantially the same relief under

13   the FDCA.  It asks for an immediate entry of a 35 U.S.C. Section

14   271(e)(4)(A) order resetting FDA's approval date to July 16,

15   2025, after the expiration of a pediatric exclusivity extension

16   to the '659 patent.

17       Yesterday, on July 14, the Federal Circuit denied

18   Novartis's motion for an emergency issuance of the mandate.  See

19   ECF Number 114 in Novartis Pharmaceutical Corporation v. MSN

20   Pharmacy, Inc., 23-2218, in the Federal Circuit.  And this

21   morning, the Delaware court rejected Novartis's emergency motion

22   for an (e)(4)(A) order.

23       As the parties are familiar, a party seeking emergency

24   relief must make a clear showing that four factors, taken

25   together, warrant relief:  Likely success on the merits, likely

1  irreparable harm in the absence of preliminary relief, a balance

2  of the equities in its favor, and accord with the public

3  interest.  League of Women Voters v. Newby, 838 F.3d 1, 6, D.C.

4  Circuit 2016.

5      Where a federal agency is the defendant, the last two

6  factors merge.  See American Immigration Council v. DHS,

7  470 F.Supp.3d 32, 36, D.D.C. 2020.

8      The Court will deny the TRO.  It finds that Novartis has no

9  likelihood of success on the merits because it cannot pursue

10  relief under the APA where it is seeking the same remedy pending

11  in the litigation before the Delaware court and the Federal

12  Circuit and where FDA has not acted arbitrarily, capriciously,

13  or contrary to law.  Further, Novartis has not established

14  irreparable harm and/or that the balance of harm and the public

15  interest favor an injunction.

16      First, the likelihood of success on the merits.  Before

17  this Court, Novartis is asking for an injunction directing the

18  FDA to, one, stay or, two, convert its prior approval of MSN's

19  drug to a temporary approval.

20      As to the stay, Novartis argues that it prevailed in its

21  paragraph IV litigation in the Federal Circuit, thereby

22  triggering a six-month pediatric exclusivity period.  But as a

23  threshold matter, Novartis cannot bring an APA suit to

24  effectuate the remedy it is already seeking through patent

25  litigation.  The APA provides for judicial review of a final

1    agency action for which there is no other adequate remedy in a

2    court.  5 U.S.C. Section 704.

3        Section 704 of the APA serves as a general grant of review

4    but does not duplicate existing procedures for review of agency

5    action.  Citizens for Responsibility and Ethics in Washington v.

6    DOJ, 846 F.3d 1235, 1244, D.C. Circuit 2017.  A remedy is

7    adequate if it provides for an alternative review procedure, and

8    that alternative procedure is preclusive of a suit under the

9    APA.  El Rio Santa Cruz Neighborhood Health Center v. HHS,

10   396 F.3d 1265, 1270, D.C. Circuit 2005.

11       Courts look for clear and convincing evidence of

12   legislative intent to create the alternative procedure.  Avadel

13   CNS Pharmaceuticals v. Becerra, 638 F.Supp.3d 23, 31 through 32,

14   D.D.C. 2022.

15       The FDCA is designed to adjudicate the patent controversy

16   and provide the remedy that Novartis seeks:  The extension of

17   Entresto's exclusivity period.  The statute sets forth specific

18   procedures for patent litigation following a generic applicant's

19   paragraph IV certification, and it provides that the patent

20   court is to issue the orders directing the parameters and timing

21   of FDA's final approval of a generic drug.

22       See 35 U.S.C. Section 271(e)(4)(A) directing the Court to

23   order the effective date of any approval of the drug involved in

24   the infringement to a date which is not earlier than the date of

25   the expiration of the patent; 21 U.S.C. Section

1    355(j)(5)(B)(ii), providing that FDA's approval shall be made

2    effective on the date specified by the District Court in a court

3    order under Section 271(e)(4)(A).

4         Congress plainly contemplated that the affirmative patent

5    infringement action would resolve any dispute between the

6    patentholder and the ANDA applicant and lead to the

7    establishment of the effective date of approval for the ANDA.

8    Avadel, 638 F.Supp.3d at 33.

9         These procedures under the FDCA were adequate for Novartis

10   to litigate the effective date of FDA's approval of MSN's

11   generic.  The effective date of the approval is contingent on

12   the '659 patent's validity, which is being resolved in the

13   Delaware court and the Federal Circuit.

14        If Novartis had prevailed in today's hearing in Delaware,

15   that is, if Novartis had obtained the immediate entry of a

16   Section 271(e)(4)(A) order resetting FDA's approval date, FDA

17   would have been compelled to stay its approval of MSN's generic.

18        In its TRO motion, Novartis is asking this Court to issue

19   effectively the same order directing the FDA to impose a stay

20   that the Delaware court declined to issue this morning.

21   Accordingly, because the ultimate relief Novartis seeks before

22   this Court is pending an effect in the Delaware court via the

23   specific avenue Congress created for it, Novartis cannot invoke

24   the APA to enjoin the FDA.  Avadel, 2022 WL 16650467 at 8.

25        Novartis points to Judge Moss's decision in Norwich

1   Pharmaceutical, Inc., v. Becerra, 703 F.Supp.3d 1, D.D.C. 2023,

2   to argue that Novartis is not precluded from bringing this APA

3   action.  But Judge Moss's case is distinguishable.  There, the

4   plaintiff alleged that FDA acted arbitrarily and capriciously by

5   misinterpreting a patent court order.  Judge Moss permitted the

6   APA action because Hatch-Waxman did not offer an avenue for the

7   plaintiff to challenge the FDA's interpretation of a Section

8   271(e)(4)(A) order.

9       But here, FDA is not misinterpreting any such order because

10  the Delaware court has not issued it.  Rather, it is properly

11  awaiting its issuance, as directed by statute, see 21 U.S.C.

12  Section 355(j)(5)(B)(ii), before taking action.  Novartis cannot

13  use the APA to ask this Court to issue an order standing in the

14  shoes of another court.

15      Novartis also argues that the FDA is unlawfully declining

16  to exercise its discretionary authority to convert its approval

17  of MSN's generic into a temporary approval.  But even if the

18  Court reached the merits of that APA claim, Novartis is unlikely

19  to prevail.  Governing regulations explicitly provide that FDA's

20  conversion authority is discretionary.  See 21 C.F.R. Section

21  10.35(a), which notes that the FDA may at any time stay or

22  extend the effective date of any action, but the regulation does

23  not require FDA to do so.

24      Further, the FDCA explicitly contemplates that a final

25  approval of a generic may go into effect even as patent

1 litigation remains ongoing, for example, 21 U.S.C. Section

2 355(j)(5)(B)(iii), providing for immediate approval 30 months

3 after paragraph IV litigation commences, even if litigation is

4 ongoing.

5     FDA has not acted arbitrarily and capriciously by not

6 exercising its discretionary authority to prevent that from

7 happening in this case.

8     Novartis also asserts it will suffer irreparable harm from

9 economic losses as well as the loss of a statutory entitlement.

10 The Court disagrees.  In the D.C. Circuit, the standard required

11 for an economic loss to constitute an irreparable harm is high.

12 Wisconsin Gas Company v. FERC, 758 F.2d 669, 674, D.C. Circuit

13 1985.

14     Monetary loss, even irretrievable monetary loss, may

15 constitute irreparable harm only if it is so severe as to cause

16 extreme hardship to the business or threaten its very existence.

17 Mylan Labs, Ltd., v. FDA, 910 F.Supp.2d 299, 313, D.D.C. 2012.

18     As the Court explained in its earlier decision, this

19 Court's decision denying a similar Novartis motion for TRO,

20 Novartis v. Becerra, 24-cv-2234, the introduction of MSN's

21 generic is unlikely to threaten the viability of Novartis's

22 business or cause such extreme hardship as to justify injunctive

23 relief.  Mylan Labs, 910 F.Supp.2d at 313.

24     Entresto sales in the United States accounted for only $3

25 billion out of Novartis's roughly $45 billion of total global

1    sales revenue in 2023.  And even if the Court were to credit

2    Novartis's worst-case scenario, the loss of 90 percent of

3    Entresto's sales revenue would amount to only a 5.7 percent loss

4    in Novartis's total global revenue over a three-month period,

5    based on numbers from Novartis's public filings.  That level of

6    economic loss does not constitute irreparable harm, because

7    Novartis will undoubtedly survive as a going business concern

8    absent injunctive relief.  Bristol-Myers, 923 F.Supp. at

9    220-221.

10       Novartis's anticipated harms from longer term price erosion

11   are also unduly speculative.  If MSN's generic were introduced

12   and later removed, Entresto would resume its dominant market

13   position as the only medication of its kind available to chronic

14   heart failure patients.  And Novartis offers no evidence or

15   projections suggesting that it actually plans to lower

16   Entresto's prices.

17       Likewise, the Court is unpersuaded by Novartis's goodwill

18   argument.  There is no reason to conclude that patients and

19   prescribers would attribute negative outcomes from MSN's label

20   to Novartis.

21       As to Novartis's argument that it will be deprived of a

22   statutory entitlement, courts in this district have recognized

23   that a statutory harm is relevant to but not dispositive of an

24   irreparable harm.  Hi-Tech Pharmacal Company, Inc., v. FDA,

25   587 F.Supp.2d 1, 11-12, D.D.C. 2008.

1    The case law does not support that every statutory injury

2    is sufficient to establish an irreparable harm, especially where

3    the related economic losses are not catastrophic.  In any case,

4    it is not clear that Novartis has yet suffered a clear-cut

5    deprivation of its statutory right to pediatric exclusivity

6    under 21 U.S.C. Section 355a(c)(1)(B)(ii).

7    Absent the issuance of the Federal Circuit's mandate, the

8    Delaware court's order finding '659 patent invalid remains in

9    effect.  The district court's ruling is effective and remains so

10   during the pendency of the appeal unless the district court

11   judgment is stayed or until the Federal Circuit issues its

12   mandate.  Mylan Labs v. Leavitt, 484 F.Supp.2d 109, 119, D.D.C.

13   2007.  Accordingly, it is not clear that Novartis's right to a

14   pediatric exclusivity period has been triggered.

15   Finally, the balance of harms and the public interest do

16   not favor an injunction here.  As I have explained, FDA has

17   likely acted lawfully and in compliance with governing

18   regulations, and without an injunction, Novartis will not suffer

19   anything more than ordinary economic losses.

20   Further, the public interest weighs against an injunction.

21   Where a generic manufacturer met all relevant safety and

22   approval standards, there is a clear public interest in

23   receiving generic competition to brand-name drugs as soon as

24   possible.  Astellas Pharma US, Inc., v. FDA, 642 F.Supp.2d 10,

25   23, D.D.C. 2009.

1    For all these reasons, the Court finds that Novartis has

2    not established on the current record that it is entitled to

3    emergency relief.  The Court will therefore deny the TRO motion.

4    All right, Counsel.  I will just issue a minute order on

5    the docket reflecting that I've made this oral ruling, but this

6    does constitute the ruling of the Court.

7    Is there anything else we need to address now?

8    MS. COOK:  Your Honor, this is Susan Cook for

9    Novartis.

10    Will you be setting a preliminary injunction schedule?

11    THE COURT:  I will ask you all to confer and propose a

12    schedule for further proceedings.  How much time do you all need

13    to do that?  Is two days adequate?  Can you do that by Friday?

14    MS. COOK:  We can certainly do that by Friday.

15    THE COURT:  Okay.

16    MR. SCHONFELD:  For the government, Your Honor, we can

17    also confer by Friday, I'm sure.

18    THE COURT:  All right.  Very well.  So on or before

19    January 17th of 2025, the parties shall propose a schedule for

20    further proceedings in this case, and I will enter an order

21    promptly or ask you all to convene for a brief telephonic status

22    call to discuss the schedule before I enter the order.

23    All right?  Anything else?  Thank you, all.

24    (Proceedings adjourned at 6:18 p.m.)

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8

9     /s/ Sara A. Wick                January 16, 2025

10    SIGNATURE OF COURT REPORTER      DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, *et al.*, <br><br> Defendants, <br><br> and <br><br> MSN PHARMACEUTICALS INC., *et al.*, <br><br> Intervenor-Defendants. | No. 1:25-cv-00090-DLF |

### Federal Defendants' Opposition to Novartis's Motion for Temporary Restraining Order or Preliminary Injunction

OF COUNSEL:

MARK RAZA
Chief Counsel
Food and Drug Administration

WENDY S. VICENTE
Deputy Chief Counsel, Litigation

LEAH A. EDELMAN
Associate Chief Counsel
Office of the Chief Counsel
Food and Drug Administration
10903 New Hampshire Ave.
White Oak Building 31
Silver Spring, MD 20993-002

BRIAN M. BOYNTON
Principal Deputy Assistant
   Attorney General

BURDEN H. WALKER
Deputy Assistant
   Attorney General

AMANDA N. LISKAMM
Director

LISA K. HSIAO
Senior Deputy Director

HILARY K. PERKINS
Assistant Director

GABRIEL I. SCHONFELD
   (D.C. Bar No. 155539)
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044-0386
(202) 353-1531
(202) 514-8742 (fax)
Gabriel.I.Schonfeld@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION..............................................................................................1

BACKGROUND ...............................................................................................3

    A.  Statutory and Regulatory Background .....................................3

    B.  Factual and Procedural Background.........................................7

LEGAL STANDARDS .......................................................................................9

ARGUMENT..................................................................................................10

  I.  Novartis Has No Likelihood of Success on the Merits...........................10

    A.  Novartis Cannot Pursue APA Review Because Paragraph IV Litigation Under the Hatch-Waxman Amendments Provides an Adequate Alternative Remedy. .................................................................................10

    B.  Even if Novartis Can Sue Under the APA, It Has No Likelihood of Success on Its Underlying Claims. ..........................................13

  II.  This Court Has Already Rejected Novartis's Assertions of Irreparable Harm .....17

  III.  Neither the Balance of Harms Nor the Public Interest Favor an Injunction..........19

CONCLUSION ...............................................................................................19

## INTRODUCTION

The Federal Food, Drug, and Cosmetic Act (FDCA) carefully balances market protections for brand-name drug manufacturers with a public policy in favor of safe and effective generic drugs. The Hatch-Waxman Amendments strike that balance in part by facilitating early resolution of patent disputes between brand-name and generic manufacturers. Congress has channeled those disputes into a special process of patent litigation meant to determine the date on which the U.S. Food and Drug Administration (FDA) may approve an abbreviated new drug application (ANDA) that references a patented brand-name drug.

Under certain circumstances, FDA may approve an ANDA before patent litigation concludes. If that litigation concludes with a judicial determination that the already-approved ANDA conflicts with the brand-name drug's patents and/or statutory exclusivity, Congress has provided a straightforward remedy. The patent court in such cases may simply enter an order requiring FDA to convert the ANDA approval to a "tentative" status until the relevant protection(s) have expired. Once such an order is entered, FDA's role in implementing it is ministerial. This Administrative Procedure Act (APA) suit arises out of Plaintiff Novartis Pharmaceuticals Corp.'s attempt to end-run the process that Congress designed.

Novartis makes a heart failure drug called Entresto® (sacubitril and valsartan). Intervenor-Defendant MSN Pharmaceuticals Inc. holds an approved ANDA for generic sacubitril and valsartan. FDA granted that approval while Novartis and MSN were still engaged in active patent litigation—after the District of Delaware held Novartis's patent invalid, but before the Federal Circuit ruled on Novartis's appeal. Since that approval, the Federal Circuit has decided that the Delaware Court erred in finding invalidity, but has not yet issued its mandate. Novartis fears that the patent courts will not issue an order requiring FDA to convert MSN's ANDA approval to a "tentative" status before its patent's expiration on January 15, 2025.

Under the Hatch-Waxman scheme, Novartis's remedy is clear—ask the Federal Circuit and District of Delaware to act quickly to preserve its claims. And it has done so. But it has also filed suit in this Court under the APA, seeking to compel FDA to act before it receives a proper order from the patent courts. That Novartis cannot do, and its motion for a temporary restraining order or preliminary injunction should be denied for several reasons.

*First*, Novartis has no likelihood of success on the merits. It has no cause of action under the APA, which applies only when a plaintiff lacks an adequate alternative remedy. Because precisely the relief Novartis seeks is available through the ordinary process of Hatch-Waxman litigation, it may not maintain an APA suit here. And even if Novartis had a cause of action, it still would not be likely to succeed on its underlying claims. Novartis is simply incorrect that FDA has a legal duty to act before receiving a proper order from the patent courts, and it has failed to show that FDA's refusal to do so was otherwise arbitrary or capricious.

*Second*, Novartis has not shown that it will suffer severe irreparable harm in the absence of emergency injunctive relief. Economic injury alone is not irreparable under settled D.C. Circuit law, and Novartis has failed to show any other harm that could justify the extraordinary relief it seeks.

*Third*, the balance of harm and public interest disfavor interim injunctive relief. FDA has acted lawfully in maintaining approval of MSN's ANDA, and disrupting that approval would harm both the government's interest in orderly application of the public policy favoring generic drug approvals, as well as the public's interest in greater access to low-cost generic medications.

For these reasons, the Court should deny Novartis's motion for emergency injunctive relief.

**BACKGROUND**

**A. Statutory and Regulatory Background**

*Requirements for ANDA Approval*. Like any other new drug, a generic drug can be marketed in the United States only with FDA's approval. 21 U.S.C. § 355(a). As relevant here, approval to market a generic drug may be sought by filing an ANDA. *Id.* § 355(j).

Because an ANDA relies on FDA's finding that a previously approved drug (the "reference" drug) is safe and effective, *id.* § 355(j)(2)(A)(i); 21 C.F.R. § 314.3(b) (defining "Reference listed drug"), § 314.94(a)(3), a generic applicant does not have to repeat the studies that established the reference drug's safety and efficacy. Subject to certain other requirements not relevant here, a generic drug will generally be approvable if it is bioequivalent to the reference drug, is the "same" as the reference drug in certain respects, and meets quality standards. *See* 21 U.S.C. § 355(j)(2)(A)(i)-(vi); 21 C.F.R. § 314.94(a)(4)-(8).

The timing of that approval is a separate question. The FDCA provides that under certain circumstances, FDA must delay approval of an otherwise-satisfactory ANDA because of a listed patent or statutory exclusivity for the reference drug. *See generally* 21 U.S.C. §§ 355(j)(5)(B)(i)-(iii); 355(j)(5)(F), 355a(c). When FDA determines that a proposed generic meets all other statutory requirements for approval but cannot be approved based on patent or statutory exclusivity, it issues a "tentative approval." 21 C.F.R. § 314.3. "A drug product that is granted tentative approval is not an approved drug," and may not be lawfully marketed until FDA *grants approval* once no patent and exclusivity barriers remain. *See id.*

*Pediatric Exclusivity.* This case concerns one such type of statutory exclusivity— pediatric exclusivity under 21 U.S.C. § 355a. The FDCA's pediatric exclusivity provisions are intended to incentivize drug manufacturers to research whether their products are safe and effective in children. A manufacturer may receive a six-month

3
Add20

period of pediatric exclusivity if it conducts, at FDA's request, pediatric studies that meet certain statutory requirements. 21 U.S.C. §§ 355a(c)(1), (d).

As relevant here, pediatric exclusivity works by extending the period during which the FDCA prohibits approval of an ANDA that is otherwise ready for approval.[1] In the absence of pediatric exclusivity, that period may in certain cases end with the expiration of the underlying patent. *See* 21 U.S.C. § 355(j)(5)(B)(i) (providing that FDA may immediately approve an ANDA when the applicant certifies that no patent information has been filed or a relevant patent has expired); 21 C.F.R. §§ 314.107(b)(1)(i)(A),(B) (same). When pediatric exclusivity applies, however, the "period during which an application may not be approved" based on patent protection is "extended by a period of six months after" the end of the patent term. 21 U.S.C. § 355a(c)(1)(B).

***Patent Certification, Patent Litigation, and ANDA Approval.*** Since reference drugs are often protected by multiple patents, the FDCA's requirement that generic drugs be in many respects the same as their predecessors leads to frequent disputes over whether those patents are valid and (if so) whether the generic drug will infringe them. As part of the Hatch-Waxman Amendments to the FDCA, Congress enacted a two-step mechanism to "facilitate[] the early resolution" of these disputes. *Caraco Pharm. Lab'ys, Ltd. v. Forest Lab'ys, Inc.*, 527 F.3d 1278, 1283-84 (Fed. Cir. 2008).

*First,* the FDCA requires a generic applicant to address in its ANDA the listed[2] patents that cover the reference drug. *See generally* 21 U.S.C. § 355(j)(2)(A)(vii)-(viii); 21

---

[1] Pediatric exclusivity may also extend other types of market exclusivity available under the FDCA. *See* 21 U.S.C. § 355a(c)(1)(A). Those other exclusivities are not at issue here, where Novartis only argues that it is entitled to pediatric exclusivity beginning with the expiration of a patent.

[2] ANDA filers are only required to address a patent if the brand-name manufacturer submits required information about what the patent protects and when it expires to FDA, which then lists that patent information (hence, "listed patents") in a volume called the Orange Book. *See generally Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 405-06 (2012); 21 C.F.R. § 314.94(a)(12).

C.F.R. § 314.94(a)(12). For each timely listed patent that covers the reference drug, an ANDA must contain an appropriate patent certification or statement. *See generally* 21 U.S.C. § 355(j)(2)(A)(vii)-(viii); 21 C.F.R. § 314.94(a)(12). Two such types of certification are potentially relevant here:

- A *paragraph II certification* states that the patent in question is expired. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(II); 21 C.F.R. § 314.94(a)(12)(i)(A)(2); and

- A *paragraph IV certification* asserts "[t]hat the patent is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale" of the proposed generic, 21 C.F.R. § 314.94(a)(12)(i)(A)(4); *see also* 21 U.S.C. § 355(j)(2)(A)(vii)(IV).

*Second*, based on which patent certifications or statements are submitted, the FDCA defines when and on what terms FDA may grant final approval to an otherwise-satisfactory ANDA. *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 677 (1990); 21 U.S.C. § 355(j)(5)(B)(i)-(iii); 21 C.F.R. § 314.107(b)(1)-(3). If a generic applicant submits a paragraph II certification that a patent is expired, the statutory default is that FDA may approve the ANDA immediately. 21 C.F.R. § 314.107(b)(1)(ii); 21 U.S.C. § 355(j)(5)(B)(i).

A paragraph IV certification, by contrast, affords the reference drug manufacturer the opportunity to assert its patent rights in litigation. The Patent Act treats submission of a paragraph IV certification as an automatic "act of infringement," 35 U.S.C. § 271(e)(2)(A), which gives the reference drug manufacturer "an immediate right to sue," *Caraco*, 566 U.S. at 407 ("Filing a paragraph IV certification means provoking litigation."). When an ANDA is submitted with a paragraph IV certification, the timing of final approval depends on, among other things, the "[d]isposition of [any] patent litigation" that the reference drug manufacturer commences within 45 days of receiving notice of the paragraph IV certification. 21 C.F.R. § 314.107(b)(3); 21 U.S.C. § 355(j)(5)(B)(iii); *Eli Lilly*, 496 U.S. at 677-78.

If the reference drug manufacturer sues within that window, and the district court "decides that the patent is invalid, unenforceable, or not infringed," the statutory default is that FDA may grant final approval immediately after that court's entry of judgment (in other words, whether or not there is an appeal). 21 C.F.R. § 314.107(b)(3)(i); 21 U.S.C. § 355(j)(5)(B)(iii)(I). Conversely, if the district court "decides that the patent [is valid and] has been infringed, and if the judgment of the district court is not appealed or is affirmed, the . . . ANDA may be [finally] approved no earlier than the date specified by the district court in an order under 35 U.S.C. § 271(e)(4)(A)." 21 C.F.R. § 314.107(b)(3)(iv).

Section 271(e)(4)(A) in turn provides that when there is a finding of infringement in a paragraph IV case, "the [patent] court shall order the effective date of any [final] approval of the drug . . . involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed." 35 U.S.C. § 271(e)(4)(A). If an order delaying approval under Section 271(e)(4)(A) issues after final approval has already been granted, FDA will implement that judgment by converting the ANDA back to tentative approval status. *See* 80 Fed. Reg. 6892, 6869 (Feb. 6, 2015) (citing *Mylan Lab'ys., Inc. v. Thompson*, 389 F.3d 1272 (D.C. Cir. 2004)); 21 C.F.R. § 314.107(g). An order delaying approval under Section 271(e)(4)(A) may extend beyond the expiration of the underlying patent to include a period of pediatric exclusivity. *Id.*

**Patent Certification and Pediatric Exclusivity.** The scheme of certification and litigation described above also controls when (if ever) pediatric exclusivity will begin for a manufacturer that completes pediatric studies at FDA's request. As relevant here, a period of pediatric exclusivity is triggered if 1) the reference drug is "the subject of a listed patent for which a [paragraph IV] certification has been submitted," 2) "patent infringement litigation result[s] from the certification," and 3) in that resulting litigation "the court determines that the patent is valid and would be infringed." 21 U.S.C. § 355a(c)(1)(B)(ii). If those conditions are met, then "the period during which [the

ANDA] may not be approved under . . . [21 U.S.C. §] 355(j)(5)(B) . . . shall be extended by a period of six months after the date the patent expires." By contrast, "[i]f the district court in the patent infringement litigation determines the patent is invalid or will not be infringed, ANDA approval is effective upon the date of the court order so stating . . . and the patent holder is entitled to no exclusivity thereafter." *Mylan*, 389 F.3d at 1276 n.2.

### B. Factual and Procedural Background

*Entresto®.* Entresto® (sacubitril and valsartan) is a heart failure medication first approved by FDA in 2015. *See generally* Entresto® Approval Letter (July 7, 2015), https://perma.cc/KJ8G-X3RV. Among other listed patents, Entresto® is covered by U.S. Patent No. 8,101,659 (the "'659 patent"), which expires on January 15, 2025. *See* FDA, *Patent and Exclusivity for NDA N2027620*, https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=003&Appl_No=207620&Appl_type=N (last visited Jan 15, 2025). At FDA's request, Novartis has completed pediatric studies of Entresto® that meet the relevant statutory requirements. *See* FDA, *Pediatric Exclusivity Determinations Made Under Section 505A of the FDCA*, https://www.fda.gov/drugs/development-resources/list-determinations-including-written-request (content current as of Dec. 23, 2024).

*MSN's Paragraph IV Certification and Subsequent Patent Litigation.* In 2019, MSN filed an ANDA for generic sacubitril and valsartan. Compl. ¶ 34. MSN's ANDA contained a paragraph IV certification to the '659 patent. Novartis responded to MSN's paragraph IV certification by suing for patent infringement in the District of Delaware within the statutory 45-day window. *See generally Novartis Pharms. Corp. v. Dr. Reddy's Lab'ys*, No. 1:19-cv-2053 (D. Del.), *consolidated into In re Entresto (Sacubitril/Valsartan) Patent Litig.*, No. 1:20-md-2930 (D. Del.). After claim construction, MSN stipulated that its proposed generic would infringe the '659 patent. *See* ECF No. 540, *In re Entresto Patent Litig.* (D. Del. Apr. 8, 2022). After a bench trial, the Delaware court entered a

judgment declaring that the '659 patent was invalid. *See* ECF No. 1120, *In re Entresto Patent Litig.*, No. 1:20-md-2930 (D. Del. July 21, 2023). Novartis appealed that judgment to the Federal Circuit. *See generally Novartis Pharms. Corp. v. MSN Pharms., Inc.*, No. 23-2218 (Fed. Cir.).

On appeal, the Federal Circuit issued an opinion holding that the Delaware court had erred in finding the '659 patent invalid. *See In re Entresto (Sacubitril/Valsartan)*, 2025 WL 63577, — F.4th — (Fed. Cir. Jan. 10, 2025). The Federal Circuit subsequently denied Novartis's motion to immediately issue the mandate. ECF No. 114, *Novartis Pharms. Corp. v. MSN Pharms., Inc.*, No. 23-2218 (Fed. Cir. Jan. 14, 2025).

***MSN's Approved ANDA***. FDA granted final approval to MSN's ANDA while Novartis's appeal was pending in the Federal Circuit. *See* Compl. ¶ 38.[3] After the Federal Circuit issued its decision, Novartis asked FDA to immediately — without waiting for that court's mandate or for any proceedings on remand — determine that Novartis is entitled to six months of pediatric exclusivity beginning after the '659 patent expires on January 15, 2025 and running through July 16, 2025. *See generally* Compl. Ex. A, Ex. B. Novartis therefore asked the agency to, upon the '659 patent's expiration, either 1) convert MSN's ANDA to tentative approval status, or 2) administratively stay its prior approval. *See* Compl. Ex. B at 2. In response, FDA explained that there is currently no "court order requiring [the agency] to convert MSN's approval to a tentative approval or otherwise directing the agency regarding MSN's ANDA." Compl. Ex. F.

---

[3] Novartis previously challenged that approval as unlawful for several reasons not applicable here, and this Court granted summary judgment for the Federal Defendants on all claims. *Novartis Pharms. Corp. v. Becerra*, 2024 WL 4492072 (D.D.C. Oct. 15, 2024) (Friedrich, J.). Novartis appealed that ruling to the D.C. Circuit. *See Novartis Pharms. Corp. v. Becerra*, No. 24-5235 (D.C. Cir.). Nearly three months later, Novartis filed an "emergency" motion for a stay pending that appeal. *See* Doc. No. 2093556, *Novartis Pharms. Corp. v. Becerra*, No. 24-5235 (D.C. Cir. Jan. 12, 2025). The D.C. Circuit has ordered the parties to complete briefing on that motion by 12:00pm today, January 15, 2025. *See* Doc. No. 2093850, *Novartis Pharms. Corp. v. Becerra*, No. 24-5235 (D.C. Cir. Jan. 13, 2025).

*Current Proceedings*. Novartis filed this lawsuit and the instant motion for interim injunctive relief on January 13, 2025. *See generally* ECF Nos. 1, 3-1. Its complaint requests that this Court "compel[] FDA to convert its final approval of MSN's ANDA to tentative approval, stay the approval, or take any other steps necessary to recognize and enforce Novartis's pediatric exclusivity for Entresto®." *See* Compl. at 25 (Prayer for Relief ¶ A).

At the same time, Novartis is seeking essentially identical relief in the Delaware court. It has filed an emergency motion for injunctive relief, asking the Delaware court for "immediate entry of a 35 U.S.C. § 271(e)(4)(A) order resetting FDA's approval date of MSN's ANDA to July 16, 2025"—the date on which the pediatric exclusivity Novartis claims would run out. *See* ECF No. 1713, *In re Entresto Patent Litig.*, No. 1:20-md-02930 (D. Del. Jan. 13, 2025). That motion is currently set for argument at 11:00am today, January 15, 2025.

MSN is also seeking further relief in the Delaware court. Based on the Federal Circuit's construction of the '659 patent's claims, MSN has moved to modify the Delaware court's final judgment to the extent it found infringement based on a prior different construction. *See* ECF No. 1723, *In re Entresto Patent Litig.*, No. 1:20-md-02930 (D. Del. Jan. 13, 2025). MSN has also moved for leave to pursue new counterclaims based on the Federal Circuit's claim construction. *See* ECF No. 1729, *In re Entresto Patent Litig.*, No. 1:20-md-02930 (D. Del. Jan. 14, 2025). The Delaware court has not yet set a schedule for MSN's motions.

## Legal Standards

*Temporary Restraining Order or Preliminary Injunction.* Interim injunctions are "an extraordinary form of judicial relief" that courts grant "sparingly" and only where "the movant, by a clear showing, carries the burden of persuasion." *Biovail Corp. v. FDA*, 519 F. Supp. 2d 39, 43-44 (D.D.C. 2007) (quotations omitted). To obtain preliminary injunctive relief, Novartis has the burden of showing (1) that it is likely to succeed on

the merits of its claims, (2) that it is likely to suffer irreparable harm without preliminary relief, (3) that the balance of equities favors an injunction, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where a federal agency is the defendant, the last two factors merge. *See Am. Immigr. Council v. DHS*, 470 F. Supp. 3d 32, 36 (D.D.C. 2020).

*Administrative Procedure Act Claims.* The agency in an APA case is entitled to prevail on the merits when its actions were consistent with the APA's standard of review. *Coal. for Common Sense in Gov't Procurement v. United States*, 821 F. Supp. 2d 275, 280 (D.D.C. 2011). The question is whether the challenged action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In applying the highly deferential arbitrary-and-capricious standard, the reviewing court may not "substitute its judgment for that of the agency," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), but must instead uphold the agency's action if it is "rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983).

ARGUMENT

### I.  Novartis Has No Likelihood of Success on the Merits.

#### A.  Novartis Cannot Pursue APA Review Because Paragraph IV Litigation Under the Hatch-Waxman Amendments Provides an Adequate Alternative Remedy.

As a threshold matter, the APA authorizes judicial review only where the plaintiff lacks any "other adequate remedy in a court." 5 U.S.C. § 704; *see also generally Avadel CNS Pharms., LLC v. Becerra*, 638 F. Supp. 3d 23, 31-32 (D.D.C. 2022). That limitation "reflects Congress's judgment that the general grant of review in the APA ought not . . . provide additional judicial remedies in situations where Congress has provided special and adequate review procedures." *Citizens for Resp. & Ethics in Wash. v. U.S. Dept. of Just.*, 846 F.3d 1235, 1244 (D.C. Cir. 2017) (quotations omitted). Courts

10

Add27

determine whether an alternative remedy exists by looking for "clear and convincing evidence of legislative intent to create a special, alternative remedy and thereby bar APA review." *Avadel*, 638 F. Supp. 3d at 32 (quotations omitted). "One way in which such intent is manifest is if Congress has provided . . . an alternative review procedure." *Id.* (quotations omitted).

At bottom, Novartis wants the effective date of MSN's approved ANDA to be reset on the ground that it conducted pediatric studies at FDA's request and subsequently prevailed (for the time being at least) in paragraph IV litigation. There is no question that *precisely* this remedy is available in the patent litigation itself. *See* 35 U.S.C. § 271(e)(4)(A) (directing court to "order the effective date of any approval of the drug . . . involved in the infringement to a date which is not earlier than the date of the expiration of the patent"); 21 U.S.C. § 355(j)(5)(B)(II) (providing that an ANDA approval "shall be made effective on the date specified by the district court in a court order under [§ 271(e)(4)(A)]" unless that order is reversed on appeal); 21 U.S.C. § 355a(c)(1)(B)(ii) (defining period of pediatric exclusivity as an extension of a "period during which an application may not be approved," which in turn is determined by the outcome of paragraph IV litigation). Novartis knows as much—it is already seeking exactly the same remedy in the Delaware court. *See* ECF No. 1713, *In re Entresto Patent Litig.*, No. 1:20-md-02930 (D. Del. Jan. 13, 2025) (moving for "immediate entry of a 35 U.S.C. § 271(e)(4)(A) order resetting FDA's approval date of MSN's ANDA to July 16, 2025").

The statutory design could hardly be more clear. The FDCA establishes a special system of patent certifications, sets up a special procedure for patent litigation in paragraph IV cases, and where that procedure finds infringement directs FDA to determine the timing of ANDA approval—including the timing of pediatric exclusivity—by ministerial application of orders entered by the patent court under a special remedial provision of the Patent Act. "Congress plainly contemplated that the affirmative patent infringement action [that follows a paragraph IV certification]"—

rather than administrative action by FDA—would "resolve any dispute between the patentholder and the [ANDA] applicant and lead to the establishment of the effective date of approval for the [ANDA]." *Avadel*, 638 F. Supp. 3d at 33.[4]. "Unlike cases in which a statute is silent on the question of alternative[s]" to APA review, "or in which the existence of an alternative remedy is doubtful, Congress has spoken clearly . . . by setting up an alternate remedial scheme via a patent infringement action." *Id.* at 34.

Nor is there any question that this alternative remedy is also an adequate one. An alternative remedy is adequate if it can "put the plaintiff in the [same] position in which they seek to be placed" under the APA. *Avadel*, 2022 WL 16650467, at *8. That test is met here because Novartis seeks exactly the same relief in the patent litigation as it does under the APA in this Court—an order directing FDA to convert MSN's ANDA back to tentative approval until Novartis's claimed exclusivity ends on July 16, 2025. Novartis cannot invoke the APA, and has no likelihood of success on the merits, because "the ultimate relief it seeks before this court" is already available "via the specific avenue Congress created for it to do so." *Id.*

Judge Moss's decision in *Norwich Pharmaceuticals, Inc. v. Becerra*, 703 F. Supp. 3d 1 (D.D.C. 2023), is not to the contrary. *Norwich* involved an ANDA applicant's challenge to FDA's interpretation of a patent judgment entered under § 271(e)(4)(a). Where FDA read the patent judgment to block final approval of an amended ANDA, the applicant argued that the patent court had in fact meant to allow it. *See Norwich*, 703 F. Supp. 3d at 14, 17. Although the court ultimately granted summary judgment for the federal defendants on other grounds, it first held that paragraph IV litigation did not provide an adequate alternative remedy because the plaintiff had "already gone through that . . .

---

[4] Although *Avadel* involved a so-called "§ 505(b)(2)" application rather than an ANDA, the distinction is immaterial here. Notwithstanding their other differences, the 505(b)(2) and ANDA pathways share a common procedure for resolving patent disputes in district court and fixing a date for final FDA approval based on the outcome of that private litigation. *See* 21 C.F.R. § 314.107 ("Date of approval of a 505(b)(2) application or ANDA").

adjudicatory process, and . . . already received a judgment," which it "allege[d] that the FDA misapplied." *Id.* at 18-19. Novartis, by contrast, is not "challeng[ing] the FDA's interpretation of a § 271(e)(4)(A) order entered by a district court at the conclusion of a patent-infringement case." *Id.* at 17-18. Rather, it is using the APA to end-run a patent infringement case that is very much still in progress. The claim Novartis presses here—that the effective date of an ANDA approval should be reset based on pediatric exclusivity that was triggered by a finding of patent infringement—is of "the very sort that a . . . suit triggered by a Paragraph IV certification is intended to resolve." *Id.* at 18.

### B. Even if Novartis Can Sue Under the APA, It Has No Likelihood of Success on Its Underlying Claims.

Because Novartis cannot use the APA where another adequate remedy is available, this Court need not reach the merits of its underlying claims in order to deny the motion. But even if the Court does reach those underlying merits, it should still deny injunctive relief for multiple reasons. Novartis has not shown either a likelihood that FDA violated any statutory duty by maintaining final approval for the MSN ANDA, or a likelihood that the agency's actions were arbitrary or capricious.

*First*, Novartis is wrong to suggest that the text of 21 U.S.C. § 355a, standing alone, required FDA to "automatically" take action to prevent MSN from marketing its approved generic once the Federal Circuit held the '659 patent valid. *See* Novartis Mem. at 14-15. That statute says precisely what it does automatically—it extends "the period during which an application may not be approved under . . . [21 U.S.C. §] 355(j)(5)(B)." When an ANDA such as MSN's is *already approved*, no such "period" exists to "extend," and the statutory text is simply inoperative. Novartis focuses on the statute's use of the present-tense verb to "be," and asserts that FDA therefore has a "continuing obligation to avoid allowing approved ANDAs to exist during a[] . . . pediatric exclusivity period." Novartis Mem. at 15. That argument reads crucial text out of the statute. Section 355a does not refer in a vacuum to "the period during which an application may not be

approved." Rather, it refers to the period where an application "may not be approved *under . . . section 355(j)(5)(B).*" 21 U.S.C. § 355a(c)(1)(B)(ii). Section 355(j)(5)(B), in turn, governs when FDA may take a specific action—when an ANDA may "be *made effective.*" 21 U.S.C. § 355(j)(5)(B). In other words, the text of Section 355a governs the act of approval rather than the status of an already-approved application.

*Second*, Novartis is wrong to argue that FDA's regulations required the agency to "convert the [MSN ANDA] approval to a tentative approval" as soon as the Federal Circuit ruled that the '659 patent is valid, without waiting for the issuance of a mandate or any district court proceedings on remand. Novartis Mem. at 15-17 (quoting 21 C.F.R. § 314.107(g)). Once again, Novartis ignores the actual text of the provision on which it relies. Section 314.107(g) of FDA's regulations identifies exactly the circumstances under which "FDA will convert" such an approval—it will do so "*if* . . . a court enters an order requiring . . . that the date of approval be delayed." 21 C.F.R. § 314.107(g). Novartis does not and could not argue that such an order has actually been entered. *See* Novartis Mem. at 15-17. For that reason alone, Section 314.107(g) does not presently impose any obligations on FDA.

There is no likelihood that Novartis will succeed in arguing otherwise. Raising a number of policy arguments, Novartis claims that "[i]t would make little sense for FDA to await issuance of a mandate or an (e)(4)(A) order" before converting MSN's ANDA to tentative approval. Novartis Mem. at 15-17. That misses the mark for two reasons. Most fundamentally, FDA's obligation is to follow its regulations rather than Novartis's policy preferences, and it has done so here. But even so, the current state of proceedings in Delaware also illustrates why it makes perfect sense for FDA to convert an approved ANDA to tentative status only when actually required by court order. While the Federal Circuit has issued an opinion on invalidity, it has not yet issued its mandate, and MSN is already raising arguments for why further proceedings are necessary (including potentially on infringement) before the Delaware court may issue an order resetting its

ANDA's effective date. *See supra* at 8-9 (discussing current proceedings). The Federal Defendants take no position on whether those arguments have merit, but they do suffice to show that the immediate issuance of an order under Section 271(e)(4)(A) may not be as "preordained" as Novartis suggests. *Cf.* Novartis Mem. at 15-16. FDA's regulations direct it to act based on court orders actually entered, not its own guesswork about what orders may be entered in the future. The agency followed those regulations, and Novartis has not shown that doing so was unlawful, arbitrary, or capricious.

*Third*, Novartis is incorrect in arguing that FDA's decision has led to "absurd results." *See id.* at 17-19. For one thing, in the Hatch-Waxman context there is nothing absurd (or even unusual) about generic approval turning in part on "the timing of [a court's] decision" relative to a statutory deadline relating to approval. *See, e.g.*, 21 U.S.C. § 355(j)(5)(B)(iii) (providing for immediate approval 30 months after paragraph IV litigation commences even if the patent litigation remains ongoing). The FDCA strikes a balance between protecting the rights of reference drug manufacturers and promoting the speedy entry of generic competition. Sometimes, this will mean that a generic goes to market while the reference manufacturer is still in the process of asserting its rights. That is not absurd—it is part and parcel of the congressional design.

Nor is FDA "rendering the Federal Circuit's correction meaningless" or "brush[ing] off" its judgment. *See* Novartis Mem. at 19. The Federal Circuit has ample tools at its disposal to rapidly effectuate its judgment as it deems appropriate. Novartis invited the court to use one such tool by expediting issuance of the mandate—and the Federal Circuit refused. *See supra* at 8. FDA is not undermining the Federal Circuit by waiting for that court's mandate to issue in the ordinary course of litigation.

*Finally*, Novartis misses the mark in claiming that FDA has arbitrarily or capriciously departed from past practice by treating like cases differently. *See* Novartis Mem. at 20-22. This is plainly not a case like *Mylan Laboratories v. Thompson*, 389 F.3d

1272 (D.C. Cir. 2004), or *Apotex v. FDA*, 508 F. Supp. 2d 78 (D.D.C. 2007), in which district courts had actually entered orders that required FDA to take action under 35 U.S.C. § 271(e)(4)(A). *Cf.* Novartis Mem. at 20.

Nor is this a case like *Endo Par Innovation Co., LLC v. Becerra*, 2024 WL 2988904 (D.D.C. June 10, 2024), where FDA exercised administrative discretion to stay a final approval while it considered "factual, legal, and policy questions" bearing on whether that approval should actually have been blocked by a 30-month stay, *see* Compl. Ex. E. Novartis has not identified any such issues that FDA should have paused to think through. Just the opposite—it argues vociferously that FDA had no option but to immediately act in anticipation of a hypothetical future order that Novartis views as "preordained." *Cf.* Novartis Mem. at 15-16, 20-21.

Lastly, Novartis cannot distinguish this case from others, stretching back many years, in which FDA has taken the position that an appellate court only determines patent issues for purposes of ANDA approval when a formal mandate issues. *See, e.g.*, Compl. Ex. D ("2007 Amlodipine Letter"). "[T]he district court's ruling is effective and remains so during the pendency of the appeal unless the district court's judgment is stayed . . . or until the Federal Circuit issues its mandate." *Mylan Lab'ys v. Leavitt*, 484 F. Supp. 2d 109, 119 (D.D.C. 2007).

Novartis's attempt to distinguish these cases is puzzling. It argues that FDA somehow disregarded its general policy of acting only when "the rights of the parties become *fixed* by the decision of the court of appeals" because the agency did not "allow the Federal Circuit's decision" (rather than its mandate) to fix the parties' rights. *See* Novartis Mem. at 21-22. But that is precisely what is required under FDA's longstanding view that as a matter of law the parties' rights can be fixed only when a mandate issues. *See* 2007 Amlodipine Letter at 7 & n.6 (explaining that a district court judgment of invalidity will remain effective to permit ANDA approval "in spite of [an]

appellate court opinion finding validity and infringement . . . unless and until the mandate issue[s]."

### II.  This Court Has Already Rejected Novartis's Assertions of Irreparable Harm

Novartis's motion should also be denied for failure to meet the D.C. Circuit's "high standard for irreparable injury." *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Failure to show irreparable harm is an independent ground for denying interim injunctive relief "even if the other three factors . . . merit [it]." *Id.* Only a few months ago, this Court rejected practically indistinguishable allegations that generic competition for Entresto® would cause Novartis sufficiently irreparable harm to support a TRO. *See* ECF No. 23 ("*Novartis I* TRO Denial"), *Novartis Pharms. Corp. v. Becerra*, 1:24-cv-02234-DLF (D.D.C. Aug. 13, 2024).[5] It should not hesitate to do the same here.

Given the highly compressed timeframe for a decision in this emergency posture, the Federal Defendants will not belabor the points this Court already considered and the rulings it has already made. Briefly, however, Novartis has failed to show irreparable harm because the core of its alleged injuries—whether framed in terms of revenue loss, loss of market position in general, exposure to generic competition in particular, or potential shrinkage of the Entresto® business unit in response to lowered demand—is a claim that Novartis will make less money from Entresto® if and when MSN enters the market. *See* Novartis Mem. at 22-26. But "[i]n the D.C. Circuit, mere economic loss does not, in and of itself, constitute irreparable harm. Monetary loss, even irretrievable monetary loss, may constitute irreparable harm only if it is so severe as to cause extreme hardship to the business or threaten its very existence." *Mylan Lab'ys Ltd.*

---

[5] The fact that the D.C. Circuit subsequently entered a one-sentence order granting Novartis's request for a stay pending appeal of this Court's TRO denial does not prevent this Court from relying on its own prior reasoning. *See* Doc. No. 2070612, *Novartis Pharms. Corp. v. Becerra*, No. 24-5186 (D.C. Cir. Aug. 19, 2024). Unexplained non-precedential orders do not make binding precedent, and Novartis tellingly does not argue that his Court should find irreparable harm on that basis.

*v. FDA*, 910 F. Supp. 2d 299, 313 (D.D.C. 2012) (quotations omitted); *see also Watson Lab'ys, Inc. v. Sebelius*, 2012 WL 13076147, at *3 (D.D.C. Oct. 23, 2012) ("[E]ven unrecoverable economic losses do not constitute irreparable harm . . . if they do not spell financial disaster for the moving party"); *Wisc. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ("Mere injuries, however substantial, in terms of money, time and energy . . . are not enough.") (quotations omitted).

This Court's thorough prior analysis resolves most of Novartis's arguments on this point. Novartis is an extraordinarily large company, with yearly global revenues in the tens of billions of dollars. This Court has already held that its likely lost revenue from generic competition, over the timeframe needed to decide this type of litigation on the merits, would not rise to a level that "spell[s] financial disaster" or threatens Novartis's "very existence." *Compare Novartis I* TRO Denial at 8-11 (quotations omitted), *with* Novartis Mem. at 23-25. And it has already held that Novartis's vague assertions that its research and development plans may be "jeopardized," and that it may have to restructure certain business units, cannot independently show irreparable harm because they are "no more than a reframing of Novartis's arguments about economic loss." *Compare Novartis I* TRO Denial at 14-15, *with* Novartis Mem. at 25-26.

Novartis's one new point on irreparable harm does not compel a different result. Contrary to its suggestion, there is no free-floating rule that every injury to a "statutory right" will establish enough irreparable harm to support interim relief. *See* Novartis Mem. at 22-23 (collecting cases). As one of Novartis's own authorities recognizes, the existence of a statutory right is relevant to but not dispositive of irreparable harm. *See Hi-Tech Pharmacal Co., Inc. v. FDA*, 587 F. Supp. 2d 1, 11-12 (D.D.C. 2008) (even though loss of statutory exclusivity "demonstrated some irreparable harm," the underlying economic stakes meant that it was not "sufficiently 'certain' and 'great' to warrant injunctive relief" under D.C. Circuit law). Novartis's alleged economic injuries are speculative and small in comparison to its enormous resources, and it cannot bootstrap

its way to emergency relief simply by framing its fundamentally economic injuries in terms of a statutory entitlement that at bottom is intended to act as an economic incentive. *Cf. Gates v. Schlesinger*, 366 F. Supp. 797, 800-01 (D.D.C. 1973) (finding irreparable harm in loss of entitlement to attend public government meeting); *Kirwa v. DOD*, 285 F. Supp. 3d 21, 42-43 & n.22 (D.D.C. 2017) (finding irreparable harm, based on analogy to deprivation of constitutional rights, in delayed processing of citizenship applications).

### III. Neither the Balance of Harms Nor the Public Interest Favor an Injunction.

Denying an injunction will not cause Novartis any irreparable injury. As discussed in detail above, FDA has acted lawfully, and Novartis will not suffer more than ordinary economic loss if and when MSN enters the market. Novartis has no legitimate interest either in enjoining lawful agency action or in avoiding competitive pressure from a lawfully approved generic drug.

By contrast, granting an injunction would inflict tremendous harm on the public at large and MSN. Where, as here, FDA followed the law in approving MSN's ANDA and found it to meet all applicable approval standards, there is a clear "public interest in receiving generic competition to brand-name drugs as soon as possible." *Astellas Pharma*, 642 F. Supp. 2d at 23-24 (quotation omitted). There is no legitimate contrary interest on which an injunction could rest. Simply put, "[t]he public interest factor is inextricably linked with the merits of [Novartis's] claim and, accordingly, provides [it] no support." *Id.* at 23 (citing *Serono Lab'ys, Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998)). An injunction would also deprive MSN of its ability under the FDCA to market its approved generic drug. The balance of harms and public interest factors tip decisively against injunctive relief.

### CONCLUSION

For these reasons, the Court should deny Novartis's motion for a temporary restraining order or preliminary injunction.

January 15, 2025

Respectfully submitted,

*/s/ Gabriel I. Schonfeld*
GABRIEL I. SCHONFELD
(D.C. Bar. No. 155539)
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
PO Box 386
Washington, DC 20044-0386
(202) 353-1531
(202) 514-8742 (fax)
Gabriel.I.Schonfeld@usdoj.gov

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, |  |
| Plaintiff, | No. 1:24-cv-00090-DLF |
| v. |  |
| XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, *et al.*, |  |
| Defendants, |  |
| and |  |
| MSN PHARMACEUTICALS INC., *et al.*, |  |
| Intervenor-Defendants. |  |

**[Proposed] Order Denying Injunction**

Before the Court is Novartis's Motion for Temporary Restraining Order or Preliminary Injunction. Based on the parties' filings and the arguments of counsel, the Court finds that Novartis has not shown a likelihood of success on the merits of its claims, will not suffer irreparable harm in the absence of emergency relief, and has not shown that the balance of harms or public interest favor an injunction. It is therefore ORDERED that Novartis's motion is DENIED.

SO ORDERED.

Dated: _____

_____
Hon. Dabney L. Friedrich
United States District Judge

Add38

# Pediatric Drug Development: Regulatory Considerations — Complying With the Pediatric Research Equity Act and Qualifying for Pediatric Exclusivity Under the Best Pharmaceuticals for Children Act Guidance for Industry

## *DRAFT GUIDANCE*

**This guidance document is being distributed for comment purposes only.**

Comments and suggestions regarding this draft document should be submitted within 60 days of publication in the *Federal Register* of the notice announcing the availability of the draft guidance. Submit electronic comments to https://www.regulations.gov. Submit written comments to the Dockets Management Staff (HFA-305), Food and Drug Administration, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852. All comments should be identified with the docket number listed in the notice of availability that publishes in the *Federal Register*.

For questions regarding this draft document, contact (CDER) Rosemary Addy at 301-796-1640 or (CBER) the Office of Communication, Outreach, and Development at 800-835-4709 or 240-402-8010.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**May 2023**
**Administrative/Procedural**

**Revision 1**

# Pediatric Drug Development:  Regulatory Considerations — Complying With the Pediatric Research Equity Act and Qualifying for Pediatric Exclusivity Under the Best Pharmaceuticals for Children Act Guidance for Industry

*Additional copies are available from:*

*Office of Communications, Division of Drug Information*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*10001 New Hampshire Ave., Hillandale Bldg., 4th Floor*
*Silver Spring, MD  20993-0002*
*Phone: 855-543-3784 or 301-796-3400; Fax: 301-431-6353; Email: druginfo@fda.hhs.gov*
*https://www.fda.gov/drugs/guidance-compliance-regulatory-information/guidances-drugs*

*and/or*

*Office of Communication, Outreach, and Development*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*10903 New Hampshire Ave., Bldg. 71, Room 3128*
*Silver Spring, MD  20993-0002*
*Phone: 800-835-4709 or 240-402-8010; Email: ocod@fda.hhs.gov*
*https://www.fda.gov/vaccines-blood-biologics/guidance-compliance-regulatory-information-biologics/biologics-guidances*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**May 2023**
**Administrative/Procedural**

**Revision 1**

***Contains Nonbinding Recommendations***
*Draft — Not for Implementation*

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................... 1

II.    OVERVIEW OF REGULATORY STRATEGY FOR PEDIATRIC DRUG
       DEVELOPMENT ........................................................................................................ 3

  A.   General Approach ....................................................................................................... 3

  B.   Developing Drugs for Pediatric Use .......................................................................... 5

       1. *Drugs for Life-Threatening or Severely Debilitating Conditions and Unmet Medical Needs* ........ 5
       2. *Drugs for Diseases or Conditions That Occur Primarily in Pediatric Populations* ...................... 6
       3. *Neonates* ............................................................................................................................ 6
       4. *Orphan Products* ................................................................................................................. 6
       5. *Drug Development in Foreign Countries* ........................................................................... 8
       6. *Drugs for Diseases or Conditions That Only Occur in Adults* .......................................... 8

III.   PEDIATRIC RESEARCH EQUITY ACT ................................................................ 8

  A.   Overview — Requirements of PREA ......................................................................... 8

       1. *PREA Applicability* ............................................................................................................ 8
       2. *Scope of Requirements — Generic drugs* ......................................................................... 9

  B.   Development of Drugs for Pediatric Use ................................................................... 9

       1. *Pediatric Study Plans* ......................................................................................................... 9
       2. *Developing a Pediatric Formulation* ............................................................................... 10

  C.   Pediatric Assessments and Molecularly Targeted Pediatric Cancer Investigations Under

       PREA ........................................................................................................................ 10

       1. *Definitions* ........................................................................................................................ 10
       2. *Submission of Pediatric Assessments or Reports on the Molecularly Targeted Pediatric Cancer
          Investigation* .................................................................................................................... 11

  D.   Waivers and Deferrals Under PREA ....................................................................... 12

       1. *Waivers* ............................................................................................................................. 12
          a.   Criteria for full waiver ............................................................................................. 12
          b.   Criteria for partial waiver ........................................................................................ 13
          c.   Information for requesting a waiver .......................................................................... 14
          d.   Waiver decision ........................................................................................................ 14
       2. *Deferrals* ........................................................................................................................... 14
          a.   Timeline .................................................................................................................... 15
          b.   Criteria for deferral .................................................................................................. 15
          c.   Information for requesting a deferral ....................................................................... 16
          d.   Deferral review and decision .................................................................................... 16
          e.   Deferral extensions ................................................................................................... 16
       3. *Annual Review* .................................................................................................................. 17

  E.   Compliance With PREA ............................................................................................ 18

IV.    BEST PHARMACEUTICALS FOR CHILDREN ACT ......................................... 19

  A.   Written Requests ....................................................................................................... 19

       1. *Description of the Written Request* .................................................................................. 19
       2. *Written Request Studies* ................................................................................................... 20
       3. *Amended Written Requests* .............................................................................................. 22

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

**B.    How to Obtain a Written Request** ........................................................................ **23**

    *1. Submitting a PPSR* ............................................................................................ *24*

    *2. Issuance and Acceptance of a WR* .................................................................... *25*

**C.    How to Submit Study Reports in Response to a Written Request** ................... **25**

**D.    Qualifying for Pediatric Exclusivity** ............................................................... **26**

    *1. For a Drug Product That Is the Subject of a New Drug Application or Biologics License*
       *Application* ...................................................................................................... *26*

    *2. Nonprescription Drugs* ..................................................................................... *27*

**E.    Determining Eligibility For Pediatric Exclusivity** ......................................... **27**

**F. Attaching the Period of Pediatric Exclusivity After a Determination That a Drug Qualifies for**

**    Pediatric Exclusivity** ............................................................................................. **29**

    *1. Drug Products* .................................................................................................... *29*

       a.   An initial 6-month period of pediatric exclusivity ...................................... *29*

       b.   A second 6-month period of pediatric exclusivity ...................................... *30*

       c.   Later-filed applications containing the same drug ...................................... *31*

    *2. Biological Products* ........................................................................................... *32*

**V.      ELEMENTS COMMON TO PREA AND THE BPCA** ............................... **32**

**A.    The Pediatric Review Committee** ...................................................................... **32**

**B.    Publishing Information About Pediatric Studies** ............................................. **33**

    *1. Pediatric Exclusivity Determinations* ............................................................... *33*

    *2. Medical, Statistical, and Clinical Pharmacology Reviews* ............................... *33*

    *3. Other Pediatric Information* ............................................................................. *34*

**C.    PREA and Pediatric Exclusivity** ...................................................................... **35**

**D.    Considerations for Labeling of Drug Products** ............................................... **36**

    *1. Labeling Study Results* ..................................................................................... *36*

    *2. Dispute Resolution* ........................................................................................... *37*

    *3. Priority Review of Applications and Labeling Supplements* ............................. *37*

**E.    Adverse Event Reporting for Drug Products Subject to the BPCA and PREA** ................... **38**

**VI.    ADDITIONAL INFORMATION** .................................................................... **38**

**GLOSSARY** ................................................................................................................ **39**

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

# Pediatric Drug Development:  Regulatory Considerations — Complying With the Pediatric Research Equity Act and Qualifying for Pediatric Exclusivity Under the Best Pharmaceuticals for Children Act Guidance for Industry[1]

> This draft guidance, when finalized, will represent the current thinking of the Food and Drug Administration (FDA or Agency) on this topic.  It does not establish any rights for any person and is not binding on FDA or the public.  You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations.  To discuss an alternative approach, contact the FDA staff responsible for this guidance as listed on the title page.

## I.     INTRODUCTION

This guidance is intended to assist industry developing drug products[2] to comply with the pediatric study requirements under the Pediatric Research Equity Act (PREA),[3] and to describe the process for qualifying for pediatric exclusivity and the protections that pediatric exclusivity offers under the Best Pharmaceuticals for Children Act (BPCA).[4]  In 2010, the Biologics Price Competition and Innovation Act of 2009 extended provisions of the BPCA to biological products.[5]

---

[1] This guidance has been prepared by the Division of Pediatrics and Maternal Health in the Center for Drug Evaluation and Research in cooperation with the Center for Biologics Evaluation and Research at the Food and Drug Administration.

[2] For the purposes of this guidance, unless otherwise specified, references to *drugs* or *drug products* include drugs approved under section 505 of the Federal Food, Drug, and Cosmetic Act (FD&C Act) (21 U.S.C. 355) and biological products licensed under section 351 of the Public Health Service (PHS) Act (42 U.S.C. 262) that are regulated as drugs.

[3] Public Law 108-155 (2003), codified at section 505B of the FD&C Act (21 U.S.C. 355c).  Although section 505B has been amended since the passage of PREA, by convention, that section of the FD&C Act is often referred to by the acronym for the Act that created it, PREA.  We adopt that convention in this guidance.

[4] Public Law 107-109 (2002), codified at section 505A of the FD&C Act (21 U.S.C. 355a). Although section 505A has been amended since the passage of the BPCA, by convention, that section of the FD&C Act is often referred to by the acronym for the Act that created it, the BPCA.  We adopt that convention in this guidance.

[5] See section 351(m) of the PHS Act (42 U.S.C. 262(m)).

1

28  Note that section 505B(b) of the Federal Food, Drug, and Cosmetic (FD&C) Act on already-
29  marketed drugs and section 409I of the Public Health Service (PHS) Act are only briefly
30  addressed in this guidance.  Future guidance may address these issues in greater detail.
31  Furthermore, this guidance only briefly addresses the Food and Drug Administration
32  Reauthorization Act of 2017's (FDARA's) amendments to section 505B of the FD&C Act
33  relating to requirements that sponsors of certain adult oncology drugs with molecular targets that
34  are determined to be substantially relevant to the growth or progression of a pediatric cancer
35  submit reports on ***molecularly targeted pediatric cancer investigations***.[6],[7]
36
37  The scientific aspects of a pediatric program (e.g., considerations regarding data in pediatric
38  subjects, timing of pediatric studies) are addressed in the draft guidance for industry *Pediatric
39  Drug Development Under the Pediatric Research Equity Act and the Best Pharmaceuticals for
40  Children Act:  Scientific Considerations* (May 2023).[8]
41
42  This guidance, along with the draft guidance for industry *Pediatric Drug Development Under the
43  Pediatric Research Equity Act and the Best Pharmaceuticals for Children Act:  Scientific
44  Considerations*,[9] revises and replaces the draft guidance for industry *How to Comply With the
45  Pediatric Research Equity Act*.[10]  In addition to addressing the PREA topics covered in the
46  earlier draft guidance (i.e., the pediatric ***assessment***, pediatric plan, ***waivers*** and ***deferrals***,
47  compliance issues, and pediatric exclusivity provisions), this guidance addresses statutory
48  changes relating to adverse event reporting, ***pediatric study plans (PSPs)***, deferral extensions,
49  and noncompliance.
50
51  In general, FDA's guidance documents do not establish legally enforceable responsibilities.
52  Instead, guidances describe the Agency's current thinking on a topic and should be viewed only
53  as recommendations, unless specific regulatory or statutory requirements are cited.  The use of
54  the word *should* in Agency guidances means that something is suggested or recommended, but
55  not required.
56
57

---

[6] Certain terms used in this guidance, which appear in bold italics at first mention, are defined for purposes of this guidance in the Glossary.

[7] For additional information on FDA's implementation of these amendments to section 505B of the FD&C Act, see the guidance for industry *FDARA Implementation Guidance for Pediatric Studies of Molecularly Targeted Oncology Drugs: Amendments to Sec. 505B of the FD&C Act* (May 2021).  We update guidances periodically.  To make sure you have the most recent version of a guidance, check the FDA guidance web page at https://www.fda.gov/regulatory-information/search-fda-guidance-documents.

[8] When final, this guidance will represent the FDA's current thinking on this topic.  For the most recent version of a guidance, check the FDA guidance web page at https://www.fda.gov/regulatory-information/search-fda-guidance-documents.

[9] When final, this guidance will represent the FDA's current thinking on this topic.

[10] This guidance also addresses certain topics previously addressed in the guidance for industry *Qualifying for Pediatric Exclusivity Under Section 505A of the Federal Food, Drug, and Cosmetic Act*.  That guidance was withdrawn August 7, 2013 (78 FR 48175).

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

58  **II.    OVERVIEW OF REGULATORY STRATEGY FOR PEDIATRIC DRUG**
59          **DEVELOPMENT**
60
61      **A.    General Approach**
62
63  For purposes of pediatric drug development, FDA generally considers the pediatric population to
64  include those patients from birth to younger than 17 years (i.e., birth through 16 years of age),
65  and to include the subpopulation age groups of neonates, infants, children, and adolescents.[11]
66  Consistent with International Council for Harmonisation (ICH) guidelines,[12] FDA considers
67  these subpopulation age groups to be divided as follows:
68
69  - Neonates:  birth through 27 days (corrected gestational age)
70  - Infants:  28 days to 23 months
71  - Children:  2 years to 11 years
72  - Adolescents:  12 years to younger than 17 years
73
74  The BPCA defines *pediatric studies* to mean at least one clinical investigation in "pediatric age
75  groups (including neonates in appropriate cases) in which a drug is anticipated to be used, and, at
76  the discretion of the Secretary, may include preclinical studies."[13]  For purposes of satisfying the
77  requirements of PREA, assessments of safety and effectiveness must be performed in all relevant
78  pediatric age groups, unless the assessments are waived or deferred.[14]
79
80  The BPCA and PREA are designed to work together to encourage the development of data to
81  inform the safe and effective use of drugs in pediatric populations.  Under PREA, pediatric
82  assessments are *required* for drug products with a new active ingredient, new indication, new
83  dosage form, new dosing regimen, or new route of administration unless the drug is for an
84  indication for which orphan designation has been granted.[15]  Also under PREA, molecularly
85  targeted pediatric cancer investigations are *required* for original new drug applications (NDAs)
86  or biologics license applications (BLAs) submitted on or after August 18, 2020, for a new active
87  ingredient, if the drug that is the subject of the application is intended for the treatment of an

---

[11] See 21 CFR 201.57(c)(9)(iv)(A) ("the terms *pediatric population(s)* and *pediatric patient(s)* are defined as the pediatric age group, from birth to 16 years, including age groups often called neonates, infants, children, and adolescents").  FDA interprets "birth to 16 years" in 21 CFR 201.57(c)(9)(iv)(A) to mean from birth to younger than 17 years old.  See, for example, the guidance for industry *Pediatric Information Incorporated Into Human Prescription Drug and Biological Product Labeling* (March 2019).

[12] For additional information, see the ICH guidances for industry *E11 Clinical Investigation of Medicinal Products in the Pediatric Population* (December 2000) and *E11(R1) Addendum: Clinical Investigation of Medicinal Products in the Pediatric Population* (April 2018).

[13] See section 505A(a) of the FD&C Act (21 U.S.C. 355a(a)).

[14] See sections 505B(a)(2)(A), 505B(a)(4), and 505B(a)(5) of the FD&C Act (21 U.S.C. 355c(a)(2)(A), 21 U.S.C. 355c(a)(4), and 21 U.S.C. 355c(a)(5)).

[15] See sections 505B(a)(1)(A) and 505B(k)(1) of the FD&C Act (21 U.S.C. 355c(a)(1)(A) and 21 U.S.C. 355c(k)(1)).

3

88  adult cancer, and directed at a molecular target that FDA determines to be substantially relevant
89  to the growth or progression of a pediatric cancer.[16]  Studies conducted under the BPCA, on the
90  other hand, are *optional* because sponsors have the option of declining to undertake them in
91  response to a **written request** (WR).  Nevertheless, it is critical that sponsors consider both laws
92  when planning their pediatric clinical development programs.

94  PREA requires that any application falling within the requirements of section 505B(a)(1) of the
95  FD&C Act for a new active ingredient, new indication, new dosage form, new dosing regimen,
96  or new route of administration must either include pediatric assessments or reports on the
97  molecularly targeted pediatric cancer investigation (as appropriate);[17] or a request for waiver
98  and/or deferral of the pediatric assessments or reports on the molecularly targeted pediatric
99  cancer investigation.[18]  There are certain exceptions; for example, PREA requirements generally
100  do not apply to a drug for an indication for which orphan designation has been granted (see
101  section II.B.4., Orphan Products).[19]

103  The FD&C Act requires sponsors to submit an initial pediatric study plan (iPSP) during the
104  investigational phase of development, which helps to ensure that sponsors thoroughly consider a
105  pediatric clinical development program earlier in their overall clinical development program.[20]
106  See sections III., Pediatric Research Equity Act, and V., Elements Common to PREA and the
107  BPCA, for additional information about PREA.

109  While addressing PREA, sponsors should also consider whether to seek a WR under the BPCA.
110  It is important to note that sponsors may qualify for pediatric exclusivity under the BPCA for
111  completed PREA studies when those studies are described in a WR,[21] and the WR is issued by
112  FDA before the sponsor submits any reports about the studies described in the WR.[22]  If FDA
113  determines that "information relating to the use of a new drug in the pediatric population may
114  produce health benefits in that population" and issues a WR, a sponsor may qualify for 6 months
115  of exclusivity under the BPCA for conducting studies that are required under PREA.[23]  However,
116  as discussed in Section IV. A. 2., Written Request Studies, FDA does not expect to issue WRs
117  solely for studies or planned studies that are required under PREA.

---

[16] Section 505B(a)(1)(B) of the FD&C Act (21 U.S.C. 355c(a)(1)(B)).

[17] For additional information, see the guidance for industry *FDARA Implementation Guidance for Pediatric Studies of Molecularly Targeted Oncology Drugs: Amendments to Sec. 505B of the FD&C Act.*

[18] See sections 505B(a)(1), 505B(a)(4), and 505B(a)(5) of the FD&C Act (21 U.S.C. 355c(a)(1), 21 U.S.C. 355c(a)(4), and 21 U.S.C. 355c(a)(5)).

[19] See section 505B(k)(1) of the FD&C Act (21 U.S.C. 355c(k)(1)).  Under section 505B(k)(2) of the FD&C Act, this orphan exemption does not apply to products that trigger PREA under section 505B(a)(1)(B) of the FD&C Act.

[20] See section 505B(e) of the FD&C Act (21 U.S.C. 355c(e)).

[21] See section 505A(h) of the FD&C Act (21 U.S.C. 355a(h)).

[22] See section 505A(b)(1) of the FD&C Act (21 U.S.C. 355a(b)(1)).

[23] See section 505A(b)(1) of the FD&C Act (21 U.S.C. 355a(b)(1)).

118
119  In addition, sponsors should consider other indications for development in the pediatric
120  population based on the current understanding of the effect of the drug (e.g., mechanism of
121  action), and include them as appropriate when seeking a WR.  FDA reviews adult safety and
122  effectiveness data and, in some instances, information from postmarketing safety reports,
123  information regarding unapproved uses, and the scientific literature to identify a potential health
124  benefit in pediatric populations when contemplating a WR.  This knowledge not only informs
125  FDA's decision to issue a WR for a given indication, but also whether to include a request to
126  study additional indications in children beyond those already approved in adults.  See sections
127  IV., Best Pharmaceuticals for Children Act, and V., Elements Common to PREA and the BPCA,
128  for more information about the BPCA.
129
130  **B.      Developing Drugs for Pediatric Use**
131
132  During clinical development programs, a sponsor should consider whether the eventual
133  marketing application will trigger the requirements of PREA.  FDA encourages sponsors to
134  interact with FDA early, including, when applicable, to discuss studies to meet PREA and other
135  requirements.  See section III., Pediatric Research Equity Act, for information about the
136  requirements of PREA.
137
138  FDA has identified a number of scenarios and considerations that may affect a sponsor's
139  approach to developing a drug product for use in pediatric patients.  Some common ones are
140  described below.
141
142      *1.      Drugs for Life-Threatening or Severely Debilitating Conditions and Unmet*
143              *Medical Needs*
144
145  Early consultation and discussions are particularly important for drugs intended for life-
146  threatening or severely debilitating conditions.[24]  For these drugs, FDA encourages sponsors to
147  discuss the pediatric plan at pre-investigational new drug application (pre-IND) and end-of-phase
148  1 meetings.[25]  In some cases, pediatric studies of drugs for life-threatening or severely
149  debilitating conditions that lack adequate therapies might begin earlier than usual in the drug
150  development process.  The need for new therapies might justify early trials despite the relative
151  lack of safety and effectiveness information in humans.  Pediatric studies might be considered
152  appropriate when prospects of direct benefit to the enrolled children are sufficient to justify the
153  risks.[26]
154

---

[24] See the guidance for industry *Expedited Programs for Serious Conditions — Drugs and Biologics* (May 2014) for more information.

[25] See section 505B(e)(2)(C)(i)(I) of the FD&C Act (21 U.S.C. 355c(e)(2)(C)(i)(I)).

[26] See 21 CFR 50.52.

155      2.      *Drugs for Diseases or Conditions That Occur Primarily in Pediatric Populations*
156
157 Sponsors developing drug products for diseases or conditions that primarily or substantially
158 occur in the pediatric population should discuss their plans with FDA as early as possible (e.g.,
159 pre-IND meeting).  They should consider submitting an iPSP earlier than is required under
160 PREA because the initial clinical studies will likely include pediatric subjects (see section
161 III.B.1., Pediatric Study Plans).
162
163      3.      *Neonates*
164
165 The complex medical state of neonates makes it critical to evaluate drugs specifically for their
166 use.  However, FDA is aware that studies in neonates present special challenges, including the
167 short time period to conduct studies during the neonatal period (e.g., birth through 27 days
168 corrected gestational age), the differences in neonatal physiology that may affect dose and
169 endpoint selection, as well as ethical issues that may be age-specific.  Under PREA, studies in
170 neonates may be required.  However, it is possible that partial waivers for this and other specific
171 age groups might be appropriate under certain circumstances.[27]
172
173 FDA encourages specific activities regarding neonates.  Under PREA, if a sponsor does not plan
174 to study an investigational drug in neonates, the rationale and supporting data explaining why the
175 drug is not appropriate for use in this population should be included in the iPSP.[28]  Under the
176 BPCA, similar rationale and supporting data explaining why the investigational drug is not
177 appropriate for use in this population should be included in the ***proposed pediatric study request***
178 ***(PPSR)*** if a sponsor does not plan to study the drug in neonates.  When FDA issues a WR that
179 does not include studies in neonates, the WR must state the rationale for not including
180 neonates.[29]  See sections IV.A.1., Description of the Written Request, and IV.B., How to Obtain
181 a Written Request, as well as the draft guidance for industry *Pediatric Drug Development Under*
182 *the Pediatric Research Equity Act and the Best Pharmaceuticals for Children Act:  Scientific*
183 *Considerations*[30] for more information regarding clinical studies in neonates.
184
185      4.      *Orphan Products*
186
187 PREA requirements generally do not apply "to any drug or biological product for an indication
188 for which orphan designation has been granted;" however, this *orphan exemption* does not apply
189 to drugs that trigger the PREA requirement for submission of reports on the molecularly targeted

---

[27] See section 505B(a)(5)(B) of the FD&C Act (21 U.S.C. 355c(a)(5)(B)).

[28] See section 505B(e)(2)(B) of the FD&C Act (21 U.S.C. 355c(e)(2)(B)) and the guidance for industry *Pediatric Study Plans:  Content of and Process for Submitting Initial Pediatric Study Plans and Amended Initial Pediatric Study Plans* (July 2020).

[29] See section 505A(d)(1)(A) of the FD&C Act (21 U.S.C. 355a(d)(1)(A)).

[30] When final, this guidance will represent FDA's current thinking on this topic.

190  pediatric cancer investigation.[31]  Thus, PREA does not require submission of pediatric
191  assessments for an application (or supplemental application) to market a drug for an indication
192  for which orphan designation has been granted.[32]  As FDA has interpreted PREA, if orphan
193  designation is granted after approval of a drug, and postmarketing studies were required under
194  PREA at the time of the drug's approval, the granting of orphan designation does not alter the
195  already existing requirement for such studies.[33]  The PREA orphan exemption is not revisited to
196  retroactively abrogate a PREA requirement that was properly imposed before orphan designation
197  was granted.  Additionally, if marketing approval is sought for multiple indications for a drug
198  product, some of which have not been granted orphan designation, the sponsor must submit
199  pediatric assessments for all indications that do not have an orphan designation, unless the
200  assessments are waived or deferred.[34]  If the orphan-designated indication(s) involve the
201  pediatric population, we encourage sponsors to conduct studies in the relevant age group(s)
202  whenever appropriate.
203
204  Despite this orphan exemption under PREA, a sponsor that submits an application to market a
205  drug for an indication for which orphan designation has been granted may be eligible to qualify
206  for pediatric exclusivity if FDA issues a WR to the sponsor in connection with the application
207  and the sponsor accepts.  Sponsors should contact FDA about the feasibility and timing of a WR
208  and about submitting a PPSR, if appropriate.  For more information, see sections III.C.2.,
209  Submission of Pediatric Assessments or Reports on the Molecularly Targeted Pediatric Cancer
210  Investigation, IV.F.2., Biological Products, and V.B.1., Pediatric Exclusivity Determinations, as
211  well as FDA's Office of Orphan Products Development web page on developing drug products
212  for rare diseases and conditions,[35] and the guidance for industry *Clarification of Orphan
213  Designation of Drugs and Biologics for Pediatric Subpopulations of Common Diseases* (July
214  2018).
215

---

[31] See sections 505B(a)(1)(B), 505B(a)(3), and 505B(k) of the FD&C Act (21 U.S.C. 355c(a)(1)(B), 21 U.S.C. 355c(a)(3), and 21 U.S.C. 355c(k)).  Note that, although section 505B(k) authorizes FDA to issue regulations that would alter the orphan exemption, as of the date of publication of this guidance, FDA has not issued any such regulations.

[32] See section 505B(k)(1) of the FD&C Act (21 U.S.C. 355c(k)(1)).  For products meeting the criteria in section 505B(a)(1)(B) of the FD&C Act, the requirement to submit reports on the investigation described in section 505B(a)(3) of the FD&C Act applies even if the drug is for an adult indication for which orphan designation has been granted.  See section 505B(k)(2) of the FD&C Act (21 U.S.C. 355c(k)(2)).  See also the guidance for industry *FDARA Implementation Guidance for Pediatric Studies of Molecularly Targeted Oncology Drugs: Amendments to Sec. 505B of the FD&C Act*.

[33] Because the orphan exemption in section 505B(k)(1) of the FD&C Act can affect whether PREA applies to a particular application or supplement submitted to the Agency for review, FDA evaluates whether the orphan exemption is applicable at the time it evaluates whether PREA would otherwise be triggered for any application or supplement under section 505B(a)(1)(A).

[34] See sections 505B(a)(1)(A), 505B(a)(4), 505B(a)(5), and 505B(k)(1) of the FD&C Act (21 U.S.C. 355c(a)(1)(A), 21 U.S.C. 355c(a)(4), 21 U.S.C. 355c(a)(5), and 21 U.S.C. 355c(k)(1)).

[35] See the Medical Products for Rare Diseases and Conditions web page at https://www.fda.gov/ForIndustry/DevelopingProductsforRareDiseasesConditions/default.htm.

216          5.        *Drug Development in Foreign Countries*

218    Many sponsors conduct their entire clinical programs in other countries and occasionally submit
219    a marketing application with little, if any, prior interaction with FDA.  All sponsors who seek to
220    market their drugs in the United States are strongly encouraged to contact FDA as early as
221    possible to avoid any delay in providing any required pediatric information in their applications.
222    Sponsors should include an agreed iPSP in any NDA, BLA, or supplement that is required by
223    PREA to include pediatric assessments or reports on the molecularly targeted pediatric cancer
224    investigation.  PREA requirements are described in more detail in section III., Pediatric Research
225    Equity Act.

227          6.        *Drugs for Diseases or Conditions That Only Occur in Adults*

229    Sponsors focusing on clinical development programs for drugs for diseases and conditions that
230    only occur in adults must submit an iPSP, assuming the application triggers PREA.[36]  A list of
231    diseases and conditions that rarely or never occur in pediatrics can be found on FDA's website.[37]
232    Generally, applications for drugs for such diseases or conditions that rarely or never occur in
233    pediatrics will qualify for a waiver because the necessary studies would be impossible or highly
234    impracticable.[38]  However, sponsors should consider all potential pediatric indications for their
235    drugs.  FDA may consider issuance of a WR for other indications that may have health benefits
236    in the pediatric population.

239    **III.    PEDIATRIC RESEARCH EQUITY ACT**

241          **A.    Overview — Requirements of PREA**

243          1.        *PREA Applicability*

245    With limited exception (for example, the orphan exemption described in section II.B.4., Orphan
246    Products), PREA applies to the following:

248    •    Applications (or supplements to an application) submitted under section 505 of the
249          FD&C Act or section 351 of the PHS Act for a new active ingredient, new indication,
250          new dosage form, new dosing regimen, or new route of administration, and

---

[36] See section 505B(e)(1) of the FD&C Act (21 U.S.C. 355c(e)(1)); see also section 505B(a)(1) of the FD&C Act (21 U.S.C. 355c(a)(1)).

[37] See Adult-Related Conditions That Qualify for a Waiver Because They Rarely or Never Occur in Pediatrics, available at https://www.fda.gov/media/101440/download.

[38] See section 505B(a)(5) of the FD&C Act (21 U.S.C. 355c(a)(5)).  FDA anticipates that there will be additional considerations for applications described in section 505B(a)(1)(B) of the FD&C Act that require submission of reports on the molecularly targeted pediatric cancer investigation described in section 505B(a)(3) of the FD&C Act. For additional information, see the guidance for industry *FDARA Implementation Guidance for Pediatric Studies of Molecularly Targeted Oncology Drugs: Amendments to Sec. 505B of the FD&C Act*.

252   • Original applications for a new active ingredient submitted under section 505 of the
253      FD&C Act or section 351 of the PHS Act on or after August 18, 2020, if the drug that is
254      the subject of the application is intended for the treatment of an adult cancer and is
255      directed at a molecular target that FDA determines to be substantially relevant to the
256      growth or progression of a pediatric cancer.[39]
257
258   PREA also authorizes FDA to require holders of already approved applications to conduct
259   pediatric assessments under certain circumstances.[40]
260
261      *2.    Scope of Requirements — Generic drugs*
262
263   Abbreviated new drug applications (ANDAs) submitted under section 505(j) of the FD&C Act
264   most often are applications for drugs containing the *same* active ingredient(s), strength(s),
265   indication(s), dosage form(s), dosing regimen(s), and route(s) of administration as the listed
266   drugs they reference and are not subject to PREA.  ANDA applicants may petition the Agency to
267   request a change from a listed drug per section 505(j)(2)(C) of the FD&C Act and 21 CFR
268   314.93, a process referred to as a suitability petition.  The regulation at 314.93 limits the types of
269   changes that may be permitted to changes in strength, dosage form, route of administration, or of
270   a single active ingredient in a combination drug subject to the restrictions identified in
271   314.93(d)(1) through (3).  ANDAs submitted pursuant to an approved suitability petition for
272   changes in dosage form, route of administration, or for a change in active ingredient in a
273   combination drug do trigger PREA, but they are only eligible for submission as ANDAs if the
274   pediatric assessment or molecularly targeted pediatric cancer investigation requirements are
275   waived.[41]  If a change proposed in a suitability petition triggers PREA and FDA does not waive
276   the requirement to submit pediatric assessments or reports on the molecularly targeted pediatric
277   cancer investigation, the suitability petition will be denied, and the proposed drug product will
278   not be eligible for submission as an ANDA.[42]
279
280      **B.    Development of Drugs for Pediatric Use**
281
282      *1.    Pediatric Study Plans*
283
284   A sponsor planning to submit a marketing application or supplement that is subject to PREA is
285   required to submit an iPSP before submission of pediatric assessments or reports on the
286   molecularly targeted pediatric cancer investigation.[43]  A sponsor should submit an iPSP to its
287   investigational new drug application (IND) for review by the appropriate review division as early

---

[39] See section 505B(a)(1) of the FD&C Act (21 U.S.C. 355c(a)(1)).

[40] See section 505B(b) of the FD&C Act (21 U.S.C. 355c(b)).

[41] See section 505(j)(2)(C) of the FD&C Act (21 U.S.C. 355(j)(2)(C)) and section 505B(a)(1) of the FD&C Act (21 U.S.C. 355c(a)(1)).

[42] See, for example, 21 CFR 314.93.

[43] See section 505B(e)(1) of the FD&C Act (21 U.S.C. 355c(e)(1)).

288  as practicable and must submit it no later than 60 calendar days after the date of the end-of-phase
289  2 meeting or such other time as agreed upon between FDA and the applicant.[44]  More
290  information on the timing and contents of iPSPs, the process for reaching agreement with FDA
291  on iPSPs, and the process for amending an agreed iPSP can be found in the guidance for industry
292  *Pediatric Study Plans:  Content of and Process for Submitting Initial Pediatric Study Plans and*
293  *Amended Initial Pediatric Study Plans* (July 2020).  Sponsors are also encouraged to consider the
294  possibility of submitting a PPSR to obtain a WR during the PSP process.  An iPSP and a PPSR
295  are different documents and have different considerations for submission; the former is a
296  requirement for compliance with PREA and the latter may be submitted at a sponsor's discretion
297  to seek a WR under the BPCA.  See sections IV.A., Written Requests, and IV.B., How to Obtain
298  a Written Request, for further discussion about PPSRs and WRs.
299
300       *2.    Developing a Pediatric Formulation*
301
302  Under PREA, sponsors are required to conduct pediatric studies "using appropriate formulations
303  for each age group" for which the assessment or investigation is required.[45]  However, FDA may
304  grant a partial waiver if a sponsor is unable to develop an age-appropriate formulation after
305  reasonable attempts to do so.[46]  (See discussion of waivers in section III.D., Waivers and
306  Deferrals Under PREA.)  Under PREA, sponsors must submit "a request for approval of a
307  pediatric formulation" used in their pediatric studies, and if a sponsor fails to submit such a
308  request, the drug may be considered misbranded.[47]  Accordingly, sponsors should submit an
309  application or supplemental application for any formulation(s) not previously approved that were
310  used during pediatric studies and for which the sponsor has data to assess the safety and
311  effectiveness and to support dosing and administration.  To avoid delays in initiation of pediatric
312  clinical studies, sponsors should begin the development of an age-appropriate formulation as
313  early as possible.
314
315  **C.    Pediatric Assessments and Molecularly Targeted Pediatric Cancer**
316       **Investigations Under PREA**
317
318       *1.    Definitions*
319
320  Pediatric assessments must contain data, gathered using appropriate formulations for each age
321  group for which the assessment is required and that are adequate to:
322
323  • Assess the safety and effectiveness of the drug for the claimed indications in all relevant
324    pediatric subpopulations; and
325

---

[44] See section 505B(e)(2)(A)(ii) of the FD&C Act (21 U.S.C. 355c(e)(2)(A)(ii)).

[45] See section 505B(a)(2)(A) and 505B(a)(3)(A) of the FD&C Act (21 U.S.C. 355c(a)(2)(A) and 355c(a)(3)(A)).

[46] See section 505B(a)(5)(B)(iv) of the FD&C Act (21 U.S.C. 355c(a)(5)(B)(iv)).

[47] See section 505B(d) of the FD&C Act (21 U.S.C. 355c(d)).

***Contains Nonbinding Recommendations***
*Draft — Not for Implementation*

- Support dosing and administration for each pediatric subpopulation for which the drug is safe and effective.[48]

A molecularly targeted pediatric cancer investigation "shall be designed to yield clinically meaningful pediatric study data, gathered using appropriate formulations for each age group for which the study is required, regarding dosing, safety, and preliminary efficacy to inform potential pediatric labeling."[49]

> 2. *Submission of Pediatric Assessments or Reports on the Molecularly Targeted Pediatric Cancer Investigation*

Sponsors must submit pediatric assessments or reports on the molecularly targeted pediatric cancer investigation with any application for which such assessments or reports are required by PREA, unless FDA defers and/or waives the requirement.[50] (For pediatric assessments, if the drug is for an indication for which orphan designation has been granted, the requirements of PREA do not apply.)[51] See section III.D., Waivers and Deferrals Under PREA, for discussion of waivers and deferrals. In general, sponsors should include pediatric studies at the time of submission of an application when there is sufficient knowledge to proceed and it is feasible to complete studies in children in parallel with adult studies.

Information about the results of pediatric assessments under PREA must be included in product labeling whether findings are positive, negative, or inconclusive.[52] Labeling changes for approved products must be submitted in accordance with applicable requirements in 21 CFR 601.12 and 21 CFR 314.70. For more information about labeling, see section V.D., Considerations for Labeling of Drug Products, and the guidance for industry *Pediatric Information Incorporated Into Human Prescription Drug and Biological Product Labeling* (March 2019).

For information about the specific types of data that may be needed to complete a pediatric assessment, refer to the draft guidance for industry *Pediatric Drug Development Under the Pediatric Research Equity Act and the Best Pharmaceuticals for Children Act: Scientific Considerations*.[53]

---

[48] See section 505B(a)(2)(A) of the FD&C Act (21 U.S.C. 355c(a)(2)(A)).

[49] Section 505B(a)(3)(A) of the FD&C Act (21 U.S.C. 355c(a)(3)(A)).

[50] See sections 505B(a)(1), 505B(a)(4), and 505B(a)(5) of the FD&C Act (21 U.S.C. 355c(a)(1), 21 U.S.C. 355c(a)(4), and 21 U.S.C. 355c(a)(5)).

[51] See section 505B(k)(1) of the FD&C Act (21 U.S.C. 355c(k)(1)).

[52] See section 505B(g)(2) of the FD&C Act (21 U.S.C. 355c(g)(2)).

[53] When final, this guidance will represent FDA's current thinking on this topic.

359    **D.    Waivers and Deferrals Under PREA**
360
361    *1.    Waivers*
362
363    PREA authorizes FDA to waive the requirement to submit pediatric assessments or reports on
364    the molecularly targeted pediatric cancer investigation, based on established criteria, for some or
365    all pediatric age groups.[54]  FDA can grant a full or partial waiver of the requirements on its own
366    initiative or at the request of an applicant.[55]  Any applicant requesting a waiver should provide
367    written justification for the waiver and evidence to support the request.
368
369    a.    Criteria for full waiver
370
371    FDA will, as appropriate, grant a full waiver of the requirement to submit pediatric assessments
372    or reports on the molecularly targeted pediatric cancer investigation if the applicant **certifies** and
373    FDA finds one or more of the following criteria:
374
375    - Necessary studies are impossible or highly impracticable (because, for example, the
376      number of patients is so small or the patients are geographically dispersed).[56] For further
377      information, see Section II.B.6., Drugs for Diseases or Conditions That Only Occur in
378      Adults.
379
380    - There is evidence strongly suggesting that the drug would be ineffective or unsafe in all
381      pediatric age groups.[57]
382
383    - The drug (1) does not represent a meaningful therapeutic benefit over existing therapies
384      for pediatric patients; and (2) is not likely to be used in a substantial number of pediatric
385      patients.[58]
386
387      — Importantly, we note that *both* criteria must be met for this waiver justification to
388        apply.  A drug is considered to represent a meaningful therapeutic benefit over
389        existing therapies if FDA determines that (1) "if approved, the drug or biological
390        product could represent an improvement in the treatment, diagnosis, or prevention of
391        a disease, compared with marketed products adequately labeled for that use in the
392        relevant pediatric population;" or (2) "the drug or biological product is in a class of
393        products or for an indication for which there is a need for additional options."[59]  FDA
394        anticipates that improvement over marketed drugs might be demonstrated by

---

[54] See section 505B(a)(5) of the FD&C Act (21 U.S.C. 355c(a)(5)).

[55] See section 505B(a)(5) of the FD&C Act (21 U.S.C. 355c(a)(5)).

[56] See section 505B(a)(5)(A)(i) of the FD&C Act (21 U.S.C. 355c(a)(5)(A)(i)).

[57] See section 505B(a)(5)(A)(ii) of the FD&C Act (21 U.S.C. 355c(a)(5)(A)(ii)).

[58] See section 505B(a)(5)(A)(iii) of the FD&C Act (21 U.S.C. 355c(a)(5)(A)(iii)).

[59] See section 505B(c) of the FD&C Act (21 U.S.C. 355c(c)).

395     showing, for example (1) evidence of increased effectiveness in treatment,
396     prevention, or diagnosis of disease; (2) an improved safety profile; (3) enhancement
397     of compliance (e.g., by virtue of less frequent dosing or mode of delivery); or (4)
398     safety and effectiveness in a new subpopulation for which marketed drugs are not
399     currently labeled.
400
401          b.     Criteria for partial waiver
402
403  FDA will, as appropriate, grant a partial waiver of the requirement to submit pediatric
404  assessments or reports on the molecularly targeted pediatric cancer investigation with respect to
405  a specific pediatric age group, if the applicant certifies and FDA finds one or more of the
406  following criteria:
407
408     •   Necessary studies are impossible or highly impracticable (because, for example, the
409         number of patients in that age group is so small or patients in that age group are
410         geographically dispersed);[60]
411
412     •   There is evidence strongly suggesting that the drug would be ineffective or unsafe in that
413         age group;[61]
414
415     •   The drug (1) does not represent a meaningful therapeutic benefit over existing therapies
416         for pediatric patients in that age group; and (2) is not likely to be used in a substantial
417         number of pediatric patients in that age group;[62]
418
419     •   The applicant can demonstrate that reasonable attempts to produce a pediatric
420         formulation necessary for that age group have failed.[63]
421
422  We note that if a partial waiver is granted on the basis that it is not possible to develop a pediatric
423  formulation, the waiver will cover only the pediatric age groups requiring that formulation.[64]
424
425  FDA believes that a partial waiver granted based on the inability to develop a pediatric
426  formulation generally should apply to situations in which the applicant can demonstrate that
427  unusually difficult technological problems prevented it from developing a pediatric formulation.
428  In certain cases, FDA may seek appropriate external expert opinion (e.g., from an advisory
429  committee) to help assess whether to grant such a waiver.
430

---

[60] See section 505B(a)(5)(B)(i) of the FD&C Act (21 U.S.C. 355c(a)(5)(B)(i)).

[61] See section 505B(a)(5)(B)(ii) of the FD&C Act (21 U.S.C. 355c(a)(5)(B)(ii)).

[62] See section 505B(a)(5)(B)(iii) of the FD&C Act (21 U.S.C. 355c(a)(5)(B)(iii)).

[63] See section 505B(a)(5)(B)(iv) of the FD&C Act (21 U.S.C. 355c(a)(5)(B)(iv)).

[64] See section 505B(a)(5)(C) of the FD&C Act (21 U.S.C. 355c(a)(5)(C)).

431  If the sponsor seeks a partial waiver on the grounds that it is not possible to develop a pediatric
432  formulation, the sponsor must submit documentation detailing why a pediatric formulation
433  cannot be developed.[65]  This should include a detailed description of the sponsor's efforts to
434  develop a pediatric formulation.[66]  If FDA grants such a waiver, the sponsor's submission will be
435  made publicly available.[67]

436

437          c.      Information for requesting a waiver

438

439  To request a waiver, sponsors should provide the following:

440

441  •  The drug name, applicant name, and indication.

442

443  •  The age group(s) included in the waiver request.

444

445  •  The statutory reason(s) for requesting a waiver, including reference to the applicable
446     statutory authority.[68]

447

448  •  Evidence that the request meets the statutory reason(s) for waiver.[69]  All relevant
449     scientific/clinical justifications for the waiver request should be included.

450

451          d.      Waiver decision

452

453  FDA grants a waiver at the time of approval of an application that triggers PREA if it determines
454  that the application satisfies the statutory requirements for a waiver.  FDA generally includes a
455  preliminary evaluation of the sponsor's plan to request a waiver in FDA's comments on the iPSP
456  (see section III.B.1., Pediatric Study Plans).  This evaluation reflects FDA's best judgment at that
457  time.

458

459      *2.    Deferrals*

460

461  PREA authorizes FDA to defer the requirement to submit pediatric assessments or reports on the
462  molecularly targeted pediatric cancer investigation, based on established criteria.[70]  A deferral
463  acknowledges that pediatric assessments or reports on the molecularly targeted pediatric cancer
464  investigation are required, but permits the applicant to submit the assessments or reports after the

---

[65] See section 505B(a)(5)(C) of the FD&C Act (21 U.S.C. 355c(a)(5)(C)).

[66] A partial waiver on this basis hinges on whether "the applicant can demonstrate" the failure of reasonable attempts to produce a pediatric formulation (section 505B(a)(5)(B)(iv) (21 U.S.C. 355c(a)(5)(B)(iv)).

[67] See section 505B(a)(5)(C) of the FD&C Act (21 U.S.C. 355c(a)(5)(C)).

[68] See sections 505B(a)(5) and 505B(e)(2)(B)(ii) of the FD&C Act (21 U.S.C. 355c(a)(5) and 21 U.S.C. 355c(e)(2)(B)(ii)).

[69] See, for example, section 505B(e)(2)(B)(ii) of the FD&C Act (21 U.S.C. 355c(e)(2)(B)(ii)).

[70] See section 505B(a)(4) of the FD&C Act (21 U.S.C. 355c(a)(4)).

***Contains Nonbinding Recommendations***
*Draft — Not for Implementation*

approval of an NDA, BLA, or supplement. FDA may, on its own initiative or at the request of an applicant, defer the submission of some or all of the pediatric assessments or reports on the molecularly targeted pediatric cancer investigation until a specified date after approval of the drug.[71]

a.    Timeline

Sponsors can discuss a plan for a deferral and the status of a deferred study with FDA as follows:

- Premarketing — It is important to include in the iPSP any plans for a deferral request. In certain cases it may be appropriate to initiate early discussion of a plan for deferral, for example, as part of a pre-IND meeting or during phase 1 of clinical development.

- Application review — FDA grants the deferral, as appropriate, upon approval of the application or supplement.

- Postmarketing — The applicant must submit an annual review of the status of a deferred pediatric study (PREA postmarketing requirement) to FDA until it has submitted the final study report.[72] The final due date of a deferred pediatric study may be extended under certain circumstances (see section III.D.2.e., Deferral extensions).

b.    Criteria for deferral

FDA may defer the timing of submission of some or all required assessments or reports on the molecularly targeted pediatric cancer investigation if the applicant submits certain required information to FDA, as discussed below, and FDA finds one or more of the following:[73]

- The drug is ready for approval for use in adults before pediatric studies are complete;

- Pediatric studies should be delayed until additional safety or effectiveness data have been collected; or

- There is another appropriate reason for deferral

An "appropriate reason" for deferral may include, for example, that development of a pediatric formulation is not complete.

---

[71] See section 505B(a)(4) of the FD&C Act (21 U.S.C. 355c(a)(3)).

[72] See section 505B(a)(4)(C) of the FD&C Act (21 U.S.C. 355c(a)(4)(C)).

[73] See section 505B(a)(4)(A)(i) of the FD&C Act (21 U.S.C. 355c(a)(4)(A)(i)).

502             c.          Information for requesting a deferral

504    To request a deferral, an applicant must provide the following:[74]

506    • A certification of the grounds for deferral;

508    • A pediatric study plan as described in section 505B(e) of the FD&C Act (see section
509      III.B.1., Pediatric Study Plans);

511    • Evidence that the studies are being conducted or will be conducted with due diligence
512      and at the earliest possible time; and

514    • A timeline for completion of such studies.

516             d.          Deferral review and decision

518    The decision to defer and the deferral date are determined on a case-by-case basis.  FDA may, as
519    appropriate, consider the following in determining whether and how long to defer submission of
520    a pediatric assessment:

522    • The need for the drug in pediatric patients;
523    • Availability of sufficient safety data to initiate pediatric clinical studies;
524    • The nature and extent of pediatric data needed to support pediatric labeling;
525    • The existence of clearly documented difficulties in enrolling subjects; and/or
526    • Evidence of technical problems in developing pediatric formulations.

528    For additional information on the circumstances in which a deferral may be appropriate for a
529    molecularly targeted pediatric cancer investigation, see the guidance for industry *FDARA*
530    *Implementation Guidance for Pediatric Studies of Molecularly Targeted Oncology Drugs:*
531    *Amendments to Sec. 505B of the FD&C Act*.

533    The iPSP, agreed iPSP, and any subsequent amendments should include the key elements of any
534    planned deferred studies.  FDA does not intend to make recommendations on planned deferral
535    requests that are submitted in the absence of an iPSP, except under rare circumstances (e.g.,
536    urgent public health need).

538    FDA grants a deferral, as appropriate, in the approval letter for an NDA, BLA, or supplement.

540             e.          Deferral extensions

542    The FD&C Act provides a mechanism for FDA to grant an extension of the timeline for a
543    deferral granted by FDA.[75]  Examples of reasons assessments or investigations may be delayed

---

[74] See section 505B(a)(4)(A)(ii) of the FD&C Act (21 U.S.C. 355c(a)(4)(A)(ii)).

[75] See section 505B(a)(4)(B) of the FD&C Act (21 U.S.C. 355c(a)(4)(B)).

*Contains Nonbinding Recommendations*
Draft — Not for Implementation

include, but are not limited to, unexpected difficulties with enrollment, unexpected delays in reaching agreement with FDA on protocols for the pediatric clinical studies, or an unanticipated need for additional safety or effectiveness data before proceeding with studies in children. During consideration of the deferral extension request, in general, FDA considers whether the applicant could have prevented or foreseen the delay. FDA also generally considers the likelihood that studies can be completed given the circumstances.

To request a deferral extension, an applicant must submit a new timeline for the completion of pediatric studies along with any significant updates to the following information from the original deferral request:[76]

- A certification of the grounds for deferral;

- PSP; and

- Evidence that the studies are being conducted or will be conducted with due diligence and at the earliest possible time.

Applicants should submit information to support the need for an extension of the timeline for deferred studies. For example, if an applicant needs additional time to complete the deferred pediatric studies because of difficulty recruiting subjects, the applicant should provide information outlining the reasons for the difficulties, evidence supporting the reasons outlined (including information on the incidence of the condition and global geographic distribution, if applicable), and information outlining its efforts to increase enrollment such as the number of clinical sites contacted and the number of subjects screened and enrolled.

An applicant must submit a request for deferral extension, along with the required information, at least 90 days before the date that the studies are due.[77] FDA will respond to such request within 45 days of receipt of the request.[78] If FDA grants the deferral extension, the specified date will be the new due date for submission of the deferred assessments or deferred reports on the molecularly targeted pediatric cancer investigation.[79]

    *3.    Annual Review*

Pediatric assessments deferred under PREA are required postmarketing studies subject to annual status reporting requirements under PREA and FDA regulations.[80]

---

[76] See section 505B(a)(4)(B)(i)(II) of the FD&C Act (21 U.S.C. 355c(a)(4)(B)(i)(II)).

[77] See section 505B(a)(4)(B)(ii) of the FD&C Act (21 U.S.C. 355c(a)(4)(B)(ii)).

[78] See section 505B(a)(4)(B)(ii) of the FD&C Act (21 U.S.C. 355c(a)(4)(B)(ii)).

[79] See section 505B(a)(4)(B)(ii) of the FD&C Act (21 U.S.C. 355c(a)(4)(B)(ii)).

[80] See section 505B(a)(4)(C) of the FD&C Act (21 U.S.C. 355c(a)(4)(C)); 21 CFR 314.81(b)(2)(vii), and 21 CFR 601.70.

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

An applicant's annual status report under PREA must contain the following:[81]

- Information detailing the progress made in conducting pediatric studies

- If no progress has been made in conducting such studies, evidence and documentation that such studies will be conducted with due diligence and at the earliest possible time

- The projected completion date for pediatric studies

- The reason(s) that a deferral or deferral extension continues to be necessary

### E.    Compliance With PREA

If an applicant submits an application or supplement subject to PREA and fails to comply with applicable PREA requirements, FDA may, as appropriate, refuse to file the application or issue a complete response letter after reviewing the application.[82] If an applicant fails to fulfill required deferred pediatric studies under PREA that were established in the approval letter, FDA will issue to the applicant a noncompliance letter that informs it of such failure.[83] The applicant must respond to this letter in writing within 45 days and may request a deferral extension as part of that response.[84]

FDA will post the noncompliance letter and the applicant's response on the FDA public website after redacting any information protected by applicable law.[85] If FDA grants a deferral extension before the initial study due date, FDA does not intend to issue a noncompliance letter unless and until the newly established due date has passed.

After FDA issues a noncompliance letter, it may take additional steps to ensure compliance if needed. The drug may be considered misbranded solely because of the applicant's failure to comply with PREA and subject to relevant enforcement action.[86] For an approved drug, the failure to submit pediatric assessments or reports on the molecularly targeted pediatric cancer investigation, or a request for waiver or deferral of those studies, will not be the basis for

---

[81] See section 505B(a)(4)(C)(i) of the FD&C Act (21 U.S.C. 355c(a)(4)(C)(i)).

[82] See 21 CFR 314.101(d), 21 CFR 314.110, and 21 CFR 601.3.

[83] See section 505B(d)(1) of the FD&C Act (21 U.S.C. 355c(d)(1)).

[84] See section 505B(d)(1) of the FD&C Act (21 U.S.C. 355c(d)(1)).

[85] See 505B(d)(1) of the FD&C Act (21 U.S.C. 355c(d)(1)). See also the Noncompliance Letters Under 505B(d)(1) of the FD&C Act web page at https://www.fda.gov/Drugs/DevelopmentApprovalProcess/DevelopmentResources/ucm343203.htm.

[86] See section 505B(d)(2) of the FD&C Act (21 U.S.C. 355c(d)(2)).

612 withdrawing approval of a drug or revoking a license for a biological product.[87]  However, if
613 FDA finds a drug to be misbranded, the drug could be subject to an injunction or seizure
614 proceedings.[88]
615
616
617 **IV.    BEST PHARMACEUTICALS FOR CHILDREN ACT**
618
619 **A.    Written Requests**
620
621 *1.    Description of the Written Request*
622
623 A WR is a document issued by FDA requesting submission of a study or studies intended to
624 provide meaningful health benefits in the pediatric population.  The WR specifies the elements
625 of the study or studies that the sponsor or application holder must complete to qualify for
626 pediatric exclusivity.[89]  FDA can issue a WR at the request of an interested party or on its own
627 initiative.  Completion of studies described in a WR is voluntary.[90]  FDA does not limit issuance
628 of a WR to a specific drug product, and the WR can result in only one 6-month period of
629 pediatric exclusivity for that sponsor, as described in section IV.F., Attaching the Period of
630 Pediatric Exclusivity After a Determination That a Drug Qualifies for Pediatric Exclusivity.
631 FDA's authority to issue a WR extends to use of an active moiety for indications that may
632 produce health benefits in the pediatric population, regardless of whether the indications have
633 been previously approved in adults.[91]
634
635 Generally, a WR seeks all applicable information necessary to establish safety and effectiveness
636 of a drug for use in all relevant pediatric populations, including study information (e.g., type,
637 timing, endpoints), drug-specific safety concerns to be monitored, statistical analysis plan, and
638 timeline for completing the studies.
639
640 FDA can use a PPSR to develop a WR or use alternative information (see section IV.B., How to
641 Obtain a Written Request).  As a greater understanding of the indication or of the mechanism of
642 action of a particular drug or drug class develops, WRs, including elements within a study or
643 studies necessary to qualify for pediatric exclusivity, may evolve.
644

---

[87] See section 505B(d)(2) of the FD&C Act (21 U.S.C. 355c(d)(2)).

[88] See sections 302 and 304 of the FD&C Act (21 U.S.C. 332 and 21 U.S.C. 334).

[89] See sections 505A(b)(1) and 505A(c)(1) of the FD&C Act (21 U.S.C. 355a(b)(1) and 21 U.S.C. 355a(c)(1)).

[90] Section 505A of the FD&C Act does not require the sponsor or application holder to conduct pediatric studies; instead, it creates an exclusivity incentive to encourage such studies.  However, the sponsor or application holder may be required to conduct pediatric studies of certain new and marketed drugs under section 505B of the FD&C Act.

[91] See sections 505A(a), 505A(b)(1), 505A(c)(1), and 505A(d)(1)(B) of the FD&C Act (21 U.S.C. 355a(a), 21 U.S.C. 355a(b)(1), 21 U.S.C. 355a(c)(1), and 21 U.S.C. 355a(d)(1)(B)).

19

***Contains Nonbinding Recommendations***
*Draft — Not for Implementation*

645 In addition, the BPCA requires that, in issuing a WR, FDA take into account adequate
646 representation of children of ethnic and racial minorities.[92]  If a WR does not request studies in
647 neonates, the request will include a statement describing the rationale for not requesting such
648 studies.[93]
649
650 A sponsor will not be eligible for pediatric exclusivity based on requirements or requests to
651 conduct postmarketing studies (e.g., studies required under PREA) or other communications
652 about pediatric studies unless it is in receipt of a WR.[94]
653
654     *2.     Written Request Studies*
655
656 In general, FDA decides what studies to include in a WR by determining what information is
657 needed to use the drug appropriately in the pediatric population.  When making this
658 determination, in general, FDA obtains the following from the sponsor:
659

660 - Information on any other indications for this product that may have health benefits in
661   children.  For example, the sponsor should provide information on any indications for
662   which there are ongoing clinical studies in adults and/or children or for which the sponsor
663   has opened an IND.
664

665 - Information that exists in the literature on the drug or on pharmacologically related drugs.
666

667 In some instances, FDA may ask a sponsor to submit information to an IND before issuing a
668 WR.  Similarly, in some cases, a sponsor may wish to submit pediatric study data to its IND in
669 support of an amendment to its WR.  Pediatric studies previously submitted to an IND can be
670 used as the basis of a PPSR or can be submitted to an NDA or BLA to qualify for pediatric
671 exclusivity in response to a WR; however, FDA does not consider pediatric studies a sponsor
672 submits to an NDA or BLA (either in an original application, amendment, or supplement) before
673 FDA issues a WR as being responsive to that WR.
674
675 In certain situations, FDA may determine that a WR for additional pediatric studies will **not** be
676 issued.  Such situations may include the following:
677

678 - Sufficient pediatric information has already been submitted to the NDA or BLA, even if
679   the pediatric information is not yet included in the labeling;
680

681 - Study of the drug for the specified indication(s) in the pediatric population would not
682   offer a health benefit in that population;
683

---

[92] See section 505A(d)(1)(A) of the FD&C Act (21 U.S.C. 355a(d)(1)(A)).

[93] See section 505A(d)(1)(A) of the FD&C Act (21 U.S.C. 355a(d)(1)(A)).

[94] See sections 505A(b)(1) and 505A(c)(1) of the FD&C Act (21 U.S.C. 355a(b)(1) and 21 U.S.C. 355a(c)(1)).

- It is not possible to conduct a study or studies of the drug for the specified indications in the pediatric population in a manner that would provide useful information (e.g., the study population is too small to yield interpretable results); and/or

- Outstanding safety concerns from studies or significant theoretical concerns need to be clarified with additional studies to support conducting studies in the pediatric population.

Historically, FDA has at times issued WRs solely for studies required under PREA, even if there were no other indications that may produce health benefits in the pediatric population. However, over time, data on pediatric labeling changes pursuant to BPCA and/or PREA have been collected. Between 2002 and 2019, there were 768 products with pediatric labeling changes under BPCA and/or PREA. Sixty-three percent of these labeling changes were based on studies conducted under PREA/Pediatric Rule alone; 21 percent were based on studies conducted under BPCA alone; 16 percent were based on studies conducted under both the BPCA and PREA. These data suggest that studies required under PREA are successfully completed, and that PREA requirements have resulted in an increase in pediatric labeling, even without the added incentive of the BPCA.

The BPCA provides FDA with discretion to determine whether to issue, and the appropriate scope of, WRs based on the information that "may produce health benefits" in the pediatric population.[95] In light of the data on pediatric labeling changes pursuant to the BPCA and/or PREA, FDA believes WRs should be reserved for those sponsors who conduct <u>additional</u> pediatric studies — beyond what is required under PREA — that may produce health benefits in children. Thus, upon finalization of this guidance, FDA does not expect to issue WRs solely for studies or planned studies that are required under PREA. In general, FDA expects that a WR that includes studies or planned studies required under PREA will also include additional indications or populations. If there are no additional studies for indications or populations that may produce health benefits in the pediatric population beyond the studies or planned studies required under PREA, then FDA does not expect to issue a WR for that drug. For example, if a sponsor has an iPSP that includes a plan for deferred studies of a drug for pediatric juvenile idiopathic arthritis (pJIA), FDA does not expect to issue a WR solely for studies of pJIA in the same pediatric population. However, if FDA determines that this drug may produce health benefits in pediatric systemic juvenile idiopathic arthritis (sJIA), and there are no studies or planned studies required under PREA for this indication, then it may be appropriate for FDA to issue a WR for pediatric studies for *both* pJIA and sJIA.

In general, when considering issuance of a WR, FDA evaluates the need for studies for all pediatric subpopulations and for all indications for which the drug is being used or could be used in the pediatric population. In general, FDA considers the indications already approved for adults, indications pending for adults, and unapproved uses including uses that might be specific to the pediatric population. A single WR may address multiple indications and uses that are both approved and unapproved.[96]

---

[95] See sections 505A(b)(1) and 505A(c)(1) of the FD&C Act (21 U.S.C. 355a(b)(1) and 21 U.S.C. 355a(c)(1)).

[96] See section 505A(d)(1)(B) of the FD&C Act (21 U.S.C. 355a(d)(1)(B)).

726
727 FDA can issue a WR that includes nonclinical studies.[97]  Section 505A(a) of the FD&C Act
728 defines the term *pediatric studies* to mean "at least one clinical investigation (that, at the
729 Secretary's discretion, may include pharmacokinetic studies) in pediatric age groups (including
730 neonates in appropriate cases) in which a drug is anticipated to be used, and, at the discretion of
731 the Secretary, may include preclinical studies."  FDA may need certain toxicology studies in
732 immature animals to evaluate the safety of drugs for use in pediatric populations.[98]  Accordingly,
733 FDA may request that a sponsor or holder of an approved application conduct nonclinical studies
734 before completing pediatric studies in humans.  FDA may need to review such studies before it
735 can determine whether information relating to use of the drug could produce health benefits in
736 the pediatric population; thus, FDA may need these studies to determine if it will issue a WR.
737
738 In response to a WR, sponsors may, as appropriate, submit studies conducted by a third party.
739 However, the sponsor should submit reports of studies that it has not conducted only if (1) the
740 data from the studies appear to provide useful pediatric information that *fairly responds* to the
741 WR issued by FDA; **and** (2) the sponsor obtains a right of reference to submit the reports of
742 studies along with the underlying data.
743
744 A sponsor can use data it collects before or after FDA issues a WR to respond to the WR.
745 Although FDA can request literature reviews as part of a larger WR, reviews of published
746 literature alone are not pediatric studies that will qualify a drug for pediatric exclusivity.[99]
747
748 Although a sponsor may, as appropriate, use studies it conducts to meet PREA requirements to
749 qualify also for pediatric exclusivity,[100] as mentioned, FDA does not consider pediatric studies a
750 sponsor submits to an NDA or BLA (either in an original application, amendment, or
751 supplement) before FDA issues a WR as being responsive to that WR.  To qualify for pediatric
752 exclusivity, sponsors and holders of an approved application should obtain a WR or an
753 amendment to an existing WR before submitting the pediatric studies to an application.
754
755     *3.     Amended Written Requests*
756
757 Each WR states that the WR may be amended.  A sponsor may request an amendment to the
758 WR, or FDA may issue an amendment on its own initiative.  However, FDA does not anticipate
759 amending WRs in the absence of scientific, medical, or regulatory justification.
760

---

[97] See section 505A(a) of the FD&C Act (21 U.S.C. 355a(a)).

[98] We support the principles of the 3Rs (reduce/refine/replace) for animal use in testing when feasible.  The FDA encourages sponsors to consult with review divisions when considering a nonanimal testing method believed to be suitable, adequate, validated, and feasible.  The FDA will consider if the alternative method could be assessed for equivalency to an animal test method.

[99] See sections 505A(a), 505A(b), and 505A(c) of the FD&C Act (21 U.S.C. 355a(a), 21 U.S.C. 355a(b), and 21 U.S.C 355a(c)).

[100] As noted earlier in this section, going forward, FDA does not expect to issue WRs solely for studies or planned studies that are required under PREA.

761    Sponsors can request a change in the studies' due date in the WR by submitting a proposed
762    amendment to the WR.  If a sponsor believes it will be unable to meet the time frames in a WR,
763    it should contact FDA to request such a change as soon as possible.  If FDA agrees to the
764    change, it intends to notify the sponsor in writing regarding the extension time.  Any request for
765    an extension of time should take into consideration that completed reports of all studies should
766    be submitted for filing at least 15 months before the expiration of the patent or exclusivity to
767    which the pediatric exclusivity would attach.  Sponsors should be aware that if they choose to
768    submit within less than 15 months, FDA may not be able to complete the review and make a
769    determination in time to meet the 9-month deadline.[101]

770
771    FDA intends to issue all amendments to a WR in writing.  Sponsors should also request any
772    amendments to a WR in writing.  Discussion of a proposed amendment at a meeting with FDA
773    does not constitute a request to amend a WR nor does it constitute FDA's amendment of the WR.
774    In addition, if a sponsor has submitted a protocol that is inconsistent with the WR, and FDA has
775    not commented on the protocol, the sponsor should not assume FDA agrees that the protocol is
776    consistent with the WR.  Even a minor change to a study, such as a change in the number of
777    subjects, the age groups enrolled, or the elimination of certain testing requirements, may warrant
778    a change in the protocol and a revision of the WR if it relates to a specified term of the WR.

779
780    Sponsors can submit preliminary data to an IND in support of a request for amendment.
781    Sponsors that believe that their studies may not fairly respond to the WR as issued but
782    nonetheless provide valuable pediatric information should (1) seek to obtain an amended WR
783    *before* submitting any pediatric study reports to their NDAs or BLAs; and (2) submit proposed
784    amendments to their WRs early enough to ensure enough time for FDA to issue an amended WR
785    and to ensure the sponsor has enough time to submit its studies at least 15 months before the
786    expiration of any patent or exclusivity to which pediatric exclusivity would attach.

787
788    Sponsors should not submit the requested study reports to their NDAs or BLAs until *after* they
789    have received FDA's response to requested amendments in writing.  Reports of studies that do
790    not fairly respond to the existing WR will *not* qualify for pediatric exclusivity (see sections
791    IV.C., How to Submit Study Reports in Response to a Written Request, IV.D., Qualifying for
792    Pediatric Exclusivity, and IV.E., Determining Eligibility For Pediatric Exclusivity).[102]

793
794        **B.    How to Obtain a Written Request**

795
796    Historically, WRs have generally been issued after a drug is approved for use in adults.
797    However, there may be situations in which it is appropriate to issue a WR before such an action.
798    See sections II., Overview of Regulatory Strategy for Pediatric Drug Development, and III.B.1.,
799    Pediatric Study Plans, and previous subsections of this section for additional considerations
800    relating to timing of a WR.  Additionally, the appropriate timing of the submission of a specific

---

[101] See sections 505A(b)(2), 505A(c)(2), and 505A(d)(4) of the FD&C Act (21 U.S.C. 355a(b)(2), 21 U.S.C. 355a(c)(2), and 21 U.S.C. 355a(d)(4)).

[102] See sections 505A(b)(1), 505A(c)(1), 505A(d)(4), and 505A(h) of the FD&C Act (21 U.S.C. 355a(b)(1), 21 U.S.C. 355a(c)(1), 21 U.S.C. 355a(d)(4), and 21 U.S.C. 355a(h)).

801 PPSR can be discussed with the relevant review division(s).  FDA may issue a WR either in
802 response to a PPSR **or** on its own initiative (see sections IV.A., Written Requests).
803
804    *1.    Submitting a PPSR*
805
806 If a sponsor has exclusivity or patent protection for a drug or exclusivity for a biological product,
807 or anticipates that it will have such exclusivity or patent protection, the sponsor can submit a
808 PPSR to the appropriate review division (such a proposal can help to expedite FDA's issuance of
809 a WR).  Sponsors should mark PPSRs with the header PROPOSED PEDIATRIC STUDY
810 REQUEST and submit it to the appropriate IND.  Sponsors that seek to qualify for pediatric
811 exclusivity to attach to existing patents and/or exclusivities should plan to submit their PPSRs
812 with sufficient time to:
813
814    • Permit FDA to review the PPSR, confer with the party submitting the PPSR as necessary,
815       and issue the WR (including review by the FDA's internal pediatric review committee
816       (the PeRC) as required before issuance[103]);
817
818    • Allow time for the sponsor, after the WR is issued, to initiate the studies, complete the
819       studies, and submit the reports for filing; **and**
820
821    • Provide FDA 180 days to review the studies and make an exclusivity determination, with
822       a remaining, nonoverlapping 9 months before expiration of the patent or exclusivity
823       period.[104]
824
825 The PPSR should describe the studies the sponsor or application holder proposes to conduct to
826 qualify for pediatric exclusivity.  The PPSR should include (1) a background section, (2)
827 nonclinical studies, (3) drug information, (4) clinical studies, (5) known drug safety concerns and
828 monitoring, (6) statistical information, including power of studies and statistical assessments, and
829 (7) time frame for submitting reports of the study or studies.
830
831 It is important to note that a PPSR is not a substitute for an iPSP (section III.B.1., Pediatric Study
832 Plans).  Although these submissions may have some similarities, each one is submitted under a
833 different statutory scheme and serves a distinct purpose.  See sections II., Overview of
834 Regulatory Strategy for Pediatric Drug Development, III., Pediatric Research Equity Act, and
835 V.C., PREA and Pediatric Exclusivity, for additional information.
836
837 FDA intends to consider PPSRs that include requests to study multiple pediatric age groups in
838 the same study, as appropriate.  FDA recognizes that studies defined by age may be
839 inappropriate when it is reasonable to define subgroups using methods other than age, such as
840 development stage.  If the sponsor submits data as part of a PPSR to indicate that a drug should

---

[103] See section 505A(f) of the FD&C Act (21 U.S.C. 355a(f)).

[104] See sections 505A(b)(2), 505A(c)(2), and 505A(d)(4) of the FD&C Act (21 U.S.C. 355a(b)(2), 21 U.S.C. 355a(c)(2), and 21 U.S.C. 355a(d)(4)).

841 be studied in pediatric groups identified by characteristics other than age, in general, FDA
842 intends to consider that data when developing the WR.
843
844 FDA has 120 days after a sponsor submits a PPSR to review and act on the submission.[105]  Our
845 response to the PPSR is either a WR or a PPSR inadequate letter, in which we inform the
846 sponsor of the reasons we will not issue a WR at this time.  In general, FDA also makes
847 suggestions as to what the sponsor should include in a resubmitted PPSR that might support our
848 issuance of a WR.
849
850    2.    *Issuance and Acceptance of a WR*
851
852 The sponsor or application holder must respond to FDA within 180 days after receiving the WR
853 indicating whether it will conduct the studies and, if so, indicate when it will initiate the
854 studies.[106]
855
856 The procedure for qualifying for exclusivity and the protections that exclusivity will confer are
857 described in more detail in sections IV.E., Determining Eligibility For Pediatric Exclusivity, and
858 IV.F., Attaching the Period of Pediatric Exclusivity After a Determination That a Drug Qualifies
859 for Pediatric Exclusivity.
860
861 If a sponsor declines a WR that is issued by FDA, the sponsor must provide the reasons it
862 declined the request.[107]  If the sponsor declines the WR because it is not possible to develop an
863 appropriate pediatric formulation, the sponsor must submit to FDA the reasons such pediatric
864 formulation cannot be developed.[108]  If a sponsor declines a WR, the sponsor is not eligible to
865 qualify for pediatric exclusivity for the studies under that WR.
866
867    **C.    How to Submit Study Reports in Response to a Written Request**
868
869 To qualify for pediatric exclusivity, sponsors or application holders must submit study reports in
870 accordance with FDA requirements for filing.[109]  Studies submitted in an application or
871 supplement that does not meet requirements for filing of an NDA, BLA, or supplement (i.e.,
872 FDA refuses to file the application or supplement) are not considered submitted to FDA.
873
874 In general, sponsors should also submit study reports in accordance with the guidance for
875 industry *Guideline for the Format and Content of the Clinical and Statistical Sections of an
876 Application* (July 1988) and the ICH guidance for industry *E3 Structure and Content of Clinical
877 Study Reports* (July 1996).

---

[105] See section 505A(d)(3) of the FD&C Act (21 U.S.C. 355a(d)(3)).

[106] See section 505A(d)(2)(A)(i) of the FD&C Act (21 U.S.C. 355a(d)(2)(A)(i)).

[107] See section 505A(d)(2)(A)(i) of the FD&C Act (21 U.S.C. 355a(d)(2)(A)(i)).

[108] See section 505A(d)(2)(A)(ii) of the FD&C Act (21 U.S.C. 355a(d)(2)(A)(ii)).

[109] See section 505A(d)(4) of the FD&C Act (21 U.S.C. 355a(d)(4)).  For additional information on filing
requirements and refusal to file, see, for example, 21 CFR 314.50, 21 CFR 314.101, and 21 CFR 601.2.

878
879   To help ensure that pediatric study reports are evaluated for eligibility for pediatric exclusivity in
880   a timely manner, sponsors should include the following with the application or supplement:
881
882   - A header that states SUBMISSION OF PEDIATRIC STUDY REPORTS —
883     PEDIATRIC EXCLUSIVITY DETERMINATION REQUESTED;
884
885   - A copy of the WR and any amendments;
886
887   - A summary of the pediatric studies conducted in response to the WR;
888
889   - An annotated WR indicating how and where in the submitted study reports each term of
890     the WR has been addressed; and
891
892   - Proposed labeling that includes information regarding the results of the study or studies.
893
894   If there is information that is adequate to support the evaluation of dosing, safety, and efficacy in
895   a subpopulation of the population included in the WR, FDA encourages the sponsor to submit an
896   NDA, BLA, or supplement to incorporate that information into labeling for the drug before the
897   determination of exclusivity.  If making multiple submissions in response to a single WR, the
898   sponsor should, in the final submission, reference prior submissions (including relevant
899   submission dates) and mark only the last submission as described above.
900
901   **D.    Qualifying for Pediatric Exclusivity**
902
903   We note at the outset that a commitment to complete a study at some future date is not sufficient
904   to qualify a drug for pediatric exclusivity.[110]  Rather, to qualify for an initial period of pediatric
905   exclusivity, a sponsor must submit study reports that fairly respond to an issued WR, were
906   conducted in accordance with commonly accepted scientific principles and protocols, and have
907   been reported in accordance with filing requirements.[111]  It is not necessary for the uses studied
908   under the WR to be approved.[112]
909
910   *1.    For a Drug Product That Is the Subject of a New Drug Application or Biologics*
911   *License Application*
912
913   A drug product qualifies for pediatric exclusivity when all of the following have occurred:[113]

---

[110] See sections 505A(b) and 505A(c) of the FD&C Act (21 U.S.C. 355a(b) and 21 U.S.C. 355A(c)).

[111] See sections 505A(b), 505A(c), and 505A(d)(4) of the FD&C Act (21 U.S.C. 355a(b), 21 U.S.C. 355a(c), and 21 U.S.C. 355a(d)(4)).

[112] Approval is required for a sponsor to qualify for a second 6-month period of pediatric exclusivity under section 505A(g) of the FD&C Act (21 U.S.C. 355a(g)).  See section IV.F.1.b., A second 6-month period of pediatric exclusivity, for further discussion of that process.

[113] See sections 505A(b), 505A(c), and 505A(d)(4) of the FD&C Act (21 U.S.C. 355a(b), 21 U.S.C. 355a(c), and 21 U.S.C. 355a(d)(4)).

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

914
915    • FDA issued a WR for pediatric studies, and the sponsor or holder of an approved
916      application agreed to the request.
917
918    • The sponsor or the holder of an approved application has submitted reports of the
919      requested studies.  Such reports should be submitted to the NDA or BLA **after** FDA
920      issues the WR.
921
922    • The studies were completed using appropriate formulations for each age group and within
923      the requested time frame.
924
925    • FDA has determined the studies fairly respond to the WR, have been conducted in
926      accordance with commonly accepted scientific principles and protocols, and have been
927      reported in accordance with filing requirements.
928
929    • FDA makes an exclusivity determination at least 9 months before the expiration date of
930      the patent and/or exclusivity protection to which the pediatric exclusivity will attach.[114]
931
932    2.    *Nonprescription Drugs*
933
934    Nonprescription drugs marketed under an approved application may be eligible for pediatric
935    exclusivity, and the recommendations in this guidance apply to those nonprescription drugs.
936
937    Nonprescription drugs that are marketed pursuant to a monograph developed under the over-the-
938    counter drug review are not eligible for exclusivity under section 505A of the FD&C Act.
939
940    **E.    Determining Eligibility For Pediatric Exclusivity**
941
942    For a drug to be considered eligible for pediatric exclusivity, FDA recommends that the sponsor
943    submit a complete report of all studies to FDA at least 15 months before the expiration of any
944    existing patent or exclusivity it wishes to protect (i.e., the 9-month time period[115] plus the 180-
945    day exclusivity determination review period[116]).  If sponsors choose to submit within less than
946    15 months, FDA may not be able to complete its review of such studies and make a
947    determination about the drug's eligibility for pediatric exclusivity in time to meet the 9-month
948    deadline.
949
950    In making an eligibility determination, FDA will evaluate whether the studies fairly respond to
951    the WR, were conducted in accordance with commonly accepted scientific principles and

---

[114] See section 505A(b)(2) and 505A(c)(2) of the FD&C Act (21 U.S.C. 355a(b)(2) and 21 U.S.C. 355a(c)(2)) and section 351(m)(4) of the PHS Act (42 U.S.C. 262(m)(4)).

[115] See section 505A(b)(2) and 505A(c)(2) of the FD&C Act; 21 U.S.C. 355a(b)(2) and 21 U.S.C. 355a(c)(2).

[116] See section 505A(d)(4) of the FD&C Act (21 U.S.C. 355a(d)(4)).

*Contains Nonbinding Recommendations*
Draft — Not for Implementation

protocols, and have been reported in accordance with filing requirements.[117]  FDA's pediatric exclusivity boards (Boards), which are comprised of representatives from the Center for Drug Evaluation and Research or the Center for Biologics Evaluation and Research, including representatives with pediatric expertise, make this determination.  In general, the Boards consider the following when assessing, as required by statute, whether the studies *fairly respond* to a WR:

- The purpose of the pediatric exclusivity provision as described in the statute, with reference to the legislative history.  The statute makes clear that its purpose is to generate meaningful clinical information on the use of drug products in children that will result in a health benefit to pediatric populations.[118]

- Whether the sponsor met the terms of a WR.

- The information sought in the WR and the objectives stated in the WR.

In general, the Boards ask whether the studies were designed and carried out by the sponsor in a way likely to meet those objectives specified in the WR and underlying the exclusivity provision as a whole.  When a sponsor meets the terms of a WR, the resulting studies fairly respond to that WR because studies that are carried out in accordance with the trial's plans and objectives, as expressed in the WR, generally satisfy the statutory goal of obtaining meaningful pediatric use information.  Sometimes, a sponsor fails to produce meaningful pediatric information despite conducting the studies in the manner requested.  Under such circumstances, FDA nevertheless considers the sponsor to have fairly responded to the WR.  FDA understands that the failure to generate meaningful information in such cases is at least partially attributable to study design, and FDA and the sponsor generally design studies described in a WR jointly.

Where the sponsor has not met the terms of the WR, FDA evaluates whether the information generated by the studies is nevertheless sufficient to meet the objectives of the WR in light of the information sought in the WR.  If FDA determines that the objectives of the WR were met, then FDA concludes that the sponsor has fairly responded, even if it did not meet the terms of the WR.  FDA considers studies that do not meet the terms of the written request to have fairly responded if, considering the data provided by the sponsor as a whole (i.e., by considering all relevant data, and not just data generated by those studies), the sponsor meets the objectives of the WR by generating clinically meaningful information of the general type (quality and quantity) the WR contemplates.

---

[117] See section 505A(d)(4) of the FD&C Act (21 U.S.C. 355a(d)(4)).

[118] See, for example, section 505A(b)(1) and 505A(c)(1) of the FD&C Act (21 U.S.C. 355a(b)(1) and 21 U.S.C. 355a(c)(1)) requiring FDA to determine "that information relating to the use of a new drug in the pediatric population may produce health benefits," section 505A(f)(2) of the FD&C Act (21 U.S.C. 355a(f)(2)) requiring review by the PeRC before FDA issues a WR, section 505A(f)(3) of the FD&C Act, providing that the same committee may review the reports of studies conducted in response to a WR before FDA makes a determination regarding pediatric exclusivity, section 505A(f)(6)(E) of the FD&C Act (21 U.S.C. 355a(f)(6)(E)) requiring FDA to publicly report, among other things, labeling changes made as a result of studies conducted in response to a WR, and section 505A(k)(2) of the FD&C Act (21 U.S.C. 355a(k)(2)) requiring sponsors to distribute the same to physicians and other health care providers.

989    For example, if a specific number of subjects is requested or a specific study duration or
990    endpoint is specified to ensure that the study will generate adequate data to provide a health
991    benefit, failure to comply with these elements of the WR may result in a denial of exclusivity.
992    Denial is likely if, in the absence of compliance with the terms of the WR, the studies are not
993    expected to be interpretable or will not provide information that otherwise yields a health benefit
994    to the pediatric populations addressed in the WR.
995
996    Where a WR is capable of more than one interpretation, the Boards generally consider a fair
997    response to be one that interprets the WR in a manner likely to generate information that will
998    provide a health benefit (including meaningful pediatric labeling) in the relevant populations that
999    the WR asked the sponsor to study.  If the studies submitted fairly respond to the WR, the Boards
1000    will recommend that the drug is eligible for pediatric exclusivity (assuming the other statutory
1001    requirements for pediatric exclusivity are met).[119]  If, on the other hand, the sponsor responds to
1002    the WR in such a way that the possibility of a health benefit (including meaningful pediatric
1003    labeling in relevant age groups) from the studies conducted is not likely, the Boards are likely to
1004    conclude that the submission does not fairly respond to the WR.
1005
1006    Generally, FDA expects to notify sponsors or holders of an approved application within the 180-
1007    day period after the study reports are submitted whether the study reports fairly responded to the
1008    WR and the drug qualifies for pediatric exclusivity.[120]
1009

1010    **F.    Attaching the Period of Pediatric Exclusivity After a Determination That a
1011    Drug Qualifies for Pediatric Exclusivity**
1012
1013    *1.    Drug Products[121]*
1014
1015    a.    An initial 6-month period of pediatric exclusivity
1016
1017    Pediatric exclusivity will attach to all unexpired exclusivities and patents[122] listed in the
1018    *Approved Drug Products With Therapeutic Equivalence Evaluations* publication (the Orange

---

[119] See sections 505A(b)(1), 505A(c)(1), and 505A(d)(4) of the FD&C Act (21 U.S.C. 355a(b)(1), 21 U.S.C. 355a(c)(1), and 21 U.S.C. 355a(d)(4)).

[120] See section 505A(d)(4) of the FD&C Act (21 U.S.C. 355a(d)(4)).

[121] For the purposes of this section IV.F.1., references to *drugs* or *drug products* do not include biological products licensed under section 351 of the PHS Act (42 U.S.C. 262).  Although the considerations in this section are generally relevant to such biological products, pediatric exclusivity for biological products differs in certain ways from pediatric exclusivity for other drug products.  For more information see section IV.F.2., Biological Products, below.

[122] Pediatric exclusivity that has attached to the end of the patent term will block for an additional 6 months after the patent expires approval of an ANDA or 505(b)(2) application if (1) the ANDA or 505(b)(2) sponsor did not seek approval until the end of the patent term; or (2) the ANDA or 505(b)(2) sponsor's patent challenge has been unsuccessful.  See, for example, sections 505A(b)(1) and 505A(c)(1) of the FD&C Act (21 U.S.C. 355a(b)(1) and 21 U.S.C. 355a(c)(1)).  In addition, if an ANDA or 505(b)(2) sponsor files a paragraph IV certification challenging a listed patent, and the patent litigation is ongoing when the patent expires, the pediatric exclusivity will attach at the

**Contains Nonbinding Recommendations**
*Draft — Not for Implementation*

1019 Book)[123] for any drug product containing the drug the sponsor studies and for which it holds the
1020 approved NDA.[124]  For studies a sponsor conducts on a previously unapproved drug, pediatric
1021 exclusivity will attach to any exclusivities or patents that will be listed in the Orange Book upon
1022 approval of that drug and to certain later listed patents or exclusivities.[125]  For studies a sponsor
1023 conducts on a previously approved drug, pediatric exclusivity will attach to protections listed for the
1024 previously approved drug *at the time the drug qualifies for pediatric exclusivity* and to certain
1025 later listed patents and exclusivities,[126] as described further in section IV.F.1.c., Later-filed
1026 applications containing the same drug.  Pediatric exclusivity for combination drugs may raise
1027 additional considerations that are not addressed in this guidance.
1028

1029         b.      A second 6-month period of pediatric exclusivity
1030

1031 Each WR may result in only one 6-month period of pediatric exclusivity.[127]  However, after a
1032 drug has qualified for an initial period of pediatric exclusivity, a sponsor submitting a
1033 supplement to an application can submit additional pediatric studies meeting the relevant
1034 statutory requirements in response to a second WR.[128]  The second 6-month period of pediatric
1035 exclusivity will attach only to any new 3-year exclusivity period for which the supplemental
1036 application qualifies.[129]  In addition, several other considerations regarding a second period of
1037 pediatric exclusivity are presented as follows:[130]
1038

1039     • A second WR can result in a 6-month period of exclusivity only if the response to the
1040        WR results in an approved *supplemental application* for a new use.
1041

1042     • A new use is a use not included in the approved labeling of an approved drug.[131]  For
1043        example, expansion of the labeling to include a new pediatric population constitutes a
1044        new use.
1045

---

end of the patent term to block approval of that ANDA or 505(b)(2) application for an additional 6 months after the patent expires (*Ranbaxy Labs.* v. *FDA*).

[123] The Orange Book is available at https://www.accessdata.fda.gov/scripts/cder/ob/index.cfm.

[124] See section 505A(c) of the FD&C Act (21 U.S.C. 355a(c)).

[125] See section 505A(b) of the FD&C Act (21 U.S.C. 355a(b)).

[126] See section 505A(c) of the FD&C Act (21 U.S.C. 355a(c)).

[127] See sections 505A(b)(1) and 505A(c)(1) of the FD&C Act (21 U.S.C. 355a(b)(1) and 21 U.S.C. 355a(c)(1)).

[128] See section 505A(g) of the FD&C Act (21 U.S.C. 355a(g)).

[129] See section 505A(g) of the FD&C Act (21 U.S.C. 355a(g)).

[130] See section 505A(g) of the FD&C Act (21 U.S.C. 355a(g)).

[131] See 21 CFR 99.3(g).

- The supplement for a new use submitted in response to the second WR must qualify for 3-year exclusivity[132] or no 6-month period of pediatric exclusivity will attach.

- The second 6-month period of pediatric exclusivity attaches *only* to the 3-year exclusivity applied to the supplement for a new use containing the studies submitted in response to the second WR and not to any other exclusivity or patent protections applicable to the drug.

- No more than two 6-month periods of exclusivity under the BPCA are possible for any specific drug product.

      c.     Later-filed applications containing the same drug

In situations where a sponsor submits an application or supplement containing an active moiety for which the sponsor previously qualified for pediatric exclusivity, pediatric exclusivity does not attach to new (not previously listed) patents or exclusivity covering the later filed applications or supplements unless the subsequent drug product could not be labeled without the data that qualified the previously approved drug product for the prior pediatric exclusivity.[133]

FDA notes that if pediatric exclusivity for which a drug product previously qualified has attached to a listed patent or exclusivity protecting the previously approved application that also protects the new application or new supplement held by the same sponsor, the pediatric exclusivity also attaches to that patent in conjunction with the new application or supplement.[134]  For example, if a sponsor qualifies for a 6-month pediatric exclusivity that attaches to a 5-year exclusivity, that exclusivity attaches to each of the sponsor's NDAs protected by that 5-year exclusivity, regardless of when the new application or supplement is filed or what it contains.  The following examples are provided:

- **Example 1** — Drug 1 (D1) qualifies for pediatric exclusivity.  The sponsor or holder of an approved application for D1 later files a different application for a drug product containing D1 or a supplement to an existing application for a drug product containing D1.  FDA does not need any of the data the sponsor or holder of an approved application submitted for pediatric exclusivity to approve the new application or new supplement.  The pediatric exclusivity does not attach to any exclusivities or patents that apply solely to the new application or the new supplement.

- **Example 2** — D1 qualifies for pediatric exclusivity.  The sponsor or holder of the approved application for D1 later files a different application for a drug product containing D1 or a supplement to an existing application for a drug product containing D1.  The drug product could not be labeled with the data submitted in the later-filed applications or supplements without the data the sponsor or holder of an approved

---

[132] See sections 505(c)(3)(E)(iv) and 505(j)(5)(F)(iv) of the FD&C Act (21 U.S.C. 355(c)(3)(E)(iv) and 21 U.S.C. (j)(5)(F)(iv)).

[133] See sections 505A(b)(1) and 505A(c)(1) of the FD&C Act (21 U.S.C. 355a(b)(1) and 21 U.S.C. 355a(c)(1)).

[134] See sections 505A(b)(1) and 505A(c)(1) of the FD&C Act (21 U.S.C. 355a(b)(1) and 21 U.S.C. 355a(c)(1)).

application previously submitted for pediatric exclusivity. The pediatric exclusivity attaches to any exclusivities or patents that apply to the new application or the new supplement. In addition, if the pediatric exclusivity attaches to a patent or exclusivity that also protects the new application or new supplement, the pediatric exclusivity applies to the new application or supplement to the same extent it applies to the previously approved application.

### 2. Biological Products

Pediatric exclusivity for biological products differs in some ways from provisions applicable to other drug products. First, as described below, pediatric exclusivity only attaches to reference product and orphan drug exclusivity periods. Second, unlike other drug products, pediatric exclusivity does not attach to patents for biological products.[135]

Under section 351(k)(7)(A) of the PHS Act, approval of an application for a biosimilar or interchangeable biological product submitted under section 351(k) of the PHS Act may not be made effective until 12 years after the date on which the reference product was first licensed under section 351(a) of the PHS Act. Moreover, under section 351(k)(7)(B) of the PHS Act, an application for a biosimilar or interchangeable biological product submitted under section 351(k) of the PHS Act may not be submitted for review until 4 years after the date on which the reference product was first licensed under section 351(a) of the PHS Act. An additional 6-month period of pediatric exclusivity will attach to the 12- and 4-year periods if the sponsor meets the requirements for pediatric exclusivity pursuant to section 505A of the FD&C Act.[136] Furthermore, an additional 6-month period of pediatric exclusivity will also attach to the 7 years of orphan drug exclusivity for a biological product designated under section 526 of the FD&C Act for a rare disease or condition.[137]

## V.    ELEMENTS COMMON TO PREA AND THE BPCA

### A.    The Pediatric Review Committee

Section 505C of the FD&C Act directed FDA to establish the PeRC that must review all WRs and all requests for deferrals, deferral extensions, and waivers.[138] The PeRC also provides consultation on pediatric assessments and on iPSPs, agreed iPSPs, and any significant amendments to such plans.[139]

---

[135] See section 351(m) of the PHS Act (42 U.S.C. 262(m)).

[136] See section 351(m) of the PHS Act (42 U.S.C. 262(m)).

[137] See section 527(a) of the FD&C Act and section 351(m) of the PHS Act (21 U.S.C. 360cc(a); 42 U.S.C. 262(m)).

[138] See sections 505C, 505A(f), and 505B(f) of the FD&C Act (21 U.S.C. 355d, 21 U.S.C. 355a(f), and 21 U.S.C. 355c(f)).

[139] See section 505B(f) of the FD&C Act (21 U.S.C. 355c(f)).

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

1123
1124 As a general matter, the PeRC also reviews significant amendments to WRs and PPSR
1125 inadequate letters to ensure consistency.
1126
1127 Members of the PeRC include FDA employees with expertise in pediatrics (including
1128 representation from the Office of Pediatric Therapeutics (OPT)), neonatology, biopharmacology
1129 (i.e., pharmacology/toxicology), statistics, chemistry, legal issues, pediatric ethics, the
1130 appropriate expertise pertaining to the pediatric drug under review, and other individuals as
1131 needed.[140]  In addition to the responsibilities above, the PeRC also provides consultation on
1132 tracking information regarding pediatric assessments and labeling changes.[141]  As a general
1133 matter, members of the relevant drug review division provide background information to the
1134 PeRC and are present during the discussion of an application.
1135
1136 **B.     Publishing Information About Pediatric Studies**
1137
1138 *1.     Pediatric Exclusivity Determinations*
1139
1140 FDA posts on its website a list of exclusivity determinations on approved drugs that have
1141 qualified for pediatric exclusivity.[142]  FDA also publishes pediatric exclusivity information for
1142 drugs in the Patent and Exclusivity Information section of the Orange Book and its supplements
1143 in the same manner as FDA publishes information regarding 5-year exclusivity, 3-year
1144 exclusivity, patent listings, and orphan drug exclusivity.[143]
1145
1146 *2.     Medical, Statistical, and Clinical Pharmacology Reviews*
1147
1148 Sections 505A(k) and 505B(h) of the FD&C Act require that FDA publish the medical,
1149 statistical, and clinical pharmacology reviews of pediatric studies conducted under the BPCA
1150 and of pediatric assessments under PREA.  For studies submitted in response to a WR, FDA
1151 must do so within 210 days after the submission.[144]  For most pediatric assessments submitted
1152 under PREA, FDA must do so within 330 days after the submission.[145]  FDA makes such

---

[140] See section 505C of the FD&C Act (21 U.S.C. 355d).

[141] See sections 505A(f)(6) and 505B(f)(6) of the FD&C Act (21 U.S.C. 355a(f)(6) and 21 U.S.C. 355c(f)(6)).

[142] See the FDA's Pediatric Exclusivity Granted web page at https://www.fda.gov/drugs/development-resources/pediatric-exclusivity-granted.

[143] See the Orange Book available at https://www.accessdata.fda.gov/scripts/cder/ob/default.cfm.

[144] See section 505A(k)(1) of the FD&C Act (21 U.S.C. 355a(k)(1)).  For drug products for which exclusivity determinations were made before September 27, 2007, we have posted summaries of medical and clinical pharmacology reviews of studies conducted under section 505A of the FD&C Act, consistent with applicable BPCA requirements at that time.

[145] See section 505B(h)(1) of the FD&C Act (21 U.S.C. 355c(h)(1)).  This provision of the law first went into effect on September 27, 2007.

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

1153  information publicly available consistent with section 301(j) of the FD&C Act, the Freedom of
1154  Information Act, and the Trade Secrets Act.[146]
1155
1156  Before disclosure, the medical, statistical, and clinical pharmacology reviews are redacted, as
1157  appropriate, for trade secret information and for confidential commercial information.[147]
1158
1159  As FDA interprets section 505A(k) of the FD&C Act, the 210-day BPCA disclosure requirement
1160  is triggered when a sponsor or holder of an approved application submits an application or a
1161  supplement in response to a WR that FDA determines meets filing requirements (see section
1162  IV.C., How to Submit Study Reports in Response to a Written Request).  FDA interprets the
1163  disclosure requirement to apply to such applications and supplements submitted in response to a
1164  WR under the BPCA, regardless of whether (1) the application process is completed or it is later
1165  withdrawn; (2) the drug qualifies for pediatric exclusivity; or (3) the application or supplement is
1166  approved or the sponsor receives a complete response letter.  In addition, FDA interprets the
1167  disclosure requirement to apply to partial responses to a WR under the BPCA that meet the filing
1168  requirements.  (See section IV.C., How to Submit Study Reports in Response to a Written
1169  Request, for a discussion of partial responses.)
1170
1171      3.     *Other Pediatric Information*
1172
1173  FDA maintains a web page[148] containing extensive information about pediatric studies
1174  conducted under sections 505A and 505B of the FD&C Act.  The web page includes, among
1175  other things, statistics and other information regarding the relevant studies, drugs, labeling
1176  changes, and reports.  Statistics we post include the number of waivers, deferrals, and deferral
1177  extensions granted; the number of pediatric formulations developed; and the number of
1178  formulations not developed (including the reason they were not developed).[149]  The web page
1179  also identifies drugs approved for use in a pediatric population for which a pediatric formulation

---

[146] See 5 U.S.C. 552 and 18 U.S.C. 1905.

[147] 21 CFR 314.430 is FDA's regulation regarding the public disclosure of information in a drug application or
abbreviated application.  21 CFR 601.51 is FDA's regulation regarding the public disclosure of information in a
biological product file.  Under 21 CFR 314.430(b), we will not publicly disclose the existence of an application or
abbreviated application before an approval or tentative approval letter is sent, unless the existence of the application
or abbreviated application has been previously publicly disclosed or acknowledged.  Under 21 CFR 601.51(b), we
will not disclose the existence of a biological product file before the application has been approved if the existence
of the file has not been previously publicly disclosed or acknowledged.  Under 21 CFR 314.430(d)(1) and
601.51(d)(1), if the existence of the application or biological product file has been publicly disclosed or
acknowledged, as a general matter, no data or information contained in the application, abbreviated application, or
biological product file is available for public disclosure before we send an approval letter or before a license is
issued.  We note that 21 CFR 314.430 and 601.51 were promulgated before the passage of PREA and the BPCA and
do not specifically discuss the disclosure of medical, statistical, and clinical pharmacology reviews of pediatric
studies conducted under the BPCA and of pediatric assessments under PREA.  As a general matter, FDA discloses
such reviews only to the extent the drug product studied has already been approved.  Additionally, the protected
status of particular information in the reviews is determined on a case-by-case basis.

[148] See the Pediatric Reports, Statistics, Reviews, and Databases web page at https://www.fda.gov/science-
research/pediatrics/reports-statistics-reviews-and-databases.

[149] See section 505B(f)(6) of the FD&C Act (21 U.S.C. 355c(f)(6)).

1180    was developed and that qualified for pediatric exclusivity, but the formulation was not marketed
1181    within 1 year of the exclusivity determination.[150]  FDA also maintains a web page containing
1182    information about section 409I of the PHS Act.[151]
1183

1184    A list of approved drugs for which WRs have been issued is published on the FDA website.[152]
1185    In addition, WRs, including any amendment(s) if not otherwise incorporated into one document,
1186    are posted on the FDA website within 30 days of the determination that the requirements for
1187    exclusivity have been met.[153]
1188

1189    Information from a required annual review following the granting of a deferral will be posted
1190    publicly within 90 days of submission.[154]  The posting will include the information submitted
1191    through the annual review, the name of the applicant, the date on which the drug was approved,
1192    and the date of each deferral or deferral extension.[155]
1193

1194    Finally, FDA posts guidances, relevant regulations, relevant presentations from conferences,
1195    press releases, and reports, among other information.  Transcripts from Pediatric Advisory
1196    Committee meetings, beginning September 2004, are posted as well, as are transcripts from past
1197    meetings of the Pediatric Advisory Subcommittee of the Anti-Infective Drugs Advisory
1198    Committee, held between April 1999 and June 2004.[156]  FDA intends to update these sites
1199    regularly.
1200

1201    **C.  PREA and Pediatric Exclusivity**
1202

1203    To qualify for pediatric exclusivity, the pediatric studies conducted to satisfy the requirements of
1204    PREA must be the subject of a WR and satisfy all other requirements for pediatric exclusivity

---

[150] See section 505A(e)(2) of the FD&C Act (21 U.S.C. 355a(e)(2)).

[151] See the Off-Patent Studies Under BPCA web page at https://www.fda.gov/drugs/development-resources/patent-studies-under-bpca.

[152] See the Written Requests Issued web page at https://www.fda.gov/drugs/development-resources/written-requests-issued.  On occasion, information obtained by FDA subsequent to issuance of a WR causes FDA to rescind the WR.  This list is not updated to indicate when a WR has been rescinded.

[153] See section 505A(e)(1) of the FD&C Act (21 U.S.C. 355a(e)(1)).  See also the FDA's Pediatric Exclusivity Granted web page at https://www.fda.gov/drugs/development-resources/pediatric-exclusivity-granted.

[154] See section 505B(a)(4)(C)(ii) of the FD&C Act (21 U.S.C. 355c(a)(4)(C)(ii)).  See also FDA's Postmarket Requirements and Commitments web page at https://www.accessdata.fda.gov/scripts/cder/pmc/index.cfm.

[155] See section 505B(a)(4)(C)(ii) of the FD&C Act (21 U.S.C. 355c(a)(4)(C)(ii)).

[156] See https://www.fda.gov/advisory-committees/pediatric-advisory-committee/past-meeting-materials-pediatric-advisory-committee.

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

1205 under the BPCA.[157]  As discussed in section IV.A.2., Written Request Studies, FDA does not
1206 expect to issue WRs solely for studies or planned studies that are required under PREA.
1207
1208 For already marketed drugs, FDA may require pediatric assessments under PREA if it finds, for
1209 example, that the drug is used for a substantial number of pediatric patients for the labeled
1210 indications and adequate pediatric labeling could confer a benefit on pediatric patients.[158]  In
1211 some cases, FDA may first issue a WR under section 505A of the FD&C Act before requiring
1212 studies under section 505B(b).  In those cases, if the sponsor declines the WR for the labeled
1213 indication(s), FDA may still require those studies under PREA.[159]
1214
1215 It is important to note the distinction between the scope of the studies FDA requests under the
1216 BPCA and those required under PREA.  The scope of studies described in a WR may be broader
1217 than those required under PREA.  FDA's authority to issue a WR extends to the use of an active
1218 moiety for indications that may produce health benefits in the pediatric population, regardless of
1219 whether it has previously approved the indications in adults.[160]  Under PREA, pediatric
1220 assessments are required only for those indications the sponsor has included in the pending
1221 application.[161]  To learn more about eligibility for pediatric exclusivity, see section IV., Best
1222 Pharmaceuticals for Children Act, or contact the relevant review division.
1223
1224 ## D. Considerations for Labeling of Drug Products
1225
1226 ### 1. Labeling Study Results
1227
1228 Study results submitted in response to PREA or a WR must be described in labeling regardless of
1229 whether these findings support safety and/or effectiveness, do not support safety and/or

---

[157] See sections 505A(b)(1), 505A(c)(1), 505A(d) and 505A(h) of the FD&C Act (21 U.S.C. 355a(b)(1), 21 U.S.C. 355a(c)(1), 21 U.S.C. 355a(d), and 21 U.S.C. 355a(h)).

[158] See section 505B(b)(1) of the FD&C Act (21 U.S.C. 355c(b)(1)).

[159] See section 505B(b) of the FD&C Act (21 U.S.C. 355c(b)).  This section states that the Secretary may require a sponsor or holder of an approved application to submit pediatric assessments as described under section 505B(a)(2) of the FD&C Act if the Secretary finds that "(A) (i) the drug or biological product is used for a substantial number of pediatric patients for the labeled indications; and (ii) adequate pediatric labeling could confer a benefit on pediatric patients; (B) there is reason to believe that the drug or biological product would represent a meaningful therapeutic benefit over existing therapies for pediatric patients for 1 or more of the claimed indications; or (C) the absence of adequate pediatric labeling could pose a risk to pediatric patients."

[160] See sections 505A(a), 505A(b)(1), 505A(c)(1), and 505A(d)(1)(B) of the FD&C Act (21 U.S.C. 355a(a); 21 U.S.C. 355a(a), 21 U.S.C. 355a(b)(1), 21 U.S.C. 355a(c)(1), and 21 U.S.C. 355a(d)(1)(B)).

[161] See sections 505B(a)(1)(A) and 505B(a)(2) of the FD&C Act (21 U.S.C. 355c(a)(1)(A) and 21 U.S.C. 355c(a)(2)).  Note, however, that molecularly targeted pediatric cancer investigations are based on molecular mechanism of action rather than clinical indication.  See sections 505B(a)(1)(B) and 505B(a)(3) of the FD&C Act (21 U.S.C. 355c(a)(1)(B) and 21 U.S.C. 355c(a)(3)).  For additional information, see the guidance for industry *FDARA Implementation Guidance for Pediatric Studies of Molecularly Targeted Oncology Drugs: Amendments to Sec. 505B of the FD&C Act.*

***Contains Nonbinding Recommendations***
*Draft — Not for Implementation*

1230    effectiveness, or are inconclusive.[162]  If a full or partial waiver is granted because there is
1231    evidence that a drug would be unsafe or ineffective in pediatric populations, applicants must
1232    include this information in labeling.[163]
1233
1234    Applicants must distribute information to health care providers describing any labeling changes
1235    that are approved as a result of these studies as required by FDA.[164]
1236

1237        *2.      Dispute Resolution*

1238
1239    The BPCA and PREA provide for a dispute resolution process when FDA and the applicant fail
1240    to agree on appropriate labeling changes.[165]  If the applicant does not agree within the specified
1241    time period after FDA's request to make labeling changes, FDA must refer the matter to the
1242    Pediatric Advisory Committee (PAC).[166]  The PAC then has 90 days after receiving the referral
1243    to review the pediatric study reports and make a recommendation to FDA.[167]  FDA will consider
1244    the recommendation, and, if appropriate, within 30 days after receiving the recommendation,
1245    make a request to the applicant to make the labeling changes FDA determines to be
1246    appropriate.[168]  If the applicant fails to agree to make the labeling changes within 30 days after
1247    receiving such a request, the drug may be deemed misbranded.[169]
1248

1249        *3.      Priority Review of Applications and Labeling Supplements*

1250
1251    Any application or supplement to an application that proposes a labeling change as a result of
1252    pediatric studies a sponsor conducts under section 505A of the FD&C Act will be considered a
1253    priority application or supplement.[170]  This priority status applies even if the studies submitted

---

[162] See sections 505A(j) and 505B(g)(2) of the FD&C Act (21 U.S.C. 355a(j) and 21 U.S.C. 355c(g)(2)).  See also the guidance for industry *Pediatric Information Incorporated Into Human Prescription Drug and Biological Product Labeling*.

[163] See section 505B(a)(5)(D) of the FD&C Act (21 U.S.C. 355c(a)(5)(D)).

[164] See sections 505A(k)(2) and 505B(h)(2) of the FD&C Act (21 U.S.C. 355a(k)(2) and 355c(h)(2)).

[165] See sections 505A(i)(2) and 505B(g)(1) of the FD&C Act (21 U.S.C. 355a(i)(2) and 355c(g)(1)).

[166] See sections 505A(i)(2)(A) and 505B(g)(1)(A) of the FD&C Act (21 U.S.C. 355a(i)(2)(A) and 355c(g)(1)(A)).

[167] See sections 505A(i)(2)(B) and 505B(g)(1)(B) of the FD&C Act (21 U.S.C. 355a(i)(2)(B) and 355c(g)(1)(B)).

[168] See sections 505A(i)(2)(C) and 505B(g)(1)(C) of the FD&C Act (21 U.S.C. 355a(i)(2)(C) and 355c(g)(1)(C)).

[169] See sections 505A(i)(2)(D) and 505B(g)(1)(D) of the FD&C Act (21 U.S.C. 355a(i)(2)(D) and 355c(g)(1)(D)).

[170] See section 505A(i)(1) of the FD&C Act (21 U.S.C. 355a(i)(1)).  This priority review provision applies only to applications and supplements containing studies conducted under section 505A of the FD&C Act; it does not apply to an application or supplement solely because it contains pediatric information.  Note that NDAs and BLAs may be otherwise eligible for priority review.  For information on Prescription Drug User Fee Act VI performance goals and procedures, see https://www.fda.gov/industry/fda-user-fee-programs/prescription-drug-user-fee-amendments.

1254 did not respond completely to the WR or did not otherwise qualify for pediatric exclusivity.[171]
1255 Applications that include a pediatric assessment submitted with the sole intention of responding
1256 to PREA requirements do not necessarily receive priority review.
1257
1258 For more information about priority review, see FDA's Prescription Drug User Fee Act
1259 reauthorization performance goals and procedures document.[172]
1260
1261    **E.    Adverse Event Reporting for Drug Products Subject to the BPCA and PREA**
1262
1263 At the same time that a sponsor submits reports of studies responding to a WR, the sponsor must
1264 also provide FDA with all available postmarketing adverse event reports regarding the studied
1265 drug.[173]  The format of the postmarketing adverse event report should follow the model for a
1266 periodic safety update report described in the ICH guidance for industry *E2C(R2) Periodic
1267 Benefit-Risk Evaluation Report (PBRER)* (July 2016).  In addition, the sponsor may contact the
1268 review division for further information.
1269
1270 Eighteen months after the date of a labeling change made to reflect studies conducted under
1271 PREA or the BPCA, the applicable center refers to OPT a report of all adverse events received
1272 by FDA for the drug product.[174]  As a general matter, OPT presents a report and analysis to the
1273 PAC, and the PAC reviews this analysis and recommends whether additional monitoring (other
1274 than the usual surveillance) is necessary.  When the PAC considers additional monitoring
1275 necessary after the 18-month period, the center generally continues to refer adverse event reports
1276 to OPT.
1277
1278
1279 **VI.    ADDITIONAL INFORMATION**
1280
1281 The Division of Pediatrics and Maternal Health can provide general information about
1282 complying with PREA and the BPCA.  Additional pediatric information and contact information
1283 is available on the Pediatric Product Development web page.[175]
1284

---

[171] See section 505A(i)(1) of the FD&C Act (21 U.S.C. 355a(i)(1)).

[172] See PDUFA Reauthorization Performance Goals and Procedures Fiscal Years 2013 Through 2017 at
https://www.fda.gov/media/81306/download.

[173] See section 505A(d)(2)(B) of the FD&C Act (21 U.S.C. 355a(d)(2)(B)).

[174] See sections 505A(l) and 505B(i) of the FD&C Act (21 U.S.C. 355a(l) and 355c(i)).

[175] Available at https://www.fda.gov/drugs/development-resources/pediatric-and-maternal-health-product-development.

***Contains Nonbinding Recommendations***
*Draft — Not for Implementation*

# GLOSSARY

***Assessment*** — Contains data, gathered using appropriate formulations for each age group for which the assessment is required, that are adequate to assess the safety and effectiveness as well as support the dosing and administration of a drug product for each relevant pediatric age group (see section 505B(a)(2) of the FD&C Act (21 U.S.C. 355c(a)(2))).

***Certify/Certification*** — In general, a certification is a statement from the applicant that the data provided to support a deferral[1] and/or waiver[2] request are accurate and complete.

***Deferral*** — Defers submission of some or all of the required assessments or reports on the molecularly targeted pediatric cancer investigation until a specified date (see section 505B(a)(4) of the FD&C Act (21 U.S.C. 355c(a)(4))).

***Pediatric Study Plan (PSP)*** — An outline of planned pediatric studies, along with any deferral and/or waiver requests, that is submitted by a sponsor for an application subject to PREA before the submission of assessments or reports on the molecularly targeted pediatric cancer investigation (see section 505B(e) of FD&C Act (21 U.S.C. 355c(e))).  For more information, see the guidance for industry *Pediatric Study Plans: Content of and Process for Submitting Initial Pediatric Study Plans and Amended Initial Pediatric Study Plans* (July 2020).[3]

***Proposed Pediatric Study Request (PPSR)*** — In general, a PPSR is a submission describing what pediatric studies a sponsor or application holder believes will yield information about the use of a drug that may produce health benefits in the pediatric population.

***Molecularly Targeted Pediatric Cancer Investigation*** — An investigation of a drug described in section 505B(a)(1)(B) of the FD&C Act that must be designed to yield clinically meaningful pediatric study data, gathered using appropriate formulations for each age group for which the study is required, regarding dosing, safety, and preliminary efficacy to inform potential pediatric labeling (see section 505B(a)(3) of the FD&C Act (21 U.S.C. 355c(a)(3))).

***Waiver*** — Waives the requirement to submit assessments or reports on the molecularly targeted pediatric cancer investigation for the entire pediatric population or specific age group(s) (see section 505B(a)(5) of the FD&C Act (21 U.S.C. 355c(a)(5))).

***Written Request (WR)*** — In general, a WR is a document from FDA, signed by the applicable office director(s), requesting submission of a certain study or studies to determine whether the use of a drug could provide a meaningful health benefit in the pediatric population that is issued under section 505A of the FD&C Act (21 U.S.C. 355a) or section 351(m) of the PHS Act (42 U.S.C. 262(m)).

---

[1] See section 505B(a)(4)(A)(ii)(I) of the FD&C Act (21 U.S.C. 355c(a)(4)(A)(ii)(I)).

[2] See section 505B(a)(5) of the FD&C Act (21 U.S.C. 355c(a)(5)).

[3] We update guidances periodically.  To make sure you have the most recent version of a guidance, check the FDA guidance web page at https://www.fda.gov/regulatory-information/search-fda-guidance-documents.